ADAM REISNER, ESQ. (State Bar No. 204351)
adam@reisnerlaw.com
TESSA KING, ESQ. (State Bar No. 251408)
tessa@reisnerlaw.com
KENZO CAPILITAN, ESQ. (SBN 333009)
kenzo@reisnerlaw.com
**REISNER & KING LLP**
15303 Ventura Blvd., Suite 1260
Sherman Oaks, California 91403
Phone: (818) 981-0901
Fax: (818) 981-0902

Attorneys for Plaintiff **YIHSING TIEN aka ANGELA TIEN**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA OAKLAND DIVISION

|  |  |
|---|---|
| YIHSING TIEN aka ANGELA TIEN,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED AIRLINES, INC., a California Corporation; TALIA ESPINOZA, an individual; and DOES 1-100, inclusive,<br><br>Defendants | Case No. 3:23-CV-02622<br><br>[Assigned to Hon. Judge Jeffrey S. White, Dept. 5]<br><br>**DECLARATION OF TESSA KING AND INDEX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with Plaintiff's Memorandum of Points & Authorities in Opposition to Defendant's Motion for Summary Judgment / Partial Summary Judgment; [Proposed] Order]<br><br>Date: Sept. 19, 2025<br>Time: 9:00 a.m.<br>Dept.: 5, 2nd Floor<br>Judge: Hon. Jeffrey S. White |

DECLARATION AND INDEX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR ALTERNAVIVELY, PARTIAL SUMMARY JUDGMENT

## DECLARATION OF TESSA KING, ESQ.

I, Tessa King, Esq. declare as follows:

1. I am an attorney at law licensed to practice in the State of California and am an attorney at Reisner & King LLP, attorneys of record for Plaintiff, Yihsing Tien aka Angela Tien, herein. All statements herein are of my own personal knowledge except where stated upon information and belief and of those things I believe them to be true.

2. Attached hereto as Exhibit "A" is a true and correct copy of the relevant excerpts of the deposition transcript of Plaintiff Angela Tien, Day One, taken on January 22, 2025. The following Deposition exhibits are attached and authenticated on the record thereto as:

    a. Exhibit 6: Leave of Absence Letter dated January 25, 2019

3. Attached hereto as Exhibit "B" is a true and correct copy of the relevant excerpts of the deposition transcript of, Plaintiff Angela Tien, Day Two, taken on July 8, 2025. The following Deposition exhibits are attached and authenticated on the record thereto as:

    a. Exhibit 35 (Erroneously marked as Deposition Ex. 36): Job Application Emails

4. Attached hereto as Exhibit "C" is a true and correct copy of the relevant excerpts of the deposition transcript of Elizabeth Jacobsen, taken on January 23, 2025. The following Deposition exhibits are attached and authenticated on the record thereto as:

    a. Exhibit 3: Leave of Absence Letter dated January 25, 2019

5. Attached hereto as Exhibit "D" is a true and correct copy of the relevant excerpts of the deposition transcript of Talia Espinoza, taken on January 24, 2025.

6. Attached hereto as Exhibit "E" is a true and correct copy of the relevant excerpts of the deposition transcript of the Person Most Qualified, Mary Meritt, Day One, taken on July 9, 2025. The following Deposition exhibits are attached and authenticated on the record thereto as:

    a. Exhibit 1: Leave of Absence Letter dated January 25, 2019

7. Attached hereto as Exhibit "F" is a true and correct copy of the relevant excerpts of the deposition transcript of Danelle Berry, Day One, taken on July 21. 2025. The following Deposition exhibits are attached and authenticated on the record thereto as:

    a. Exhibit 4: Leave of Absence Letter dated January 25, 2019

**DECLARATION AND INDEX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR ALTERNAVIVELY, PARTIAL SUMMARY JUDGMENT**

b. Exhibit 5: Email chain between FAST-Inflight-Admin, Gayle Kuntschik, David Dingledy, Dona Gebon-Fletcher, and Tonya Williams regarding Yising Tien.

8. Attached hereto as Exhibit "G" is a true and correct copy of the relevant excerpts of the deposition transcript of Nancy ByunRidel, taken on July 21, 2025. The following Deposition exhibits are attached and authenticated on the record thereto as:

a. Exhibit 8: Email chain between Talia Espinoza, Nancy ByumRiedel, and Clarissa Perez along with a leave of absence letter dated January 25, 2019

9. Attached hereto as Exhibit "H" is intentionally left blank.

10. Attached hereto as Exhibit "I" is a true and correct copy of the relevant excerpts of the deposition transcript of Person Most Qualified, Robert Krabbe, taken on July 16, 2025.

11. Attached hereto as Exhibit "J" is a true and correct copy of the relevant excerpts of the deposition transcript of Carlos Torres, taken on July 25, 2025. The following Deposition exhibits are attached and authenticated on the record thereto as:

a. Exhibit 33: Flight Attendant Pay Option Acknowledgment (Occupational) Letter dated January 23, 2019

12. Attached hereto as Exhibit "K" is a true and correct copy of the Declaration of Yihsing "Angela" Tien dated August 25, 2025.

13. If the Court believes any part of Plaintiff's MSJ Opp is deficient, I respectfully request more time to cure any deficiencies. Due to my two week Arbitration and trial right after, I rushed to file a Motion for Administrative Relief as soon as I was able and I requested an extension of a week to file this Opposition. I appreciate this Honorable Court graciously partially granting an extension. However, if this Honorable Court believes any part is deficient, I would renew my request for more time. Under FRCP 56(e)(1), if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may give an opportunity to properly support or address the fact.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on August 25, 2025, in Shermans Oaks, California.

**DECLARATION AND INDEX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR ALTERNAVIVELY, PARTIAL SUMMARY JUDGMENT**

By: __/s/ Tessa King_____

Tessa King, Esq.
Attorneys for PLAINTIFF
YIHSING aka ANGELA TIEN

**DECLARATION AND INDEX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR ALTERNAVIVELY, PARTIAL SUMMARY JUDGMENT**

# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


YIHSING TIEN AKA ANGELA TIEN,    )
                                  )  CASE NO.
                    PLAINTIFF,    )  4:23-CV-02622-JSW
                                  )
          vs.                     )
                                  )
UNITED AIRLINES, INC., A CALIFORNIA  )
CORPORATION; TALIA ESPINOZA, AN   )
INDIVIDUAL; AND DOES 1-100,       )
INCLUSIVE,                        )
                                  )
                    DEFENDANTS.   )
                                  )



VIDEO-RECORDED DEPOSITION OF YIHSING TIEN

WEDNESDAY, JANUARY 22, 2025

9:39 A.M. PST

SAN FRANCISCO, CALIFORNIA





REPORTED BY AUDRA E. CRAMER, CSR NO. 9901
JOB NO. 107571

**First Legal Depositions - Calendar@firstlegal.com**
**855.348.4997**

INDEX

WITNESS
YIHSING TIEN
EXAMINATION                                        PAGE
BY MS. GEHRKE                                         8
(P.M. SESSION)                                      121

E X H I B I T S

NO.                  DESCRIPTION                              PAGE

Exhibit 1     RÉSUMÉ OF YIHSING TIEN                     32
              [TIEN1 AND 2]

Exhibit 2     UNITED AIRLINES EMPLOYEE                   39
              PROFILE [UNITED72 AND 73]

Exhibit 3     EMAIL CHAIN [UNITED3626 AND                58
              3627]

Exhibit 4     EMAIL CHAIN [UNITED3454]                   64

Exhibit 5     FLIGHT ATTENDANT JOB DUTIES                67
              [TIEN24 AND 25]

Exhibit 6     LETTER DATED 1/25/2019                     89
              [TIEN0493]

Exhibit 7     FLIGHT ATTENDANT AGREEMENT                109
              BETWEEN THE ASSOCIATION OF
              FLIGHT ATTENDANTS, CWA AND
              UNITED AIRLINES [UNITED110
              THRU 542]

Exhibit 8     WORKING TOGETHER GUIDELINES               121
              DATED NOVEMBER 2021
              [UNITED545 THRU 748]

Exhibit 9     TRAINING TRANSCRIPT REPORT                165
              [UNITED75 AND 76]

Exhibit 10    SECOND AMENDED COMPLAINT                  188
              FOR DAMAGES

Exhibit 11    LETTER DATED 1/27/22                      198
              [UNITED82 AND 83]

Exhibit 12    INVOLUNTARY EMPLOYEE                      205
              TERMINATION [UNITED84]

EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | EMAIL [UNITED3647] | 206 |
| Exhibit 14 | EMAIL [UNITED3662] | 208 |
| Exhibit 15 | EMAIL CHAIN [UNITED3596 AND 3597] | 209 |
| Exhibit 16 | EMAIL CHAIN UNITED3598 AND 3599 | 223 |
| Exhibit 17 | TEXT MESSAGES [AFA36 THRU 53] | 232 |
| Exhibit 18 | TEXT MESSAGES TIEN0874 THRU 0884 | 232 |
| Exhibit 19 | TEXT MESSAGES [TIEN0885 THRU 0898] | 258 |
| Exhibit 20 | LETTER DATED 8/14/17 | 261 |
| Exhibit 21 | LETTER DATED 2/1/22 [UNITED1258] | 263 |
| Exhibit 22 | QMR [UNITED1292 THRU 1311] | 266 |
| Exhibit 23 | LETTER RE APPLICATION [TIEN523 AND 524] | 283 |
| Exhibit 24 | LETTER DATED 5/23/23 [TIEN505] | 287 |
| Exhibit 25 | 2023 W-2 [TIEN510] | 294 |
| Exhibit 26 | PAY OPTION ACKNOWLEDGMENT | 313 |
| Exhibit 27 | PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANT UNITED AIRLINES, INC.'S INTERROGATORIES, SET ONE | 318 |
| Exhibit 28 | PLAINTIFF'S ORIGINAL RESPONSES TO DEFENDANT UNITED AIRLINES, INC.'S INTERROGATORIES, SET ONE | 333 |

EXHIBITS (CONTINUED)

NO.              DESCRIPTION                        PAGE

Exhibit 29   RAP INDICATION DATED                341
             6/24/21


QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER

                 PAGE      LINE

                    88        2

                   108        5

                   156       25

                   215       25

                   316       25


REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

Q. When was the last time you went to Taiwan to visit?

A. **Not to visit. Last September.**

Q. What did you do there?

A. **Surgery.**

Q. Surgery for what?

A. **My wrist.**

Q. Okay. On average since October 2018, how often have you returned to Taiwan for any purpose per year?

A. **Several times a year for medical.**

Q. Are there unique treatments in Taiwan that you can't get in the United States? Why do you go to Taiwan for treatment?

A. **For second opinion. Also alternative treatments.**

Q. Do you have to pay for medical treatment in Taiwan out of pocket?

A. **Yes.**

Q. Do you have health insurance that covers your treatment in Taiwan?

A. **Not all. I still have some payment.**

Q. So there's some coverage under your health insurance, but you may have to have some kind of copayment?

Q. Okay. Have you ever been convicted of a criminal offense?

A. No.

Q. Other than English, what other languages do you speak?

A. Mandarin Chinese.

Q. And is that your first language?

A. Yes.

Q. And did you graduate from high school?

A. College.

Q. So high school --

A. Oh. Yes.

Q. -- and college?

A. Yeah.

Q. Okay. And did you graduate from high school?

A. It was a junior college in Taiwan but equivalent to high school.

Q. Okay. And did you actually get a university degree as well?

A. Yes.

Q. Where did you get your degree from?

A. Brandon University in Manitoba, Canada.

Q. And what was your major?

A. Math.

employment when you had that small business?

A. So 2006 and just, like, before -- approximately when I started United in 2013.

Q. Okay. So you did this wholesale business from 2006 to 2013 --

A. Uh-huh.

Q. -- and then you started at United?

A. Yes.

Q. Okay. Let me get that back. Thank you.

And then I see here 2004 to 2006 you worked at Nien Made as a sales associate.

What is that position?

A. Sales associate.

Q. What was the products that they made?

A. Like, mini blinds and, like, window coverings.

Q. Okay. And what made --

Let's go off the record for a second.

THE VIDEOGRAPHER: Going off the record. The time is 10:10.

(Discussion held off the record.)

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. Time is 10:17.

BY MS. GEHRKE:

Q. Okay. Ms. Tien, when you first started working for United Airlines, was it -- you said that was in what year? 2013?

A. '13.

Q. Okay. And were you hired as a flight attendant?

A. Yes.

Q. And where were you based?

A. In the beginning?

Q. Uh-huh.

A. Newark.

Q. Newark?

A. Yes.

Q. And at that time had United Airlines already merged with Continental Airlines?

A. Not the flight attendant departments. Not the inflight. But yes.

Q. Okay. So you were -- were you hired on the Continental side of the flight attendant department?

A. Yes.

Q. Okay. And were you represented by a union when you first started?

A. Yes.

expanding.

Q. Okay. If we go down -- back near the middle where we were, it says you took a leave of absence here, March 4, 2014, to April 3, 2014.

Do you remember why you took that company-offered leave of absence?

A. For that one month -- oh, yes. Because the company offered -- they call it a COLA, company-offered leave of absence, like a month-by-month. And I put in, I was awarded it, so I just took one month off.

Q. Okay. So they allowed people to take a month off as a company-offered leave of absence if you wanted to do that?

A. Yes.

Q. Okay. All right. Then if we go back to the first page here, three lines from the bottom it says, "January 25, 2019. Leave of Absence. Illness: Occupational."

Is that the date you went on your leave of absence due to your occupational injury from October 2018?

A. Yes.

Q. Okay. And you remained on that leave

of absence the entire time until you were separated on January 25, 2022?

A. Correct.

Q. Okay. And do you see here it states the reason for your separation was not returning from leave?

A. I do see that.

Q. Is that what the company told you the reason for your termination was?

A. Yes.

Q. Okay. When you were informed of your separation from United Airlines, did they tell you it was because the collective bargaining agreement mandated the administrative separation if you did not return from leave after three years?

A. You mean when my supervisor informed me?

Q. Yes. When you were informed of your separation from United Airlines, did they tell you it was because you had been out over the three-year maximum leave allotted by the collective bargaining agreement?

A. She did.

Q. Okay. And when you were -- prior to

had a disability at the time that she was your supervisor?

MR. CAPILITAN: Objection. Vague and ambiguous as to "disability."

THE WITNESS: I had no idea.

BY MS. GEHRKE:

Q. Okay. And what about Ms. Espinoza? Do you know whether or not she had a disability at the time she supervised you?

MR. CAPILITAN: Same objection.

THE WITNESS: No idea.

BY MS. GEHRKE:

Q. Okay. All right. Now, you suffered a workplace injury around October 30, 2018; correct?

A. Correct.

Q. And that occurred while you were on a work trip; is that right?

A. Right.

Q. Where did the injury occur?

A. Taiwan.

Q. Okay. Did you often fly trips to Taiwan for United?

A. Not really.

Q. Okay. Where in Taiwan did the injury

occur?

A. Like, outside the hotel door. The entrance.

Q. Okay. And what happened to cause the injury?

A. I had a bad fall.

Q. You tripped?

A. Yes.

Q. What did you trip on?

A. Like, a curb, the sidewalk, the difference.

Q. Like, the sidewalk was raised?

A. Yes.

Q. And you didn't see it and you tripped?

A. Right.

Q. Okay. And were you with anybody at the time this happened?

A. Yes.

Q. Who were you with?

A. Another United flight attendant. We worked the trip together.

Q. Who was that?

A. Christine Hsu.

Q. Hsu?

A. H-s-u, I believe. Christine H-s-u.

Q. My question was a little different.

Did you go out on sick leave immediately after the injury, after October 30, 2018.

Before you went on the leave of absence in January 2019 --

A. Right.

Q. -- what was your status from October 30, 2018, until you went on the unpaid leave of absence --

A. My status.

Q. Hang on.

-- until you went on the unpaid leave of absence on January 25, 2019?

A. My status between the injury and the leave?

Q. Correct.

A. I was active.

Q. Okay. You were active.

But weren't you receiving occupational sick leave?

A. No.

Q. Were you being paid?

A. Wait. Okay. I remember they used the occupational hours we accumulated.

Q. Okay. So you received it by US mail?

A. Yes.

Q. Okay. And did you receive a copy by email as well?

A. I don't recall.

Q. Okay. All right. And when you received this letter, did you read it?

A. Yes.

Q. Okay. And you understood that because you had exhausted your sick leave bank, you were being placed on an unpaid leave of absence effective January 25, 2019?

A. Yes.

Q. Okay. And you understood that under Section 15E of the joint collective bargaining agreement, if you did not return to work, that you would eventually be administratively separated?

A. Can we clarify. You mean in this paragraph what it is saying, or what the actual CBA Section 15E --

Q. Well, let's talk about both. Okay. So when you -- and I'm not talking about the exact date. I'm talking about the general concept.

Q. Okay.

A. Company email address.

Q. All right. So back to after your injury --

A. Uh-huh.

Q. -- and while you were out on the unpaid leave of absence and occupational sick leave, were you ever cleared to return to work in any capacity at United prior to your separation?

A. Say again?

Q. After your injury on October 30, 2018, that you went out on occupational sick leave and then an unpaid medical leave of absence until your termination on January 25, 2022, had you ever been cleared to return to work in any capacity prior to your separation?

A. No.

Q. Okay. So given the nature of your work restrictions from your doctor after your injury on October 30, 2018, your doctor felt it was medically advisable for you to go on a leave of absence from work?

A. Can you clarify my -- do you mean my doctors wanted me to be on leave?

Q. Because of the nature of your

A. Uh-huh.

Q. Did you understand that if you did not return to work in accordance with Section 15E of the joint collective bargaining agreement, that you would be administratively separated from United at some point in time?

MR. CAPILITAN: Objection. Speculative.

THE WITNESS: I believed the date. And I knew -- I notice she mentioned the contract, and I believed the date, and I relied on the date.

BY MS. GEHRKE:

Q. Okay. My question, though, was more general.

A. Okay.

Q. You understood when you received this letter that there was a maximum duration that you could remain out on leave --

A. Uh-huh.

Q. -- before you would be separated from United if you had not returned to work; correct?

MR. CAPILITAN: Objection. Speculative. Lacks foundation.

THE WITNESS: Say it again.

BY MS. GEHRKE:

Q. You understood when you received this letter that, as a general concept, if you did not return to work by a certain date, that under the collective bargaining agreement you would be administratively terminated?

MR. CAPILITAN: Same objections.

THE WITNESS: Yes.

BY MS. GEHRKE:

Q. Okay. And when you read this letter -- you see this January 25, 2023, date; correct?

A. Correct.

Q. And when you read that letter at the time when you received it around January 25, 2019, did you notice that the date was four years from the start of your leave?

A. Yes.

Q. And did you notice that that was a mistake?

A. No.

MR. CAPILITAN: Objection. Speculative.

BY MS. GEHRKE:

Q. Okay. Did you later learn that that was a mistake?

A. After they terminated me.

Q. Okay. So when is the first time that you realized that the date stated on Exhibit 6 of January 25, 2023, was the wrong date?

A. When Talia say it was the wrong date.

Q. Okay. So when Ms. Espinoza called you on January 27, 2022, and informed you of your administrative separation, that's when you realized that there was an error in Exhibit 6 on the date?

A. Not that call.

Q. Okay. When?

A. The next day, I believe, January 28, 2022.

Q. Okay. Was it on a phone call or an email communication?

A. Phone call.

Q. Okay. And that's when you realized there was a mistake on the letter date?

MR. CAPILITAN: Objection. Vague and ambiguous as to "mistake."

THE WITNESS: Yes.

BY MS. GEHRKE:

Q. Okay. And we'll go into that conversation. Let's go back to this letter.

A. Yes.

Q. And so does that refresh your recollection as to when Ms. Jacobson became your supervisor?

A. Yes.

Q. Okay. And so it was sometime around January 25, 2019, she became your supervisor?

A. Sometime around that, yes.

Q. Okay. All right. Prior to receiving this letter -- we saw Section 15E of the joint collective bargaining agreement referenced there in the first paragraph.

Had you ever looked at that section of the joint collective bargaining agreement?

A. Yes.

Q. When did you first look at Section 15E of the joint collective bargaining agreement?

A. I believe after I received this letter. I'm not sure, like, which date, but sometime soon after, yes, receiving.

Q. Okay. So you receive this letter, and you see it's referring to Section 15E of the joint collective bargaining agreement, and you say, "Hmm. I'm going to go see what that section says"?

A.   Correct.

Q.   Okay.  And so you went and you read Section 15E of the joint collective bargaining agreement?

A.   Yes.

Q.   And after you read Section 15E of the joint collective bargaining agreement, did you understand that the maximum duration of your leave of absence for medical reasons was either the duration of your medical condition, your length of employment or three years, whichever was the least?

MR. CAPILITAN:  Objection.  Speculative.  Lacks foundation.  Compound.  And vague and ambiguous as to timeframe.

BY MS. GEHRKE:

Q.   You can answer.

A.   I want to say I read the contract, and the contract says -- okay, not exactly the words -- medical leave due to personal and nonoccupational illness are subject to these -- you know, the rules.  Those rules you mentioned, like the year of service and --

Q.   Length of the medical condition.

A.   Right.

-- apply to medical leave due to personal and nonoccupational --

Q. Okay.

A. -- basis. Illness.

Q. And so --

A. So I believed the letter was correct, gave me the, you know, clarification, and it was clear dated.

Q. So even though you were on an occupational -- originally on occupational injury leave that was then converted into the unpaid medical leave of absence because of that same injury, and you see a reference here to Section 15E of the joint collective bargaining agreement, you believed that those time limitations that are listed in that section did not apply to you.

A. Correct.

Q. Okay. And you thought instead that the date listed in this letter, January 25, 2023, would be what applied to you.

A. Absolutely.

Q. And did you ever seek clarification from anybody at United prior to your separation as to "Why is this letter referencing

Section 15E of the joint collective bargaining agreement and being referred to in my letter?"

MR. CAPILITAN: Objection. Argumentative.

THE WITNESS: Say again?

BY MS. GEHRKE:

Q. Did you ever seek clarification from anyone at United prior to your separation asking why you have the date listed here of January 25, 2023, yet a reference to Section 15E of the joint collective bargaining agreement, which you thought did not apply to you?

A. No.

MR. CAPILITAN: Same objection.

THE WITNESS: But can I explain?

BY MS. GEHRKE:

Q. Yes.

A. I believe when Elizabeth mentioned this part and gave me the bolded date here was for me to understand the medical leave in general, and I wasn't in that category, so I should comply with this date on this official letter she gave me. And because I didn't have doubt that this was wrong, so I didn't think I needed to double-, triple-check with anyone.

Q. Okay. And do you see here in the second paragraph it says that there is a leave of absence packet located on Flying Together?

A. I didn't -- where?

Q. Second paragraph: "As company policy and governing mandates may change, the most current leaves of absence packet is located on Flying Together. The leave of absence packet contains a summary of benefits affected by the status and should be read carefully."

Do you see that?

A. I see it now, yeah.

Q. Okay. And did you ever go look at the leave of absence packet on Flying Together?

A. I don't recall. And because this was so clear to me and -- I just complied with this date, and I believe it and -- yeah.

Q. Okay. But the letter advises you to read the leave of absence packet carefully.

Did you do that?

A. I'm not sure if I read it.

Q. Okay. So do you have any idea what is contained within the leave of absence packet referenced in this letter?

A. Say again?

First Legal Depositions - Calendar@firstlegal.com
First Legal Depositions - Calendar@firstlegal.com
855.348.4997
855.348.4997

101

Q. Do you have any knowledge as to what is contained within the leave of absence packet referred to in this letter?

A. Okay. It's been years, and you ask me now, I'm not sure what's in the packet.

Q. Did you ever read the leave of absence packet?

I'm not asking if you remember in detail what's included, but did you ever read it?

A. I don't remember whether I did or not, honestly.

Q. Okay. All right. So under these little bullet points it says here, "You are expected to remain under a physician's care as well as provide OPCMD with regular medical updates following each visit or as directed by UAL Medical. To verify receipt of your medical documentation, you may contact the employee service center," and it provides the phone number.

Is United Medical or OPCMD the department that you provided your medical documentation to?

A. I believe so.

First Legal Depositions - Calendar@firstlegal.com
First Legal Depositions - Calendar@firstlegal.com
855.348.4997
855.348.4997          102

Q. Okay. Did you ever separately provide it to your supervisor, whether that was Ms. Jacobson or Ms. Espinoza, or did you only provide it to United Medical?

A. I think -- in the very beginning, before the leave of absence, I think I might have emailed Elizabeth the status -- this medical status forms.

Q. Okay. But I'm asking, I guess, more specifically: After you were placed on the unpaid leave of absence effective January 25, 2019, did you only provide the medical documentation to United Medical?

A. I think so.

Q. Okay. And then the last bullet point, "Reasonable accommodation process outside employment guidelines and information regarding seniority accrual is in the leave of absence packet."

I know you don't remember whether or not you ever read it, but were you aware that there were these -- after reading this letter, were you aware that these policies were discussed in the leave of absence packet?

MR. CAPILITAN: Objection.

Speculative. Lacks foundation.

THE WITNESS: Okay. At the time I didn't pay much attention to this, because the most important information for me from this letter was the date.

BY MS. GEHRKE:

Q. Okay.

A. That I believed. And I'm sure I read the whole letter at the time, but, like you said, there's so much information on Flying Together, I don't, you know, remember everything in details what I read or not.

Q. You referred to that you did go review Section 15E of the joint collective bargaining agreement.

Did you have a personal copy of the joint collective bargaining agreement? Or where did you read that?

A. From the contract downloaded from AFA website.

Q. Okay. So you were able to download the joint collective bargaining agreement from the AFA website?

A. Correct.

Q. And so you had a copy of it for your

Q. Okay. Back to the first paragraph where it says, "You will be administratively separated."

You understood that that meant your employment would be terminated on January 25, 2023, pursuant to Section 15E?

A. I wasn't so sure of the "administratively separated."

Q. Administratively separated? Okay.

A. But, yeah, I knew I had to return by this date.

Q. And did you understand at the time you received this letter that if you didn't return by the date listed in the letter, that you would be terminated from United?

A. I wasn't sure "terminated" and, like, "administratively separated" were exactly the same thing and why they wouldn't just use, you know, the common word "terminated."

Q. Okay. Did you ever ask anybody prior to your termination from United what it meant to be administratively separated as it's reflected here in the letter?

A. Because I still had time from this letter, I didn't --

Yes.

Q. Okay. All right. If we go to Section 15 and page 262 of the contract, Section 15 is titled "Leaves of Absence." Page 262, Section E, "Medical Leave." Let me know when you get there.

Okay. Section E, "Medical Leave," Subsection (1), states, "Leaves of absences required due to illness or nonoccupational injury shall be granted upon written verification of disability from a qualified medical doctor. Any such leave may not exceed the lesser of (a) the period of disability or (b) three years or (c) the flight attendant's total length of active service."

Do you see that?

A. Yes.

Q. And is this the section that you read when you received the January 25, 2019, letter from Liz Jacobson?

A. Yes.

Q. Okay. And so when you were testifying earlier about due to illness or nonoccupational leave injury, this is the language you were referring to?

A. Yes.

Q. Okay. And then Sub 2 says, "At the end of the maximum period, the flight attendant will be administratively terminated and removed from the system's seniority list."

Do you see that?

A. Yes.

Q. And when you received Ms. Jacobson's letter on January 25, 2019, did you read Subsection E(2) as well?

A. Yes.

Q. Okay. And so when it said "administratively terminated," did you understand that if you exceeded whatever the maximum duration of the medical leave was, that you would be terminated from United and removed from the seniority list?

A. I want to explain here. The letter from Elizabeth, it states "administratively separated," which, to me, it could be different from "terminated."

And also, as I mentioned earlier, she mentioned Section 15E. I believe it was for me to understand, since I was not in this category, and that's why she needed to let me know the

maximum leave of absence was January 25, 2023.

Q. So did it seem strange to you that she would refer to a section of the collective bargaining agreement that you felt did not apply to you?

A. No.

MR. CAPILITAN: Objection. Argumentative.

BY MS. GEHRKE:

Q. No?

But you did read E(2) where it says "administratively terminated." So you testified before you weren't really sure what "administratively separated" meant.

But when you read this provision in the joint collective bargaining agreement and it says "terminated," did that clarify in your mind that if you exceeded whatever the maximum date was, that you would be terminated and removed from the system's seniority list?

A. It clarified to me those who had medical leave due to illness -- due to illness, like, personal illness or nonoccupational, those flight attendants will be administratively terminated if they -- you know, like, three

years and the period of disability. So those -- yeah.

Q. You added the word "personal" before "illness." I don't see "personal."

A. No, I guess it would be personal. The illness required you to illness or nonoccupational.

Q. Okay --

A. Nonoccupational --

Q. -- "personal" is not listed in this first sentence, is it?

A. It's not.

Q. Okay. It says "due to illness or nonoccupational injury."

A. Yes.

Q. Okay.

A. "Or nonoccupational."

Q. Okay. So this was the section that you read after you received the letter from Ms. Jacobson?

A. Yes.

Q. Okay. All right. And so prior to your separation, did you ever reach out to anyone at United Airlines regarding the length of your leave of absence?

You mean other than the occupational medical leave?

Q.   My question is, other than the collective bargaining agreement language that we looked at --

A.   Uh-huh.

Q.   -- were you aware that United had a general policy on unpaid medical leaves?

A.   No, I wasn't aware.

Q.   Okay.  All right.  You see at the bottom left-hand corner of page 676 it says "August 2019"?

A.   Uh-huh.

Q.   Do you have any reason to dispute that this was the policy that was rolled out effective August 2019?

MR. CAPILITAN:  Objection. Speculative.

THE WITNESS:  No.

BY MS. GEHRKE:

Q.   All right.  If you look at the next page, 677, you see "Length of Leave"?

A.   Uh-huh.

Q.   Do you see that it says that "The unpaid medical leave is the shortest of the two

possible times below: (1) the amount of time a doctor confirms you are unable to work or (2) a period of time equal to your total length of service, not to exceed three years"?

Do you see that?

A. Yes.

Q. Were you aware that, outside of the collective bargaining agreement, that United had a policy that unpaid medical leaves could not exceed three years?

A. No.

Q. Okay. All right. Let's talk about your leave period.

So when you went out after the injury on October 30, 2018, you testified before you were on an occupational sick leave.

You used your time that you had in that bank; right?

A. Uh-huh.

Q. And then once -- yes?

A. Yes.

Q. And then once you exhausted it, on January 25, 2019, you went on an unpaid medical leave of absence; correct?

A. Correct.

all the documentations.  And also I went to my appointments, physical therapist.

BY MS. GEHRKE:

Q.    Okay.  So basically you were working on your recovery and your medical treatment and the paperwork with Sedgwick?

A.    Yes.

Q.    Okay.  And how were you supporting yourself financially during the time that you were on the unpaid medical leave starting in January 2019?

A.    I had savings.

Q.    I'm sorry?

A.    Savings.

Q.    Savings?  Okay.

And you were also receiving some form of wage replacement, either through state disability or the workers' comp pay?

A.    Yes.

Q.    Okay.  Other than those sources of income, did you receive any other potential sources of income, like loans from family or friends or gifts?

A.    No.

Q.    Okay.  Prior to your separation of

employment on January 25, 2022, did you ever ask United Airlines for any other accommodation other than the time off from work that you were taking?

MR. CAPILITAN: Objection. Calls for a legal conclusion and legal contention.

I'm going to instruct my client not to answer.

MS. GEHRKE: That's an improper instruction. Please mark it.

I'll rephrase and see if that helps, but I think that's a completely improper instruction, and I reserve my right to recall this witness to come back in person. So I suggest you think about that a little closer during the break.

Q. Other than the leave of absence that you were on, did you ever ask United to do anything else to return you to work prior to your separation in January 25, 2022?

A. I did.

Q. What did you do?

A. So approximately February 2021, Dr. Pertsch, the hand surgeon, he gave me a cortisone shot on my right wrist. Then I feel a

lot better.  I went to inflight in San Francisco Airport, the crew office.  I spoke to -- I don't remember their names.  There were, like, different -- people on different shifts, and I didn't recognize any of those working at the duty desk at the time.

I told them I -- like, I was on medical leave, but I was going to return to work, and I wanted to work, and can they, like, any of them at the duty desk give me some, like, information regarding the process of returning to work from medical leave or occupational medical leave.  I forgot if I mentioned that.

Q.  Okay.  So this is sometime after February 2021.

Was it on one occasion that you spoke to a single inflight duty desk supervisor, or was it on multiple occasions?

A.  No.  There were several people at the duty desk at the time, and then --

Q.  Are we talking about one occasion or multiple occasions?

A.  One occasion.

Q.  Okay.  So one time sometime after February 2021 you went to the SFO inflight duty

First Legal Depositions - Calendar@firstlegal.com
First Legal Depositions - Calendar@firstlegal.com
855.348.4997

158

desk, and there were multiple people there at the desk at the same time?

A. Yes.

Q. And you don't recall their names?

A. No.

Q. Okay. And how many do you think there were present?

A. Three or four.

Q. Okay. And were you having a conversation with all of them at the same time, or were you speaking to one individual?

A. I spoke to them, and one individual replied me.

Q. So there were three or four of them sitting there, you asked the question kind of generally to all of them, and one person replied?

A. Yes.

Q. And the person that replied, was that a male or a female?

A. Male.

Q. Okay. And can you describe what he looked like?

A. Okay. I only saw him that one time; right? I don't remember his face. He was, I

First Legal Depositions - Calendar@firstlegal.com
First Legal Depositions - Calendar@firstlegal.com
855.348.4997
855.348.4997

159

would say, maybe in his thirties.  Tall.  Looked like -- not, like, big, but not too skinny and not too -- and not fat.  I mean, somebody who looked like work out.

Q.    Uh-huh.

A.    Well-dressed.  Let me think.

Q.    What was his race?  Could you tell?

A.    I couldn't tell.  I -- yeah, I...

Q.    Okay.

A.    I think darker hair.  I think.

Q.    And did he have fair skin or darker skin?

A.    Between.

Q.    Okay.  All right.  So what did this male say in response to your inquiry about what the process is for you to potentially return to work?

A.    He said I will be informed the process. He didn't tell me the process.

Q.    He told you that someone at, like, United Medical would be in touch with you regarding the process?

A.    He didn't say Medical.  I don't remember he said any -- like, he mentioned any specific department.  I guess maybe he didn't

know. I don't -- yeah. But he said, like, people -- like, somebody from United or maybe he mentioned department, which I don't remember now.

Q. Uh-huh.

A. Basically he was telling me, like, the company will tell me what the process will be. Yes.

Q. And did he say that the company will tell you what the process will be after you submit documentation saying you are able or want to come back?

A. No, he didn't mention the second part. But he told me that, like, someone from United, like -- or maybe a certain position or a department will, like, touching base with me and, like, give me information and the instructions how to return to work.

Q. Okay. And did you ask him for anything else besides the initial question of what's the process to return to work?

A. No.

Q. Okay. Did you ever follow up with the department that you can't recall right now but that he mentioned would be in contact with you

conversation in February 2021, had you actually been released to return to work?

A.   No.

Q.   Okay.  The first time you were released to return to work was after your termination in January 2022; correct?

A.   Correct.

Q.   Okay.  All right.  So other than kind of gathering information about this return to work process, did you make any other request from these individuals at the San Francisco inflight duty desk?

A.   No.

Q.   All right.  At any other time prior to your termination, did you make any other request to United about returning to work or needing something in order to enable you to come back to work?

A.   Not directly to United.

Q.   Okay.  Did you know and have knowledge that there was a department available to you as a resource to help you if you needed accommodations or had questions regarding coming back to work?

MR. CAPILITAN:  Objection.  Lacks

foundation. And vague and ambiguous.
Speculative.

THE WITNESS: Can I answer?

BY MS. GEHRKE:

Q. Yes.

A. Sorry. Say again.

MS. GEHRKE: Can you read it back, please.

(Record read as follows:

"Question: Did you know and have knowledge that there was a department available to you as a resource to help you if you needed accommodations or had questions regarding coming back to work?")

THE WITNESS: No.

BY MS. GEHRKE:

Q. Had you ever heard of the reasonable accommodation team at United, or department?

A. Not I recall.

Q. All right. Okay. I want to move now to the termination and how you first learned that you were going to be -- or that you had been terminated from United.

time.  Maybe during COVID.  I don't know if I mentioned maybe during COVID, but I explained to her Sedgwick took so much time.

And I'm not sure if I mentioned also that Dr. Pertsch's office also took a lot of time, like -- more like they dropped the ball. And my primary doctor and myself, we contacted, I think, maybe -- yeah, the doctor and I'm not sure if my workers' comp attorney, too, like they -- okay.

Q.   I want to focus on --

A.   Okay.

Q.   -- the conversation with Talia --

A.   Okay.  Yeah, I'm trying to --

Q.   -- and what you said to her.

A.   -- think what I told her.

Q.   Okay.  So think in your mind --

A.   Yes.

Q.   -- and then when you remember what the conversation was with Talia --

A.   Okay.  So maybe --

Q.   -- that's what I want to hear.

A.   Maybe I told her that we were trying to reach out Sedgwick.

Q.   You did tell her or you're not sure?

A.    I think I told her.

Q.    Okay.

A.    Yeah, I think so.  And then she said, "Okay.  Company doesn't care those things."

Q.    Okay.  Anything else that you recall --

A.    And then --

Q.    -- regarding the conversation?

A.    So I asked her what I should do now. She say, "Talk to the union."

Q.    Okay.

A.    And that's what I can remember now.

Q.    Okay.  So you've told me everything you can recall about that conversation?

A.    I can recall right now.

Q.    Okay.  All right.  So you said that Talia seemed surprised that you still had the letter from Ms. Jacobson.

A.    From her voice, yes.

Q.    What made you think that she was surprised?

Did she say she was surprised or --

A.    She didn't.  But then -- she was talk and talk; right?  And then after I mentioned I had the letter, she went on silence.

Q.    Okay.  I thought you said she was

silent, and then she asked if you still had the letter.

A. Yes -- no, no. She -- okay. Let me think.

She was silent after I told her I still had the letter.

Q. Okay.

A. Or maybe both. Wait. I'm trying to think.

So -- maybe both. Maybe.

Q. You're not sure?

A. I'm not sure.

Q. Okay.

A. I could be wrong. But --

Q. But she seemed surprised?

A. -- at least one.

Q. Okay.

A. On time at least. Or both.

Q. And the reason why you thought she was surprised is because she was silent after you said you had the letter?

A. And her voice. The tone changed a little bit.

Q. In what way?

A. Like, cautious.

Q.    Okay.

A.    But Talia wanted to talk to -- like, call me directly and skip the union rep.

Q.    Okay.  So --

A.    Maybe they talked afterwards.  I don't know.

Q.    Okay.  So Talia called and said the union rep, who you believe to be Sheila Schultz, had contacted her and left a message saying, "Please call me"?

Do I have that right so far?

A.    I don't know if she left a message or spoke to her directly.

Q.    Okay.  But then Talia called you?

A.    On the -- yes.

Q.    And other than telling you about the union rep reaching out to her, what else did Talia say on the second phone call on January 28?

A.    She said the upper management said because the letter stated the beginning date of the medical leave, and that was enough.

Q.    Enough to put you on notice as to when the three years would expire?

A.    She didn't go -- she didn't explain

further. She just said that was enough for me to know. She didn't, you know, clarify further.

Q. Okay. So Talia told you that because the Liz Jacobson letter to you on January 25, 2019, stated correctly the beginning date of your medical leave as January 25, 2019, that was enough for you to know?

A. That was what she meant, yes.

Q. Okay. And did you say anything in response?

A. Yes.

Q. What did you say?

A. I said to her the title of this letter is called "Maximum Leave of Absence." The maximum means, like, when this is going to be the maximum date. So I argued with her the end of the date is -- I forgot which word I used. Like, it's the most important thing, the keyword. Like, the most important information on this letter was the maximum the last day, not the beginning.

Q. Let me ask you this: Prior to receiving the January 25, '22, letter, were you aware that any medical leave of absence for flight attendants at United was limited to no

more than three years?

A. As I explained before, the contract --

Q. I'm not referring --

A. I know.

Q. -- specifically to that.

Just were you aware generally as a flight attendant at United, if you needed a medical leave, that it could last no longer than three years.

A. No.

Q. Okay. So you explained to Talia on this second phone call that it doesn't matter what the start date is listed on the letter; it's the end date, because the subject line says "Maximum Leave of Absence"?

A. I didn't say it doesn't matter the starting date. I said the most -- the end date is more important than the starting date.

Q. Okay. And what was her response?

A. And I feel she was a little bit annoyed.

Q. Why do you think that?

A. Because I argued her back.

Q. Yeah, but how do you know she was annoyed?

A. Just from her voice became impatient and louder.

Q. What did she say in response to that?

A. She said, "It's contractual."

Q. And what did you understand her to mean by that? Did she explain?

A. Can we just finish what she said?

"It's contractual," and then, "It's black and white."

Q. Okay. So she said, "It's contractual" and "It's black and white."

Did she say what she meant by "contractual"?

A. No.

Q. Did you understand what she meant by contractual to be the joint collective bargaining agreement?

A. I wasn't sure.

Q. Okay. Did you ask her to clarify?

A. No.

Q. Okay. What else do you remember from that conversation?

A. I replied her -- I mean I argued her back again.

Q. You what?

A.   I argued with her back again.

Q.   Okay.

A.   I said, "This letter" -- I don't remember if I say, "This official letter." "This letter from inflight is also black and white."

And I feel she was further annoyed just from the tone, like, louder and impatient.

Q.   Okay.  Anything else that you remember?

A.   Yes.  And then she said she didn't have to ask the upper manager.  She did it to give me a favor.  It was not her job.  And --

Q.   So she told you that she was not required to inquire with upper management, but she did it to do you a favor?

A.   Yes.

Q.   Okay.

A.   And she credit herself by saying something like, "I went above and beyond" or "I went extra mile," something like that.

Q.   Were you appreciative of her efforts to go to upper management to --

A.   I reply her, "Thank you."  And then --

Q.   Did you feel she was trying to be helpful to you?

MR. CAPILITAN: Objection. Speculative.

THE WITNESS: Not really.

BY MS. GEHRKE:

Q. Okay. So even though she was contacting upper management on your behalf and looking into the situation, you didn't think she was being helpful?

A. Yes and no.

Q. Care to elaborate? Why? Do you need a break?

A. I can continue. I'm just crying.

I could tell she was impatient on the phone, and then she start to say, "I have" -- I mean, I'm trying to imitate her voice at the time. Like, "I have over 20 phone calls to make," and she made me feel like I was wasting her time.

And then she said something like it was not her job and she did a job for me. And, I mean, just from her tone, I didn't appreciate her.

So I answer you yes and no. She wasn't really trying to help from what she did for me, courtesy call -- courtesy -- to me there was no

courtesy. It was very sarcastic that you tell a person, "I'm doing a courtesy call for you, and you are fired" -- or "terminated." She didn't use the word "fire."

Q. Okay --

A. She used "terminated."

Q. You're talking about the first phone call now on the 27th?

A. Okay. Yeah.

Q. Okay. Did she say "courtesy call" on the second call on the 28th?

A. No, she didn't. But then she started to be impatient, "I have more than 20 phone calls," and, like, she already spending -- I forgot, like, how many minutes "talking to you on the phone." Yeah, on the second phone call.

Sorry. Your question again.

Q. I just asked whether or not she said the words she was making a courtesy phone call to you when she called you the second time on the 28th.

A. I don't -- I don't recall on the 28th, but for sure on the 27th. Yeah, she --

Q. Anything else that you recall from the conversation on the 28th?

somewhat, but not like page by page and everything.

Q. All right. So let's look at page 8 of the document.

If you go down to paragraph (f), it says, "On or around January 25, 2022, without notice to Plaintiff and without Plaintiff's knowledge, to harass Plaintiff, Defendant United informed Plaintiff that it had terminated Plaintiff's employment. Plaintiff is unaware of the exact timing of her termination."

So I just want to clarify. You have a date here of January 25, 2022.

That was the effective date of your termination; correct?

A. Correct.

Q. But you didn't actually first learn of it until January 27?

A. Correct.

Q. Okay. And then the next subparagraph, (g), it says, "On a severe and/or pervasive basis, Defendant Espinoza" -- although she's no longer a Defendant. She's been dismissed from the case -- "to harass Plaintiff, called Plaintiff and advised Plaintiff in a sarcastic

tone that she was providing a courtesy notification of Plaintiff's termination, allegedly effective two days prior."

So that paragraph is in reference to the January 27 phone call?

A. Yes.

Q. Okay. And you mention here "sarcastic tone."

What made you think that Ms. Espinoza was speaking to you in a sarcastic tone?

A. I think it explain itself. It's the tone, tone of the voice.

Q. What did she say, though, that was sarcastic?

What do you remember being sarcastic?

A. Like, the courtesy call after two days.

Q. So it's just --

A. Meaning it was a courtesy after she did it two days ago.

Q. Okay. So it was just the fact that it was two days later and she described it as a courtesy call? That, in your mind, made it sarcastic?

A. Her --

MR. CAPILITAN: Objection. Misstates

prior testimony.

THE WITNESS: Her voice, her tone --

BY MS. GEHRKE:

Q. Okay.

A. -- made me feel that way.

Q. Okay. Was it anything in particular about her tone or her voice that made you feel she was being sarcastic?

A. Particular way? Just the overall tone.

Q. Okay. If you go to the next page, page 9, Subset (i), it says, "On a severe and a pervasive basis, Defendant Espinoza, to harass Plaintiff, admonished Plaintiff by saying, 'You did not come back.' Defendant Espinoza also claimed in a dismissive tone that Plaintiff should have known what her leave entitlement was because 'Plaintiff could do the math,' even though Defendant United told Plaintiff she was on an approved medical leave of absence until January 25, 2023."

So you didn't mention to me earlier this statement that you did not come back.

A. I think I did.

Q. Oh, is that --

A. "You didn't return."

Q. "You did not return." Okay. So that's what you meant by that. Okay.

And then what was it -- you say "in a dismissive tone" that you should have known of your leave entitlement because "Plaintiff" -- you could do the math?

A. Right. I forgot to mention that to you.

Q. Okay. Was that during the January 27 phone call?

A. I think it was 28, if I remember correctly.

Q. Okay. So during the second phone call --

A. Right.

Q. -- you now believe that Talia Espinoza said to you that you could do the math on the dates?

A. Yes. And the tone was rude, "You could do the math," like, impatient and --

Q. Okay. Now, we looked at the leave of absence letter earlier in the day, and it should still be in your pile of paperwork.

If you look back at Exhibit 6, where does it say on this letter that you are on an

the clinic -- the workers' comp clinic, I think they forgot to submit the note, and then -- so United Medical didn't receive the update.

Q. And so did they follow up asking for the update?

A. I forgot. I don't remember.

Q. Okay. But you understood that in order for the leave to continue to be approved, you had to submit those employee status forms?

A. No. I believe I had this period of time, and then I had to, like, regularly, like, periodically provide the notes from the doctor. I mean, they will provide it, not from me.

Q. Right. But that was in order for your leave to continue to be approved?

A. I believe I was already approved.

Q. Right. But as a condition of that approval, you had to submit these employee status forms; correct?

A. Yes and no. I didn't -- I didn't think of that. I mean, for me those were more like, okay, I had this leave, and then at the same time I need to update my status. So I didn't think they would be conflict to each other.

Q. But didn't you receive letters from

United saying that you had to update the employee status form and provide documentation in order for your leave to continue to be approved?

A. I remember the first part. Like, I had to continue providing, yes.

Q. Okay. All right. In Subparagraph (j) here, you say in this second amended complaint, "On a severe and/or pervasive basis and as a biased personnel action, Defendant Espinoza dismissively told Plaintiff that she did not have to address Defendant's specific representation to Plaintiff that she was granted medical leave until January 25, 2023, as stated in Defendant's January 25, 2019, letter to Plaintiff because Defendant Espinoza 'did not have to do the extra work.'"

What conversation do you believe that statement was made?

A. What conversation? The second conversation.

Q. On the 28th?

A. Yes.

Q. Okay.

A. Let me see it again.

It was -- sorry -- (i), (j) or (k) --

Q. (j).

A. [Mumbled reading.] "Did not have to do the extra work."

Both. But maybe different phrases.

Q. Okay. Do you have anything in writing from United Airlines saying that your leave of absence was actually approved until January 25, 2023?

A. I believe this was it.

Q. Exhibit 6?

A. Yes.

Q. Is that the only document that you believe was in writing from United approving your leave until January 25, 2023?

A. Yes.

Q. Even though that letter doesn't use the word "approve"; it talks about maximum leave of absence?

A. Correct.

Q. Okay. All right. So let's look at the termination letter. We'll go ahead and mark this the next one.

Are we on 11?

For the record, Exhibit 11 is

Bates-labeled UNITED82 to 83. It's a letter dated January 27, 2022, to Ms. Tien from Talia Espinoza.

(Whereupon, Exhibit 11 was marked for identification.)

BY MS. GEHRKE:

Q. Do you recognize this document?

A. Yes.

Q. And is this the letter from Ms. Espinoza that you received at your home notifying you in writing of your separation of employment?

A. Yes.

Q. Okay. And you received this via Federal Express?

A. Yes.

Q. And did you also receive a copy to your United email address?

A. I believe so.

Q. Okay. During your leave of absence were you checking your United email?

A. Once in a while.

Q. Okay.

A. I think Talia send this to me shortly after the first phone call on 27th --

Q.   Okay.

A.   -- in the email format and then this from FedEx.

Q.   Okay.  And so do you believe you received the physical FedEx'd copy on, like, the next day, January 28?

A.   Maybe two days letter or so.  Yeah, I don't remember exact what date.

Q.   Okay.  So let's look at the content of the letter.  It says, "On September 29, 2016, you were sent a business letter indicating changes to the leave of absence policy, including but not limited to the maximum length of some leaves per the joint collective bargaining agreement."

Do you recall receiving that September 29, 2016, business letter?

A.   Sort of.  So I think this letter referred to the merger, the Continental and United.  Hmm.  Oh, wait.  September 29, 2016.  No, but the merger was 2018.

Actually, I don't recall.

Q.   Okay.  You don't remember one way or the other?

A.   I don't remember, yeah.

Q.    Do you remember there being an announcement that because the two Continental and United flight attendant workgroups were merging into a single workgroup with a single joint collective bargaining agreement, that there was going to be a change to the maximum length of leave of absences?

A.    The beginning of your question -- can you just repeat the beginning.

Q.    Just generally -- you said you don't remember one way or the other --

A.    Right.

Q.    -- whether you got this September 29, 2016, letter.

A.    Yes.

Q.    But do you remember generally there being discussion about the merger of the two flight attendant workgroups and there being changes to maximum length of leaves of absence?

A.    Okay.    I knew the contract negotiations were going on but not specifically to the subject.

Q.    Okay.    So you knew that they were working on negotiating a joint collective bargaining agreement for the two workgroups, but

you didn't know it was -- if there was anything specific to leaves of absence?

A. Correct.

Q. Okay. All right. If you look at the next paragraph, it quotes Section 15E(1) and (2) of the joint collective bargaining agreement that we read earlier.

Do you see that?

A. Yes.

Q. Okay. The next paragraph states, "Company records reflect that you have been off work nonpaid since January 25, 2019."

You agree with that?

A. Yes.

Q. "As indicated in the September 29, 2016, business letter, if you do not return to work prior to the expiration of your medical leave, your employment with United Airlines will be administratively terminated in accordance with Section 15E(2)."

Do you see that?

A. Yes.

Q. And did you understand that they were referring back to Section 15E of the joint collective bargaining agreement?

A. I see it from the letter, yes.

Q. And then it states, "You have exceeded the contractual inactive status effective January 24, 2022. Therefore, you have been removed from the United Airlines flight attendant system seniority list in accordance with the collective bargaining agreement, and you have been released from your employment with United Airlines effective January 25, 2022."

See that?

A. Yes.

Q. Okay. And so when you read that, did you understand that your employment had been terminated because you did not come back to work within the three-year contractual maximum leave of absence deadline?

A. I understood it states what you just mentioned, and I also understood the -- where here they mention, the second paragraph, Section 15E(1) and (2), I was not in that category. So yes.

Q. Okay. So then it talks about you returning your duty items listed there, which you did; correct?

A. Correct.

Q. Okay. All right. And so you agreed with the company that as of January 25, 2022, you had not returned to work; correct?

A. Correct.

Q. But your basis for disputing the decision was because of the date error in Exhibit 6; correct?

A. Correct.

Q. Okay. All right. On page 2 there's some individuals listed as being cc'd on the letter: Nancy Byun-Riedel, base director; John Wolfe, senior manager; Clarissa Perez, base manager.

Those were all the inflight management team at SFO; is that right?

A. I believe so.

Q. Okay. And Kaitlin White was the local president for the AFA?

A. I think so.

Q. Did you ever have any communications directly with Ms. White regarding your leave of absence or your termination?

A. I don't recall. Probably not.

Q. Okay. All right. Did you ever file a grievance with the union regarding your

considered a termination for cause under the contract?

A. I believe that was what he was trying to explaining to me.

Q. Okay. So if you had been terminated for poor performance or poor discipline, then potentially you'd be able to grieve your termination as not being proper under the contract?

A. I guess so.

Q. But because this was an "administrative separation" or "administrative termination" under the contract, Rick Gonzalez told you that you could not grieve it or appeal it?

A. I think that was what he was telling me.

MS. GEHRKE: Okay. All right. Okay. Let's go ahead and mark this next document No. 12.

(Whereupon, Exhibit 12 was marked for identification.)

MS. GEHRKE: Okay. For the record, Exhibit 12 is Bates-labeled UNITED84.

Q. Have you seen this document before?

A. I think -- wait.

Q. Was this attached to your termination letter or part of that packet?

A. Okay. I could be wrong, but I don't recall this was being attached with the termination. That's sent via FedEx.

Q. Okay.

A. I think I saw this from the employee profile.

Q. Personnel file?

A. Yes.

Q. Okay.

A. Like, there was a big file, and I think I saw this from there.

Q. Okay. All right. You can set that one aside.

Okay. I want to mark this next one. This is 13.

(Whereupon, Exhibit 13 was marked for identification.)

BY MS. GEHRKE:

Q. All right. For the record, Exhibit 13 is Bates-labeled UNITED3647. It's an email from Talia Espinoza to you, with cc to various United managers and union people, January 27, 2022, subject "Max Leave of Absence Letter."

A. Okay. I was trying to say if the company send the correct information, then that was, like, a contractual information. But since they send me the wrong information, I think -- I thought it should be a violation. It violate what the contract tells us.

Q. Okay. So you thought United violated the contract, the collective bargaining agreement, by sending you a letter with the wrong date?

A. Right.

Q. Okay. And then you say, "How I feel after the conversations is that the company was trying to get rid of me because of my disability, as they refused to own a mistake initiated by the company and blamed everything on me. They blamed on me did not verify the years, did not do the math, did not read the work history and CCS where it had stated three years."

Okay. So when you say, "How I feel after the conversations," are you referring to the two conversations with Talia?

A. Yes.

Q. Okay. And so based on that

conversation, it was your opinion that you thought United was trying to get rid of you because of your disability even though they had accommodated you on a leave of absence for over three years?

MR. CAPILITAN: Objection. Vague and ambiguous. Argumentative. Lacks foundation.

BY MS. GEHRKE:

Q. You can respond.

A. Okay. Say again. Sorry.

MS. GEHRKE: Can you repeat it back, please.

(Record read as follows:

"Question: And so based on that conversation, it was your opinion that you thought United was trying to get rid of you because of your disability even though they had accommodated you on a leave of absence for over three years?")

MR. CAPILITAN: Objection. I'm going to object and say that also calls for a legal conclusion/legal contention.

I'm going to instruct my client not to

answer.

BY MS. GEHRKE:

Q. Are you going to follow your attorney's advice?

THE WITNESS: Did you say not to answer?

MR. CAPILITAN: Yes.

MS. GEHRKE: Okay. Please mark that question as well.

Q. So explain to me why you thought United Airlines was trying to get rid of you because of your disability even though they had allowed you to be out on a leave of absence for over three years?

A. Okay. I heard from many other flight attendants United -- they hate employees who are on medical leaves, and there were, like, plenty of examples that other flight attendants complained they were giving a hard time because they took medical leave. And it's -- I mean, it's -- a lot of flight attendants experienced that, and some of them warned me the company will try to make those who take medical leaves unable to return.

Q. Okay. But United never prevented you

from returning from leave.

A. They did.

Q. How?

A. After they made me believe the last day, and they prevented me from returning.

Q. After your separation?

A. Yes.

Q. Okay. But prior to your separation they never prevented you from returning to work; correct?

A. Correct.

Q. Okay. So who are these unspecified people who were telling you that if you take a medical leave, United doesn't like it, and they'll do something to you?

Do you have a name?

A. I can find out from -- I mean, I'm still -- I was -- I joined some, like, flight attendant groups on Facebook.

Q. I want to know as you sit here today --

A. The names?

Q. -- if you have a recollection of who --

A. Today? Now?

Q. Yes.

A. You want me to use my phone and pull

Q.   Well, I don't want you to guess.

She was the inflight base director for SFO?

A.   Only the inflight?

Q.   That's my understanding.

Do you know one way or the other?  I don't want you to guess.

A.   Okay.  I thought she oversees the whole base, not only the inflight.

Q.   Do you know that, or are you guessing?

A.   I think -- I thought, and I'm still thinking --

Q.   Okay.  Because let's look at her signature --

A.   Okay.

Q.   -- there.  It says "Director, Inflight Base Operations."

A.   Okay.  You're right.

Q.   Okay.

A.   Inflight, uh-huh.

Q.   So you write to her and say you've been on this leave and you thought you had until January 25, 2023; that you were surprised on January 27, 2022, when Talia called to inform you of your administrative separation; and you

kind of go through this conversation that you had with Talia about the letter and the date.

But then basically you're asking her for the company to fix this and to undo your termination; correct?

A.   Correct.

Q.   Okay.  You can state here, "I was simply terminated by surprise on January 25, 2022, and I wasn't told about it until two days later."

I'm on the top of page 2.

A.   Okay.

Q.   "No one asked me if I was medically able to return to work or gave me any opening to come back.  This made it impossible for me to come back from my medical leave.  Had I been asked to return to work by January 25, 2022, I would have agreed.  I can return to my original position with some accommodation for my hand injury or to another position where I am qualified."

Okay.  So you basically were telling her in this email that if you had known that you were going to be separated on January 25, 2022, you would have tried to come back to work

sooner; is that correct?

A.    Yes.

Q.    And that you would have either tried to come back to your flight attendant position if they could accommodate the hand injury; right?

A.    Right.

Q.    And do you know, based on the job description that we looked at, is United able to accommodate your hand injury?

MR. CAPILITAN:  Objection. Speculative.

THE WITNESS:  I don't know.

BY MS. GEHRKE:

Q.    Okay.  Or you would have sought some other position; is that right?

A.    Right.

Q.    Had you ever sought to go to another position at United prior to your separation on January 25, 2022?

A.    No.

Q.    Okay.

A.    You mean have I ever thought?

Q.    No, not thinking.

Had you ever asked United to place you at another position at the company prior to your

termination?

A. No.

Q. Okay. "Doctors believed I can return to work as a flight attendant without any restrictions after the cyst removal surgery."

And at that point in time had you had the cyst removal surgery?

A. At this time?

Q. Yes. When you were sending this letter on February 7, had you had the cyst removal surgery yet?

A. Not yet.

Q. Okay. All right. So you ask her to reconsider or -- the termination or to apply for new job with accommodation.

And then she writes you back the next day, on February 8; is that right?

A. Correct.

Q. All right. And she let's you know that the union, the AFA, had approached her about your case, and she had been looking into it.

"Ultimately the three-year max LOA is contractual and is not changeable, regardless of what was written on the letter by a previous supervisor."

years. So --

A. That was my understanding.

Q. Okay. So as of February 6, 2020, your understanding is that if you were on a workers' comp leave of absence, you had two years to come back to work to United?

A. No.

Q. So what did you mean here when you said, "Workers' comp only allows two years"?

A. My medical benefit.

Q. Okay. So your workers' comp medical benefits would only last for two years?

A. I believed so.

Q. Okay. And so you were asking her whether or not you should reach out to Liz Jacobson to see if you need a third year to recover.

Was that a third year of medical leave or a third year of medical benefits or something else?

A. Third year of medical benefit, the treatments

Q. Okay.

A. -- doctor visits.

Q. Okay. So this mention is in reference

to how long workers' comp will cover your medical treatments?

A. I believe only two years. That's why I contacted Sheila.

Q. Okay.

A. And I was still not recovered. I mean --

Q. Okay.

A. -- it was close to two years.

Q. Okay. So let's turn the page. And this is where your production picks up. So when you produced these messages to us, we did not have the first page, but we did have the page starting with the 6:38 p.m. message. Do you see that?

A. The second page?

Q. Yeah. This message is where your production started of the messages. You produced these.

A. Oh, okay.

Q. The union produced these. I'm saying this is where the message came up.

A. Okay. Yeah. Because I wouldn't think I will type these question marks, and I don't know where these were from.

Q. Okay.

A. Yeah.

Q. So this what we got from the union pursuant to a subpoena.

A. Okay.

Q. You didn't have the first page, but you did start producing the messages starting with that message we just talked about.

You see?

A. Yes.

Q. Okay. All right. So if we go to page 3 of the AFA production, page 38 in the Bates labels, the green bubble, that's Sheila responding to you; correct?

A. Yes.

Q. Okay. And she states, "You can be on a medical leave of absence for up to three years."

Do you see that?

A. Yes.

Q. Okay. So as of February 6, 2020, you knew, based on this message from Sheila, that your medical leave of absence could last no longer than three years; correct?

A. Yes and no. I know she mentioned here the years; however, the letter from Elizabeth

says until 2023.

Q. Okay. But --

A. So -- okay.

Q. Go ahead. Finish if you have something else.

A. Yes. So she said three years, and then my understanding was, okay, if the medical leave end three years, but I have until January 25, 2023, to return.

Q. Okay. So when she sends you this message and says you can be on a leave of absence for up to three years, you had already received the January 25, 2019, letter from Liz Jacobson; correct?

A. Yes.

Q. Why didn't you seek clarification from Sheila, saying, "I'm confused, then, because you're saying I have up to three years, but my letter from United is giving me four years"?

A. Okay. Can we go back to my first message -- I mean -- not the first -- the previous message -- I was asking her about the workers' comp two years?

Q. For medical treatment?

A. Yes.

Q. Okay.

A. So this also made me believe that, okay, my medical treatment -- I would have three years medical treatments. And because the letter from Elizabeth was so clear and simple, I had until January 25, 2023.

Q. Okay. But she's not talking about medical treatment here in this message.

A. But that was my -- I mean, my confusion about the workers' comp two years, I contacted her.

Q. Right. And she told you -- you asked if you could have three years to -- for your recovery for your workers' comp, and she responded you can be on a medical leave of absence -- doesn't say anything about medical treatment -- a medical leave of absence for up to three years; correct?

A. That's what she says.

Q. Okay. So if you misunderstood that and thought she was talking about medical benefits, why didn't you get confirmation from her or anybody else?

A. Because I relied on the letter from Elizabeth. It was so clear it was 2023, and I

didn't feel I needed -- I mean, because it was so clear. And then I didn't get like a double-check, triple-check with anybody.

Q. But she's telling you in plain English here that the leave of absence can be no more than three years.

So you knew in February 6, 2020, that the leave of absence could be no more than three years; right?

A. Yes.

Q. So why didn't you follow up and say, "But that's not what my letter says"?

MR. CAPILITAN: Objection. Argumentative.

THE WITNESS: Because I believed the official letter from Elizabeth. I had until 2023.

BY MS. GEHRKE:

Q. Okay. She then attaches a link here to United AFA Occupational Benefits.

Do you see that?

A. After this.

Q. Right underneath that green bubble there's a unitedafa.org. You can see it on the production that you made here on Exhibit 18.

There's a link to United AFA Benefits/Occupational.

Do you see that?

A. Oh, the other --

Q. These messages are the same.

A. Okay.

Q. This is two different productions of the same messages.

A. Right. This one --

Q. Yes.

A. -- doesn't show --

Q. You produced Exhibit 18. The AFA produced Exhibit 17.

A. Okay.

Q. You can see the link a little bit better on your production.

A. Okay.

Q. Okay?

So she gave you a link to the unitedafa.org website that had information on occupational leave benefits.

Do you see that?

A. Yes.

Q. Okay. And did you click on that link?

A. I don't recall.

First Legal Depositions - Calendar@firstlegal.com
855.348.4997

Q. Okay.

A. It's been years, so I don't recall.

Q. Would you agree that it would have been a good idea to click on the link to see the information she was providing you to clarify your questions?

MR. CAPILITAN: Objection. Argumentative. Speculative.

THE WITNESS: Could be. And because I got the letter from Elizabeth, which I trusted, I believed, I relied on, and that was the simplest, most straightforward information that directly communicated to me was from that letter. And then nobody ever contact me I should verify and verify and verify.

BY MS. GEHRKE:

Q. But even though in your mind there was conflicting information, you never sought clarity?

A. It wasn't really conflict.

Q. She's telling you three years.

A. Right.

Q. The letter --

A. But my understanding -- okay.

Q. The letter has the four-year date.

You agree those conflict?

A.   The letter stated my last day to return.

Q.   Which was more than three years.

It was four years; right?

A.   So even though the three year from Sheila -- the message from Sheila state three years, however, I still believed I had another year after even though this, the three year, it was still one year.  And nobody told me --

Q.   Because you chose to ignore what she's telling you, you chose not to click on the link that she provided to you that would have further reinforced it's three years?

MR. CAPILITAN:  Objection. Argumentative.  Lacks foundation.  Speculative.

THE WITNESS:  So can we go click this link right now and see if it says occupational medical leave has three years limitation and then -- yes.  I am not sure if I click it or not.

BY MS. GEHRKE:

Q.   Okay.  So let's keep going.

So then you say here that a nurse practitioner in NMCI suggested that you return

to work now and just use FMLA, but you don't think it's the best solution.

Why was that?

A. Because they knew I have been suffering from this chronic pain, and then he suggest to use FMLA. And I told him about the United's -- the penalty system. I'm not, like, extremely familiar with those penalty system.

Say I have to -- say after I return to work, it was still a lot of pain. Then if I had to reopen or return the work back to the workers' comp, and then I might get more penalty points. Like, they keep flight attendant's penalty point by, like, calling out sick and --

Q. But you don't get penalty points if you're on an approved leave of absence; right?

A. I'm not sure. But --

Q. Okay. So basically you wanted to remain out on leave and not do what this nurse practitioner stated?

A. Because we -- also the doctor -- like, we believe I still had time and wait for the hand surgery.

Q. Okay. And you did at that point in time. This was February 6, 2020. You still had

some time. So, fine, I'm not disputing that.

Okay. So your next message with Sheila is January 27, 2022, at 10:48 a.m.

So when you sent this message to Sheila, had had you already spoken to Talia to be notified of the separation?

A. Yes.

Q. Okay. And so why did you reach out to Sheila in this message?

A. Because that phone call with Talia, I asked her what I should do now, and she suggested that I talk to the union.

Q. Okay. All right. And so Sheila responds and says, "LOA" -- you understood that to mean "leave of absence"?

"LOA" means "leave of absence"?

A. Yes.

Q. Okay. "LOA maximums are covered in our contract. What is your specific situation/question?"

When she said "in our" -- actually, she says "contract." First Legal Depositions - Calendar@firstlegal.com 855.348.4997

Did you know what she was referring to there?

Was she referring to the joint

collective bargaining agreement?

A. Yes.

Q. Okay. You respond and say, "My supervisor called me this morning. Told me I have been separated on January 25, 2022. The notification letter I received stated January 25, 2023," and you attach a screenshot; right?

A. Yes.

Q. Okay. And then she responds back to you and says, "When you went out, did you use your sick bank/occupational bank for a year or so? Once you enter a LOA, exhausted your sick bank, you have three years or the amount of time you have with the company, if it's under three years, to return. Please reach out to Talia Espinoza," and she provides her number.

Do you see that?

A. Yes.

Q. Okay. So she asks you some questions, and then she further explains in that second green bubble about the — the — the joint collective bargaining agreement, once you exhaust your sick bank and go to a leave of absence, it's either the time that you've been with the company or

So he responds to you and says, "Hi, Angela. There is a letter of agreement between the company and AFA on this issue. It is also on page 11 of the occupational illness/injury packet. So while 15E(1) is not very clear, what was negotiated was that the three-year limit would also apply to occupational LOAs."

Do you see that?

A. Yes.

Q. Okay. So is this when you learned that there was a further agreement to apply Section 15E to occupational leaves of absences and occupational injuries?

A. Yes.

Q. Okay. And you responded back and said, "The contract states in Section 15E(1) leave of absence required due to illness or nonoccupational injury. Why does the three-year rule apply to an occupational injury, which is not written on the contract?"

Do you see that?

A. Yes.

Q. Do you know if he ever responded to you?

A. I think I wrote him that first, and

then he replied to me.

Q. Oh. So it goes in this order down?

A. I believe so.

Q. Okay. Okay. Got it.

All right. So let's look at the side letter that he's referring to. So we'll mark this next one as Exhibit 20.

(Whereupon, Exhibit 20 was marked for identification.)

BY MS. GEHRKE:

Q. Okay. Have you ever seen this document before?

A. Until Rick send it to me.

Q. Okay. So this is a copy of the side letter dated August 14, 2017, that you received from Rick?

A. From Rick, yes.

Q. Okay. And that was in reference to those email communications we just looked at in Exhibit 19?

A. Yes.

Q. Okay. And that was after your termination --

A. Right.

Q. -- in late January/early February 2022?

A.   Right.

Q.   Okay.  And so if you look at this side letter agreement, do you see here that it says that "the provisions negotiated in the joint collective bargaining agreement in 15E are meant to cover occupational medical leaves"?

A.   Yes.

Q.   Okay.  And were you aware that this document was available to you through the union?

A.   No.

Q.   Were you aware that this document was available along with the joint collective bargaining agreement --

A.   No.

Q.   Well, I wasn't done yet.

A.   Oh, sorry.

Q.   -- on Flying Together or through United?

A.   No.

Q.   Okay.  All right.  You can set that aside.

After you received -- sorry.  One more question:  After you received this side letter with AFA from Rick, did you understand why the company was taking the position that your

ability to be cleared for full duty or even modified duty if you were to go back to work, do you remember when that was after your surgery?

A. I don't remember when exactly.

Q. Okay. Do you recall that you were on modified duty for -- if you look at the April 4, 2022, and the one above it, March 14, 2022, that you had work restrictions on lifting and the ability to lift/push/pull?

A. In the middle?

Q. Yes. March 14, 2022, says, "Work Status: Return to work, modified duty. Restrictions: Maximum 2-pound lifting and 15 minutes per hour typing and writing on the right. Follow up on April 4, 2022."

Do you see that?

A. Uh-huh. Yes.

Q. So was this the first time after your termination that you had the ability to return to work with restrictions?

A. No. Dr. Pertsch, the hand surgeon, was not the one who decided to release me or not.

Q. Who was that?

A. Dr. Brian Mitchell.

Q. Okay. And when did Dr. Mitchell

release you to return to work after your surgery?

A.    He did it before.

Q.    When was that?

A.    I think it was sometime in the beginning of February 2022 he cleared me.

Q.    Full duty?  No restrictions?

A.    I don't recall if there was any restrictions, but he cleared me before the surgery.

Q.    Okay.  Because we haven't seen those records.

The first time that you were released was after the surgery, first in March of 2022 with restrictions and then in May of 2022 without restrictions.

That's not your recollection?

A.    Before -- no, it's not the accurate record.

Q.    And when do you think Dr. Mitchell cleared you return to work without restrictions?

A.    Sometime in February -- beginning of February, I think.  And I'm not sure if he removed all the restrictions or not, but he cleared me before the hand surgery.

Q. But you don't know the date?

A. I can find out.

Q. Is Dr. Mitchell with NMCI?

A. Right.

Q. Okay. I see a date here in your medical records of February 7, 2022, that you have, "Return to full duty. Trial full duty. Will assess with primary treating physician on March of 2022."

A. Yeah, that sounds --

Q. Is that right?

A. Yes.

Q. Okay. But then you ended up not returning because you had already been separated, and then you decided to get the surgery?

A. I decide to get surgery before the termination.

Q. Okay. All right. And then you had the surgery in March?

A. Correct.

Q. And was that in the US?

A. Yes.

MS. GEHRKE: Okay. We'll have to meet and confer regarding the medical records.

San Francisco or Daly City to Dallas?

A. Yes.

Q. Have you ever sought a transfer to San Francisco base at American?

A. Not my choice. They don't have San Francisco base.

Q. Okay. What about their Los Angeles base?

A. It's not open.

Q. Will you seek a transfer when it opens?

A. I would. I would consider if it is open.

Q. Have you ever thought about moving to Texas to be closer to your employment?

A. Yes, but no.

Q. Explain, please.

A. Yes, I had thought about that. No, because I prefer -- I prefer the Bay Area.

Q. Okay. And since you started at American Airlines, have you been clear to work full duty?

A. Been clear, yes.

Q. No restrictions?

A. No.

Q. Okay. When did you first consider

yourself to have a disability during your United Airlines employment?

Was it after your workplace injury in October of 2018?

A. Yes.

Q. Okay. And what medical conditions did you consider to be the disabilities?

A. The joint pain.

Q. Joint pain?

A. Yes.

Q. Anything else?

A. On the multiple parts of my body.

Q. The parts of your body?

A. I mean -- yeah. On multiple parts.

Q. Okay. Like what?

A. Like, they hurt when I had some movements or --

Q. What hurt?

A. My joint.

Q. Okay. Any particular part of your body or --

A. Yes.

Q. Which parts of your body?

A. My left knee.

Q. Left knee.

A. Left elbow.

Q. Left elbow.

A. Right wrist.

Q. Right wrist.

A. And left foot.

Q. Okay. So those are the four parts of your body that you had joint pain?

A. Yes.

Q. Okay. Anything else that you considered to be a medical condition at United that was a disability?

A. No.

Q. Okay. All right. And then --

MR. CAPILITAN: Can I have, like, a one-minute break? Just -- I'm kind of --

MS. GEHRKE: Sure.

MR. CAPILITAN: Sorry. Feeling [unintelligible]. I just want to grab a snack.

THE VIDEOGRAPHER: Going off the record at 5:21.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on the record. Time is 5:24.

BY MS. GEHRKE:

Q. Okay. Ms. Tien, are you still

First Legal Depositions - Calendar@firstlegal.com
First Legal Depositions - Calendar@firstlegal.com
855.348.4997
855.348.4997

298

elect to be placed on occupational leave of absence --

A. Yes.

Q. -- and only receiving workers' comp through your occupational sick leave bank?

A. Yes.

Q. All right. You can set that aside.

All right. I want to ask you about United's reasonable accommodation process.

Were you aware that United has a reasonable accommodation process that you could follow to seek an accommodation?

A. Was I aware?

Q. Uh-huh.

A. No.

Q. Okay. Well, I'll represent to you there's a process outlined in the Working Together Guidelines that we looked at earlier.

Were you aware that there was a policy and procedure on Flying Together regarding the reasonable accommodation process?

A. No.

MR. CAPILITAN: Objection. Speculative. Lacks foundation.

BY MS. GEHRKE:

Q. And were you aware that there's a reasonable accommodation policy in the Working Together Guidelines?

MR. CAPILITAN: Same objections.

THE WITNESS: No.

BY MS. GEHRKE:

Q. Okay. Do you recall ever being contacted by the United -- either United Medical or the United Employee Service Center about initiating a RAP process?

A. What is RAP?

Q. Reasonable accommodation process.

A. I kind of remember somebody called me once.

Q. Uh-huh. Okay.

A. And -- from the headquarter, I think, Chicago. I think she said that she was calling from the headquarter of United. And she -- okay. It's been a while.

I remember she ask me if I want -- like, something like if I wanted to work for different department. Something like that.

Q. Okay. And what did you tell her?

A. I told her I wanted to return to

the inflight duty desk at SFO?

MR. CAPILITAN: I'm sorry. Which number are we on?

MS. GEHRKE: No. 8.

MR. CAPILITAN: No. 8? Okay.

THE WITNESS: At the duty desk, yes.

BY MS. GEHRKE:

Q. Okay. So that's what you're referring to there in this written response?

A. Yes.

Q. Anything else?

A. No.

Q. Okay. Let's move on to No. 11.

This interrogatory asks you about -- to "identify all requests for leave under the CFRA you claim to have made to United, including the date you made the request, the person whom you made the request to, and the manner in which you made the request."

All right. So if you look at page 7, you have a supplemental response. It states here that your only -- this is the second paragraph here on page 7, Supplemental Response No. 11.

You state, "Plaintiff's only request

for leave under CFRA was made in or around January 2019 following the injuries Plaintiff sustained to her knees, left elbow, left shoulder and left wrist as a result of falling on the premises of a hotel during a work trip. Plaintiff made her request to Defendant United using Defendant United's employee application Help Hub."

Do you see that?

A. Yes.

Q. Okay. And so the request for CFRA leave that you made in January 2019 through the Help Hub application, was that the request that was granted when you received Ms. Jacobson's January 25, 2019, letter?

A. I believe so.

Q. Okay. So your request for CFRA leave in January 2019 was granted?

A. Yes.

Q. Okay. And the duration of the protected leave under the CFRA, assuming it was approved in January 2019, that would have been for 12 weeks; is that correct?

A. I didn't know.

Q. Okay. Do you have any reason to doubt

that it was 12 weeks?

A. No.

MR. CAPILITAN: Objection. Speculative.

BY MS. GEHRKE:

Q. Do you know what the requirements are to be eligible for CFRA leave under California law in the 2019 timeframe for your own medical condition?

A. No.

Q. Do you know if you had exhausted your CFRA medical leave prior -- sometime in 2019?

A. No.

Q. You don't know one way or the other?

A. No.

Q. Okay. All right. Let's keep going. If you look -- actually, same page starts Interrogatory No. 17: "Identify all discriminatory remarks or statements based on your disability that you attribute to United, including the persons who made such remarks, the date such remarks were made, the manner in which they were communicated, and substance of each remark or statement."

Do you see that?

A.    [No audible response.]

Q.    And I want to direct your attention to the top of page 9.

You state here, "Lastly, Plaintiff was repeatedly subjected to remarks from United flight attendants she encountered while traveling to receive treatment for her injuries. Plaintiff was subjected to various remarks such as 'What are you doing while you are aren't working?' and 'What are you doing with all that free time?' insinuating Plaintiff was pretending to be hurt."

All right.  Let's stop there for a second.

Who made these alleged comments to you?

A.    I don't remember those flight attendants' names.

Q.    So it was fellow flight attendants that made those comments?

A.    Right.

Q.    And how many people was it?  Do you know?

A.    I don't remember, like, how many, the number, no.

Q.    So you don't remember who and you don't

remember how many times it happened?

A. Right. Because there were so many different flight attendants and wouldn't now see the same person anymore.

Q. Can you provide me an estimate of how many remarks fellow flight attendants made to you along the lines of what you allege here in your response, or you have no idea?

A. Only guess.

Q. You don't know?

A. No.

Q. Okay. I don't want you to guess. So if you don't know, okay.

So what's the basis of stating here that you were repeatedly subject to remarks if you don't know how many?

MR. CAPILITAN: Objection. Vague and ambiguous.

BY MS. GEHRKE:

Q. Why did you use the word "repeatedly" here?

A. Because more than one or two.

Q. Okay. But you can't provide me an estimate other than more than one or two?

A. No. I don't want to guess; right?

those friends would know.

Q.   Okay.

A.   I don't --

Q.   I'm pretty sure we asked an interrogatory to ask -- that asks you to identify people who have knowledge regarding your claims, including any emotional distress. So if you do have any names that are not already provided, please do provide those.

All right.  Why don't we go off the record while I take a look to see what else I may have left.

THE VIDEOGRAPHER:  Going off the record at 6:18.

(Discussion held off the record.)

THE VIDEOGRAPHER:  Back on the record at 6:21.

MS. GEHRKE:  Okay.  Ms. Tien, I'm marking Exhibit 29, which is a letter to you dated June 24, 2021.

(Whereupon, Exhibit 29 was marked for identification.)

BY MS. GEHRKE:

Q.   Do you recall receiving this letter?

A.   Honestly, I don't recall.

Q. Okay. You had testified earlier about having a conversation with a representative from one of the corporate teams about the reasonable accommodation process.

Does this refresh your recollection that that may have taken place on June 24, 2021?

A. **It might be that phone call.**

Q. Okay. And do you recall -- well, you don't recall receiving this letter?

A. **No.**

Q. Okay. You see it was sent via Federal Express tracking number and via corporate email at the top?

A. **Yes.**

Q. Okay. And it invites you to participate in the reasonable accommodation program if you'd like to?

A. **I see it.**

Q. Okay. And did you ever complete the accompanying work restriction form on page 2?

A. **I think I have send this for the doctors to fill out.**

Q. Okay. But in response to this June 24, 2021, letter from United to you inviting you to participate in the RAP program, did you ever

Q. after that date return the completed work restriction form filled out by you or your doctors?

A. You mean this came with this?

Q. Yes.

A. I don't recall receiving this.

Q. Okay. So as you sit here today, you're not aware of you returning this form --

A. No.

Q. -- in order to participate in the RAP program; is that correct?

A. Correct.

Q. Okay. And does it refresh your recollection if I told you that United's records show that you spoke to somebody by the name of Gina Guy?

A. No.

Q. Does that name sound familiar to you?

A. No. Totally unfamiliar.

Q. Okay. But do you have any reason to doubt that that's the person if that's who the records reflect you spoke to?

A. No.

Q. Okay. All right. I want to ask you quickly about your current treatment.

Are you currently seeing any doctors or healthcare professionals for your workplace injuries?

A. The injury I had in 2018?

Q. Yes.

A. No.

Q. Okay. And you're not seeing anybody for any mental health as well; correct?

A. No. Correct.

Q. Okay. So the only doctors you're seeing currently are just for your general well care?

A. Yes.

Q. Okay. All right. You have a claim for disability discrimination against United Airlines.

Who do you believe at United Airlines discriminated against you?

A. The management.

Q. Who in management?

A. Like, not specifically who, but the overall management, I believe.

Q. Okay. So you don't know of anyone specifically by name who you believe discriminated against you based on your

disability or medical condition?

A. I'll say as a whole. The management as a whole.

Q. Okay. But my question was a little different.

Do you have any specific name or believe it was any particular person in United management that discriminated against you?

A. Yes.

Q. Who?

A. Talia Espinoza.

Q. Okay. And why do you believe Talia discriminated against you?

A. Because she never contact me for light duty accommodation or termination, and she purposely waited two days after she terminated me and told me it was a courtesy.

Q. Okay. Do you know whether or not Ms. Espinoza actually made the decision to terminate your employment, or was it made by somebody else?

A. I don't know.

Q. And do you know -- you said that you believe Ms. Espinoza purposely waited two days after your termination to give you the courtesy

notification of the phone call and the letter.

How do you know that Ms. Espinoza was aware of the termination on January 25, 2022?

A. I didn't know. But the way she talked to me. Also, that 2023 letter was in my personnel file, and she was my supervisor, and I would believe she would know.

Q. Okay. But you don't know one way or the other, based on your personal knowledge, whether or not Ms. Espinoza was aware of the January 25, 2019, Liz Jacobson letter; correct?

A. Correct.

Q. Okay. And so you actually don't know one way or the other if Ms. Espinoza made the decision to terminate your employment or when that decision was made; correct?

A. I guess so. Because I just believe it was made 25th, and then I was informed on the 27th.

Q. But you don't know for certain?

A. I only knew those information.

Q. Okay. And you said you believe she discriminated against you because of the termination even though you don't know if she was the one that made the decision; correct?

STATE OF CALIFORNIA          )

COUNTY OF SAN MATEO          )  SS.

I, AUDRA E. CRAMER, CSR No. 9901, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

I further certify that I am not interested in the event of the action.

Witness my hand this 5th day of February, 2025.

_____

Certified Shorthand

Reporter for the

State of California

# EXHIBIT 6



1/25/2019

U308222 / SFOSW
Yihsing Tien
370 Imperial Way Apt 228
Daly City, CA 94015 USA

Dear Yihsing,

The purpose of this letter is to advise you that our records indicate you have been placed on a leave of absence effective **1/25/2019**. If you remain medically unable to return to work, in accordance with Section 15E. of the Joint Collective Bargaining Agreement, you will be administratively separated on **1/25/2023**.

When you begin your Leave of Absence I will be your supervisor in lieu of your base supervisor. As Company policy, and government mandates may change, the most current Leaves of Absence Packet is located on Flying Together. The Leave of Absence Packet contains a summary of benefits affected by this status and should be read carefully.

Important information while on an inactive Leave of Absence:

- ☐ You are expected to remain under a physician's care, as well as provide OPCMD with regular medical updates following each visit or as directed by UAL Medical. To verify receipt of your medical documentation you may contact the Employee Service Center (ESC) at 1-877 UAL-ESC9 (1-877-825-3729).
- ☐ Your UA-issued (white) TSA crewmember badge may be retained. Should it expire during your leave of absence, it cannot be renewed until your return to active status.
- ☐ You will keep your LINK and accessories for the duration of your leave. If your leave of absence extends past 90 days, your LINK service will be suspended until your return to active service.
- ☐ Reasonable Accommodation Process (RAP), outside employment guidelines and information regarding seniority accrual is in the Leaves of Absence packet.

You are very important to United's success. I wish you a speedy recovery and look forward to having you back to work soon. Please contact me if you have any questions.


Respectfully,


Elizabeth Jacobsen
Supervisor Inflight Service
650-874-6514
elizabeth.jacobsen@united.com

cc: Personnel File



# Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASE NO. 4:23-CV-02622-JSW

YIHSING TIEN AKA ANGELA TIEN,  )
                               )
        Plaintiff,             )
                               )
           vs.                 )
                               )
United Airlines, Inc., A California )
Corporation; Talia Espinoza, an )
individual; and DOES 1-1000,   )
inclusive,                     )
                               )
        Defendants.            )
                               )
_____)

VIDEOTAPED VIRTUAL DEPOSITION VIA ZOOM OF

YIHSING TIEN

Tuesday, July 8, 2025

VOLUME II

Reported by Adriana S. Angulo   CSR No. 13824

& Arleen Jimenez, CSR No. 4240

Job No. 113890

INDEX

Examination by:                                          PAGE

   Ms. Gehrke                                      364, 471

                                          PAGE      LINE

Questions Instructed not

to Answer                                 480         2

E X H I B I T S

EXHIBITS                                                          PAGE

Exhibit 30    United letter dated June 24, 2021,        382
              Bates United 773 through 774

Exhibit 31    United letter dated May 24, 2019,         387
              Bates United 1144 through 754

Exhibit 32    United Flight Attendant Leave of          427
              Absence Packet, Revised 2018,
              Bates United 3789 through 3854

Exhibit 33    United Flight Attendant Leave of          432
              Absence Packet, Revised 2021,
              Bates United 3855 through 3943

Exhibit 34    Document entitled: Know Your              435
              Occupational Benefits from AFA
              website

Exhibit 35    Plaintiff's Second Amended Initial        437
              Disclosures and Response to General
              Order 71

Exhibit 36    Documents reflecting positions            447
              applied to after termination at
              United, Bates Tien 522 through 525

E X H I B I T S (Continued)

| EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 37 | Termination letter dated February 6th, 2025, from American Airlines, Bates Tien 1702 through 1703 | 461 |
| Exhibit 38 | NMCI medical records, dated 12-29-21, Bates 511 to 535 | 495 |
| Exhibit 39 | Letter to Dr. Mitchell, dated 2-1-22 re ganglion removal surgery, Bates Pertsch 62 | 497 |
| Exhibit 40 | Letter from Dr. Pertsch, dated 2-23-22, Bates Pertsch 53 to 57 | 498 |
| Exhibit 41 | Request for hand surgery, Pertsch 157 | 501 |
| Exhibit 42 | Workers' Compensation Request for Authorization, Bates Pertsch 41 | 501 |
| Exhibit 43 | Dr. Pertsch report, dated 3-14-22, Bates Pertsch 46 to 51 | 502 |
| Exhibit 44 | Letter from Dr Pertsch, dated 5-18-22, Bates Pertsch 221 to 227 | 511 |
| Exhibit 45 | NMCI record, dated 5-11-21, Bates NMCI 748 to 751 | 515 |

E X H I B I T S (Continued)

EXHIBITS                                              PAGE

Exhibit 46   NMCI report, dated 7-14-22, Bates        516
             NMCI 31 to 47


 P R E V I O U S L Y   M A R K E D   E X H I B I T S


EXHIBITS                                    REFERENCE PAGE

Exhibit 5    Flight Attendant Job Duties              372
             [TIEN1 and 2]

Exhibit 6    Letter Dated 1/25/2019                   398
             [TIEN0493]

Exhibit 16   Email Chain UNITED3598 and               443
             3599

Exhibit 18   Text Messages TIEN0874 Thru              434
             0884

Exhibit 27   Plaintiff's Supplemental                 421
             Responses to Defendant
             United Airlines, Inc.'s
             Interrogatories, Set One

Exhibit 28   Plaintiff's Original                     433
             Responses to Defendant
             United Airlines, Inc.'s
             Interrogatories, Set One

staff during the period of time?

Q. Correct.

A. Last deposition I mentioned to you somebody called from Chicago, and I don't remember which department she was calling from. I don't remember her name. I think you told me her name, Diana or something. I forgot. And I wasn't sure, and I am not sure which department she -- she was working.

Q. Okay. Let's go ahead and mark as Exhibit 30 this next document. Maybe this will help refresh your recollection.

(Exhibit 30 marked for identification.)

BY MS. GEHRKE:

Q. Okay. For the record, Exhibit 30 is Bates-labeled United 773 through 774. And I'll start at the top here. This is a June 24, 2021, letter addressed to you at your home address, correct?

A. Correct.

Q. Okay. And do you recall receiving this letter?

A. I don't. I don't recall this letter.

Q. Okay. And it says here on the second paragraph, "Per our conversation on June 24th, 2021, we would like to extend to you the opportunity to

utilize our reasonable accommodation program."

Do you see that?

A. Yes.

Q. And do you think this is the conversation with the employee in Chicago that you were testifying about before?

A. I believe so.

Q. Okay.

A. It was summertime 2021. So it sounds right.

Q. Okay. All right. And so do you recall any further details about that summer of 2021 conversation? Do you believe it was with someone who was a RAP specialist as part of the Employee Service Center?

A. I don't know.

Q. Okay. And do you recall that United employee telling you that if you wanted to pursue a different accommodation other than a leave of absence that you can participate in the reasonable accommodation program?

A. I remember she told me on the phone if I would like to work for a different department.

Q. Okay. And -- but you told her -- I think you testified last time -- that you wanted to stay in the inflight department as a flight attendant,

correct?

A. Correct.

Q. Okay. And so with this letter it enclosed a medical restriction form and a copy of your job description, "Here is the work restriction form."

So if I you wanted to pursue a different type of accommodation other than the leave of absence, did you understand that you needed to have your doctor fill out this form and you needed to submit that to United so that they could evaluate what other options might be available to you?

A. I wasn't aware of that, this -- this part.

Q. Okay. But you see it says that here, "You will find a medical restriction form. Please have your treating provider review your job description and complete the medical restriction form with as much detail as possible. After completion of the form, you may fax it to our medical department."

And then the next paragraph goes on to state that once they receive that form, they can take the next step, which is to complete an assessment of functional capabilities, and then they can contact you to schedule a meeting for possible accommodation options.

Do you see that?

A. I see it now.

Q. Okay. And you did not submit the completed work restriction form, correct?

A. I did not complete this form, no.

Q. Okay. And you did not have your doctor do that either, correct?

A. Correct.

Q. Okay. All right.

A. Can I explain something further?

Q. With respect to that question?

A. The person who called me, I also mentioned to her I still had time to recover furthermore because at the time I already knew I was going to get a surgery. I just want to clarify that.

Q. Okay. All right. So your hope was, you know you -- you knew you still had time under your occupational leave of absence to recover. You were hoping to have the hand surgery. So you wanted to remain out on leave as a flight attendant rather than trying to transfer department or do some other form of accommodation; is that right?

A. Exactly. That's what I told her. I still had time. And she never clarified what -- what was the time limit or correct the letter I received.

Q. Okay. Do you know whether or not this

employee that you spoke to whether or not she was aware of your maximum leave of absence date?

A. I am not sure. But since she called me, there must be some type of a timeline.

Q. I don't want you to speculate. I don't want you to speculate.

Do you know for a fact --

A. She didn't say anything about that.

Q. Okay.

A. So I'm not sure.

Q. Okay. So you don't -- you don't know, one way or the other, whether or not she was aware of what your maximum leave of absence date was?

A. I'm not sure.

Q. Okay. All right. And up until this time, up until your separation, you felt that United was accommodating you and helping you through providing you the leave of absence, correct?

A. I felt -- can you say that again?

Q. Yes. Prior to your separation of employment, you felt that United was accommodating you because they were allowing you to remain out on this leave of absence so that you could get treatment and heal with the hope of eventually coming back as a flight attendant, correct?

A. Correct.

MR. CAPILITAN: Objection. Misstates prior testimony.

MS. GEHRKE: Okay.

BY MS. GEHRKE:

Q. And -- and because of that, you never filed any kind of internal complaint with United through the avenues we discussed last time under the Working Together guidelines, complaining that, you know, United wasn't doing enough to help you; is that correct?

MR. CAPILITAN: Objection. Vague and ambiguous. Compound. Speculative.

THE WITNESS: No.

BY MS. GEHRKE:

Q. Did you ever file an internal complaint, stating that United Airlines was not accommodating you or engaging with you as part of this process, prior to your separation of employment?

A. No.

Q. Okay. All right. We'll set that one aside.

(Exhibit 31 marked for identification.)

BY MS. GEHRKE:

Q. We're now going to mark as Exhibit 31 some letters that were sent to you throughout your leave

of absence, where they -- United medical employment service center is asking you to complete employee status form updates.

So let me go through the Bates numbers for the record. So Exhibit 31 is Bates-labeled United 1144 through United 754, and I'll scroll -- scroll through so you can see. We'll take them one at a time.

So this first one is dated May 24th, 2019, and it says that you have an approved occupational status through July 1st, 2019, and that your next employee status form is due on July 1st, 2019.

Do you see that?

A. Yes.

Q. And do you recall receiving letters similar to this throughout your leave of absence, where you were being asked to complete these employee status forms to continue to substantiate your need for your occupational leave?

A. It does look familiar that I received periodically after each visit of the doctor --

Q. Okay.

A. -- I think.

Q. All right. And so if we go to page 2 of the exhibit, there's a letter. It says, "Dear

paragraphs down, it says, "However, note some workgroups may not have transitional duty available, as per their collective bargaining agreement, but your completion of the employee status form will help United track the employee's level of medical improvement."

Do you see that?

A. Yes.

Q. Okay. And if we go to the next page, there's the employee transitional duty -- I'm sorry -- the employee status form.

And I want to go down to this page that talks about -- this is page 1064. And it talks about which job titles or work groups have transitional duty available.

Was it -- and I don't see a flight attendant or inflight listed here. There's customer service, ramp service, technical ops, and catering operations.

Is it your understanding that because of the safety-sensitive nature of the flight attendant position, transitional duty was not available?

A. I don't remember seeing this. So do you ask me do I agree it when I received the letter?

Q. Even if you don't recall this particular

First Legal Depositions - Calendar@firstlegal.com
First Legal Depositions - Calendar@firstlegal.com
855.348.4997
855.348.4997

392

page when you received it, were you aware generally, because of the safety-sensitive nature of the flight attendant position, that United was not able to offer you transitional duty as a flight attendant?

A. To my understanding, inflight department is not only working on the airplanes.

Q. Okay. But let's focus on the flight attendant position itself, not the entire department.

Was it your understanding that in order to be a flight attendant, you had to be able to perform all those functions we looked at in the job description, such that they could not offer transitional duty in the flight attendant position?

A. Yes. If working on the airplane.

Q. Okay. All right. And you're saying inflight has different -- other positions like supervisors or coordinators or other office administrative roles as well?

A. Absolutely.

Q. Okay. And did you ever seek a transfer or reassignment to any of those other inflight positions?

A. I didn't --

Q. While you were on a --

First Legal Depositions - Calendar@firstlegal.com
855.348.4997
First Legal Depositions - Calendar@firstlegal.com
855.348.4997

393

A. Sorry. I cut you off now.

Q. Go ahead. Just answer.

A. I didn't ask.

Q. Okay. All right. Did you ever file an internal complaint at United Airlines that they did not assign you to transitional duty as a flight attendant?

A. I did not file for a request.

Q. Okay. All right. At the end of the first deposition, we were talking about Talia Espinoza, who was your assigned supervisor at the time of your separation, and I was asking you if you felt that Ms. Espinoza discriminated against you because she was the one that communicated the decision to separate your employment?

Do you recall that?

A. I recall that was the last question, yeah.

Q. Okay. All right. So do you believe that Ms. Espinoza personally discriminated against you, or do you think she was just doing her job in communicating the separation decision to you?

A. Do you mean it's from one person to another person?

MR. CAPILITAN: Objection. Calls for -- objection as it calls for a legal conclusion, legal

contention.

BY MS. GEHRKE:

Q. You can answer.

A. So before I answer, do you mean it's from one person to another person or as a group of the same department in general. Not just to --

Q. Well, I think the last time I asked you who at United Airlines do you feel discriminated against you? Is there any particular individual person, or is it just the airline as a whole you feel discriminated against you?

MR. CAPILITAN: Same objections and vague and ambiguous and compound.

THE WITNESS: From the way Talia spoke to me on the phone when she terminated me, I do feel she discriminated me because I was disabled, part of -- partial disabled. I do feel she as a group -- I mean as a manager, they want to get rid of flight attendants, being not just me, who took medical leave or who have had disabilities.

BY MS. GEHRKE:

Q. So what was it that Ms. Espinoza did that you felt was discriminatory? It was the way she communicated the separation decision to you?

A. Yes --

MR. CAPILITAN: Objection -- Ms. Tien, please. I'm -- let me finish my objections when I do them.

Objection. Compound. Vague and ambiguous. Calls for legal contention and legal conclusion.

MS. GEHRKE: What was the last thing you said, Counsel Kenzo? Legal contention --

MR. CAPILITAN: Legal conclusion.

BY MS. GEHRKE:

Q. And Ms. Tien, you said yes, and then you got interrupted. Can you continue your answer?

A. Yes. Supervisors, maybe not just Talia, to flight attendant who, I mean, they -- I felt they tried to get rid or give them the hard time. And I was part of them because I took the medical leave and was disabled partially.

Q. So other than the manner in which Ms. Espinoza communicated the separation decision to you, which we already discussed, is there anything else that Ms. Espinoza did that you felt was discriminatory towards you?

MR. CAPILITAN: Objection. Vague and ambiguous.

THE WITNESS: No.

BY MS. GEHRKE:

Q. Okay. All right. Other than Ms. Espinoza, is there anyone else at United Airlines that you can point to that you feel discriminated against you?

MR. CAPILITAN: Objection. Calls for legal contention. Legal conclusion.

THE WITNESS: I felt it was the management, the culture. So maybe not a particular one person, one manager. So I felt that --

BY MS. GEHRKE:

Q. So you felt United as a whole, the management team as a whole, there was a separation of your employment after the three years of your occupational leave, you felt that that was discriminatory because they wanted to get rid of you because you had a partial disability?

A. Correct. That's what I felt.

Q. And was there any particular comments or actions that you're aware of that made you feel that way, other than the separation decision itself?

A. Yes.

Q. Please tell me what those are.

A. When I sent an email to Nancy -- I don't know how to pronounce her last name.

Q. Byun-Riedel.

A. The director --

Q. Let's call her Nancy. We know who it is.

A. Yeah -- the inflight director, I believe, at the time in San Francisco, the way she emailed me back, that made me feel it was the management, the culture; so...

Q. The email from Ms. Nancy Byun-Riedel, where she informed you that they were not going to change the separation decision because, if you were able to return to work, then you should have returned to work within the three-year leave of absence period under the contract and if you were not able to return to work, because you were medically unable to. Then any error in the date in the letter, which was Exhibit 6, was irrelevant.

Is that the email you're referring to?

A. That email, yes.

Q. Okay. Okay. Anything else besides the email from Nancy Byun-Riedel to you that was Exhibit 6, that you felt reflected discrimination towards you by any United manager or supervisor?

A. Only that email was the communication, and I didn't have the chance to interact with more managers besides Talia and Nancy.

Q. Okay. And that email from Nancy

Byun-Riedel, that was after your separation, where you had contacted her, seeking her help in trying to change the decision, correct?

A. Correct.

Q. Okay. All right. Have you now told me everything that you feel was discriminatory by a United manager or supervisor towards you?

MR. CAPILITAN: Objection. Vague and ambiguous.

THE WITNESS: I don't know if I should explain this, yes. Especially I explained to them I was misled by the letter and I believed the letter. So -- and --

Q. We talked about that last time. Okay. So the answer is, yes, you've now told me everything that you feel was discriminatory towards you by United, correct?

A. Correct. Because they didn't want to help.

BY MS. GEHRKE:

Q. Okay. All right.

THE COURT REPORTER: I didn't understand what the witness said, the last thing she said. Correct, because --

THE WITNESS: Because they didn't want to help.

THE COURT REPORTER: Thank you.

BY MS. GEHRKE:

Q. Okay. I wanted to ask you, you have a retaliation claim in your lawsuit, which means that you feel that you did something that was protected under the law and you -- something bad happened to you because of that.

Do you understand the concept of retaliation?

A. Yes.

Q. Okay. So who at United, if there is anybody specific, did you feel retaliated against you? Or would your responses be the same as what we just covered regarding discrimination?

MR. CAPILITAN: Objection. Vague and ambiguous. Calls for legal contention, legal conclusion.

THE WITNESS: It's the same. I feel it was the management.

BY MS. GEHRKE:

Q. Okay. And -- and you believe that based on Talia's phone call to you, where she was communicating the separation decision and the tone she took with you, correct?

MR. CAPILITAN: Same objections.

THE WITNESS: Also the conversation with the one of the reps.

BY MS. GEHRKE:

Q. One of the?

A. The union reps.

Q. Okay. When they -- the union rep told you that United was not going to change their decision?

A. No. He told me that, on the phone, United would not admit they made mistakes. They would only blame the flight attendant. So that, to me, is they retaliate the flight attendants who --

Q. I don't understand what you're saying.

You're referring to your conversation with Ric Gonzalez, the AFA union rep?

A. Right.

Q. And is it your testimony that Mr. Gonzalez told you that even though United may have made a mistake in the letter to you regarding your leave of absence date, that they would blame you for not knowing the date?

A. Correct.

Q. Okay. And you felt that United blaming you for not knowing the maximum leave of absence date was retaliation?

MR. CAPILITAN: Objection. Calls for a

legal contention, legal conclusion.

THE WITNESS: I believe United -- can you repeat --

BY MS. GEHRKE:

Q. I'm trying to understand why you think that United retaliated against you. So why don't you answer that question? Why do you think United retaliated against you?

MR. CAPILITAN: Same objection. Also calls for a narrative.

THE WITNESS: Because I took medical leave and they give hard time to the flight attendants who take medical leave.

BY MS. GEHRKE:

Q. And how did United give you a hard time for taking medical leave that you consider to be retaliation?

A. Because --

MR. CAPILITAN: Same objections.

THE WITNESS: Because after I told them they misled me, they refused to accommodate or provide a reasonable alternative solution.

BY MS. GEHRKE:

Q. And so after your -- your separation of employment, when you went to United and said, I want

you to fix this because you made a mistake on the date and they refused to do that, that is why you believe they retaliated against you?

MR. CAPILITAN: Objection. Calls for legal contention, legal conclusion.

THE WITNESS: Part of it.

BY MS. GEHRKE:

Q. Okay. Anything else?

MR. CAPILITAN: Same objections.

THE WITNESS: Not that I can think of right now.

BY MS. GEHRKE:

Q. Okay. And again that wasn't anyone in particular, it was just the management as a whole, as embodied by Ms. Byun-Riedel's email to you, saying we're not going to change the decision?

A. Yes.

Q. Okay. All right. And on the failure to accommodate claim that you have, is there any particular -- person that you feel was responsible for United not accommodating you, or was it the management as a whole?

MR. CAPILITAN: Objection. Calls for legal contention, legal conclusion. Compound. Vague and ambiguous.

THE WITNESS: I am not sure because we didn't get involved much in their -- in United's internal administration. So I'm not sure if particular persons might be more discriminated or not.

BY MS. GEHRKE:

Q. Okay. And how do you feel that United failed to accommodate you? Was it solely the fact that they didn't allow you to have the extra year of leave, based on the error in the date in the letter?

MR. CAPILITAN: Same objections.

THE WITNESS: One of the reasons, yes.

THE COURT REPORTER: One more time. Can you repeat that, please, Mrs. Angela?

THE WITNESS: One of the reasons, yes.

BY MS. GEHRKE:

Q. So one of the reasons you feel United failed to accommodate you is that, after they separated your employment, they would not do something to help you because of the error in the max LOA date in the letter?

A. Sorry. I got -- I got lost. So one of the reasons was, yes, they failed to accommodate after they -- they knew the mistake.

Q. After separation?

A. After the separation, yes.

Q. Okay. What else do you believe that United failed to do to accommodate you, if anything?

MR. CAPILITAN: Objection. Calls for a legal contention, legal conclusion.

THE WITNESS: Yes. Okay. I have to tell you something happened before, when I was based in LAX.

BY MS. GEHRKE:

Q. Okay. I think we already talked about this, when you said somebody made a comment or did something to you back in, like, 2015?

A. About what?

Q. I don't know. What are you referring to? I'm asking about after your --

A. Accommodation.

Q. -- occupational injury in October 2018, is there anything else that you believe United failed to do to accommodate you, other than after your separation reinstating you or allowing you to come back, based on the max LOA date error in the letter?

MR. CAPILITAN: Same objections.

THE WITNESS: Let me try to answer, and you can tell me if that is what you are asking.

BY MS. GEHRKE:

Q. Okay. The LAX thing, was that after your occupational injury?

A. Huh?

Q. You're talking about an LAX issue, but you were not based at LAX after your occupational injury.

A. Okay. Why I felt United failed to accommodate me, part of another reason was, yes, it happened when I was in LAX before the injury. At the time, there were other flight attendants who were on occupational injury, and supervisors in LAX, they would communicate and assign light duty to those flight attendants who had physical work restrictions. So that would be my understanding, the supervisor in San Francisco, after I got injured, then they would do something similar to assign me a light duty as an accommodation.

Q. Okay. But we already reestablished, you never asked for light duty or transitional duty; you asked for a full leave of absence, correct?

A. I didn't ask. None of us asked.

Q. Okay.

A. And they just assigned.

Q. So do you know for how long those LAX flight

attendants were given the ability to do light duty? Was there a time limit on that?

A. Do you mean, when they were doing light duty, how long did they perform the light duty?

Q. Yes.

A. I don't know how long.

Q. Okay. And do you know whether or not there is -- I'm sorry?

A. Continue.

Q. Do you know whether or not there is a time limit if light duty is ever provided?

A. I don't know.

Q. Okay. But you -- you testified you never asked for light duty but you think they should have offered it to you even though you asked for a leave of absence?

A. I believe so because that is what they did in LAX. The LAX supervisors, they called the flight attendants who were unable to perform the job duties on the airplanes. But they were other light duty positions, so they accommodated -- they called, they initiate -- I mean the -- they reach out.

Q. Okay. So it's your -- your belief that the San Francisco inflight supervisors should have affirmatively reached out to you to offer light duty

as a flight attendant even though you requested a leave of absence?

A. That was my understanding, yes.

Q. Okay. And do you have any knowledge as to what the light duty entailed? Were they still on the airplanes or was it an office job or something else?

A. Office job.

Q. Okay. And -- but you don't know how long those LAX flight attendants may have done the light duty in the LAX office?

A. I don't know.

Q. Okay. But you agree that the LAX flight attendants that you are referring to, they were not able to fly on the airplanes, given their restrictions, they could only do some kind of temporary light duty in the office?

A. I agree.

Q. Okay. And if -- at the time that you had your workplace injury after October 2018, if you wanted to do light duty in the inflight office, why didn't you request it? Why did you request to go on a leave of absence instead?

A. I didn't request because I believed they would assign me and even I was on medical leave,

they could still assign me, I believed.

Q. Okay. But did you ever communicate -- well, first of all, did you actually have a desire to do light-duty office work after your injury, or did you prefer to go on a full medical leave of absence?

A. I would perform the light duty, if I was reached out and assigned one.

Q. Yes, but that's not my question. My question is did you prefer to do light duty or did you prefer to do a leave of absence right after your injury in October of 2018?

A. I don't have preference.

Q. Okay. But you did not ask anybody to provide light duty, correct?

A. I did not ask, correct.

Q. But you, in hindsight after your separation, you wish that someone from United would have proactively offered that instead of granting your request for a full leave of absence?

MR. CAPILITAN: Objection. Vague and ambiguous.

THE WITNESS: Can you repeat?

BY MS. GEHRKE:

Q. You're -- you're saying that in hindsight after your separation, you wish somebody would have

offered you proactively light duty instead of approving your request for a full leave of absence?

MR. CAPILITAN: Objection. Vague and ambiguous. Improper hypothetical.

THE WITNESS: I wouldn't say it is in hind- -- hindsight; I would say I would just follow the policies and the rules, which I complied everything I could.

BY MS. GEHRKE:

Q. Okay. But you --

A. I would comply. I would say that. I'll put it in that way.

Q. Right. But I'm trying to understand why do you think there was a failure to accommodate, and at the time you were happy to take -- you accepted, you requested and accepted taking the full leave of absence. It wasn't until after your separation that you now felt it would have been better if someone at United had proactively reached out to you about light duty?

MR. CAPILITAN: Same objections and argumentative.

THE WITNESS: No. That was not the way it was.

BY MS. GEHRKE:

Q. Okay. So you're saying you felt that at the time as well?

MR. CAPILITAN: Same objections.

BY MS. GEHRKE:

Q. During your leave of absence, were you hoping that someone at United would proactively reach out to you about light duty?

MR. CAPILITAN: Same objections.

THE WITNESS: I was not hoping something happened or not happened.

BY MS. GEHRKE:

Q. Okay.

A. I wasn't -- that was not what I was hoping or thinking or planning.

Q. Okay. You were content with taking a leave of absence, focusing on your treatment, and trying to return to your job as a flight attendant?

MR. CAPILITAN: Same objections.

THE WITNESS: I would comply what they asked me to do.

BY MS. GEHRKE:

Q. That wasn't my question, though. My question was at the time, when this was all happening after October 2018 work injury, you asked

for and they approved a leave of absence and you were satisfied with that, correct?

MR. CAPILITAN: Same objections.

THE WITNESS: You mean I was satisfied I was approved.

BY MS. GEHRKE:

Q. Okay. All right.

THE COURT REPORTER: Counsel, when there's a good opening for a break, please?

MS. GEHRKE: We can go now.

THE VIDEOGRAPHER: Counselor, would you like to go off the record?

MS. GEHRKE: Yes, please.

THE VIDEOGRAPHER: Counselors, we're going off the record. The time is 11:27. One moment please.

(Recess taken.)

THE VIDEOGRAPHER: Counselors, Madam Court Reporter, Madam Witness, we're now going back on the record. The time is 11:39. Please proceed.

BY MS. GEHRKE:

Q. Ms. Tien, I want to ask you about one of your other claims in this lawsuit, which is that United failed to engage in the interactive process, which basically means there was a breakdown in the

communication in the attempts to accommodate your disability.

And I'd like to ask you why you feel that United failed to engage in the interactive process with you?

MR. CAPILITAN: Objection. Calls for a legal conclusion, legal contention. Vague and ambiguous.

BY MS. GEHRKE:

Q. Go ahead.

A. I think part I mentioned before the break, was an example of breaking communication, and United failed to commute -- communicate with me properly.

Q. What are you referring to when you say prior to the break? What is it that United do that failed to communicate with you?

A. I mean, the example I mentioned in LAX, the supervisors, they communicate with the injured flight attendants.

Q. Okay. So you feel that --

A. But in San Francisco they failed --

(Indiscernible crosstalk.)

BY MS. GEHRKE:

Q. Okay. You feel that the San Francisco supervisors failed to proactively offer you light

duty like you had heard LAX supervisors had provided in the past?

A. Yes.

Q. Okay. Anything else that you feel United did that was a failure to engage in the interactive process?

MR. CAPILITAN: Same objections.

THE WITNESS: Yes.

BY MS. GEHRKE:

Q. What else?

A. We also talked about this earlier. The woman who called me from Chicago, she could have mentioned to me that how much time I had and they would terminate me if, say, I didn't transfer to a different department. She didn't mention any of those. She could have.

Q. You think the Employee Service Center employee, during that June 2021 phone call, should have proactively let you know that this is how much time you had left on your leave of absence under the joint collective bargaining agreement and volunteered different options other than staying out on a leave; is that correct?

A. Correct. Especially after I mentioned to her I still have time.

Q. Okay. But in June 2021 you still did had time. You still had another almost seven months of leave left under the contract, correct?

A. If I knew it was 2022, I probably wouldn't say to her I still had time because to my understanding, a year and seven months and seven months, it's very different.

Q. Okay. So you were expecting an employee in Chicago in an Employee Service Center to know better than you what your maximum leave of absence dates were?

MR. CAPILITAN: Objection. Argumentative. Speculative.

THE WITNESS: When you use the word "better than" me, my understanding was 2023; so...

BY MS. GEHRKE:

Q. I understand that. But why would you expect an employee in the service center, who is -- well, you know, you're one of 90,000 United airline employees -- why would you expect that employee in Chicago to know the specifics of your maximum leave of absence dates when you didn't take the time --

MR. CAPILITAN: Objection.

BY MS. GEHRKE:

Q. -- to look and know what they were outside

A. Correct.

Q. And are you aware that the CFRA allows for up to 12 weeks of leave under the state law?

A. You mean now or am I? I am aware of that, but I wasn't aware of it before.

Q. Okay. And the leave of absence that United approved for you was longer than 12 weeks, correct?

A. Correct.

Q. Okay. And so can you explain to me how you feel that United violated your rights under the California Family Rights Act, if they provided you more than 12 weeks of leave?

MR. CAPILITAN: Objection. Calls for a legal contention, legal conclusion.

THE WITNESS: Because that was the given approved medical leave.

BY MS. GEHRKE:

Q. Okay. So United approved your medical leave after January 2019, right?

A. Yes.

Q. Okay. So why do you feel that United violated the CFRA, if they approved your medical leave after you made the --

(Connectivity/audio distortion.)

BY MS. GEHRKE:

Q. Why do you feel that United violated the CFRA, if they approved your medical leave request in January 2019 and you were off for more than 12 weeks?

MR. CAPILITAN: Same objections.

THE WITNESS: Why I feel United violated the law, the CFR- -- the --

BY MS. GEHRKE:

Q. Yes.

A. Because to my understanding, it was -- it was approved -- I mean, 12 weeks or 15 weeks or 20 weeks or 4 years, 3 years, that was approved and given. And they gave me four years, and then they changed their mind or they made mistake or typo or anything that has it states four years. Then they broke their promise, and they misled me because I absolutely relied on the letter, which stated clearly how much time I was given, and it didn't mention anything about the FMLA 12 weeks. So I wouldn't think I had to compare about the 12 weeks. I just simply very -- I mean, I didn't feel I had to look up any type of laws, how much time should to be given, and simply I believe that letter. I relied on it.

Q. Okay. Is it your --

A. Yeah. Sorry.

Q. Is it your understanding that the three-year leave of absence or the four-year leave of absence, based on the error in the letter, that that was under the joint collective bargaining agreement and not under the CFRA?

A. Can you repeat again?

Q. Your right to take the three or four-year leave of absence, that was under the collective bargaining agreement not under the CFRA, correct?

A. Right. I -- I'm referring to the contract and looked up the contract.

Q. Okay. So other than the fact that there was this error in the max LOA letter that you received and you feel you relied on that, is there any other reason why you feel United violated your rights under the CFRA?

MR. CAPILITAN: Same objections.

THE WITNESS: Yes.

BY MS. GEHRKE:

Q. What?

A. To my understanding, they broke their promise, and the time they gave will be equivalent to the CFRA.

Q. We talked about before that the CFRA and the

FMLA provide 12 weeks of leave under the statute.

Are you aware that anything beyond the 12 weeks of leave that you received was under the joint collective bargaining agreement and not under state or federal law?

A. I wasn't aware of it.

Q. Okay. So other than the fact that the letter said four years instead of three years and you relied on that, is there any other reason why you feel United violated your rights under the CFRA state law not the contract?

MR. CAPILITAN: Same objections.

THE WITNESS: I would think breaking their word and official letter will be equivalent to violate the Family Medical Leave Act.

BY MS. GEHRKE:

Q. Okay. So, in your mind, because United did not honor the date in the max LOA letter, that's a violation of either the FMLA or the CFRA?

A. Yes.

Q. Anything else?

A. No.

Q. Okay. All right. I want to show you now the max LOA letter, which we previously marked as Exhibit 6 in your day one deposition.

Did you recall this letter?

A. Yes.

Q. Okay. All right. If -- if we look down in the second paragraph, second sentence, it says, "As company policy and government mandates may change, the most current leave of absence packet is located on Flying Together. The leave of absence packet contains a summary of benefits affected by this status and should be read carefully."

Do you see that?

A. Yes.

Q. Okay. And I think -- last time we did not have the leave of absence packet as an exhibit. So I wanted to ask you about that now.

And we'll mark this next exhibit as Exhibit 32.

(Exhibit 32 marked for identification.)

BY MS. GEHRKE:

Q. For the record, it's Bates-labeled United 3789 through 3854. There's date on it of February 2018 as the last date it was revised.

Do you recognize this document?

A. Not all the pages, but I remember I received a lot of information, documents, paper or electronically, and I would -- I would think I

probably received this as one of the documents I received.

Q. Okay. So when you went on your leave of absence, you -- you believe you received this packet, Exhibit 32?

A. Probably, either electronically or in paper.

Q. Okay. And you see here to get --

(Connectivity/audio distortion.)

THE COURT REPORTER: Counsel, that complete question did not come out.

BY MS. GEHRKE:

Q. Were you aware that the flight attendant leave of absence packet was also available on Flying Together?

A. I see it.

Q. Okay. And do you recall ever going to Flying Together to look at the electronic version of the leave of absence packet?

A. I don't remember whether I did or not.

Q. Okay. All right. So let's go down here to the occupational leave section.

All right. That starts on page Bates-labeled 3804. Okay? And you testified earlier that you were on an occupational leave of absence, correct?

in this packet. So not particularly to a certain paragraph or section, I just don't recall this.

Q. All right. Under General Policies, Section 2, Returning from an occupational leave of absence, it states here, "You are expected to return to work as soon as you are able. If you are unable to return to work due to a different medical condition, you'll be transitioned to a nonoccupational leave of absence."

Did you understand, either because you saw this packet or more generally you had an awareness that you were expected to return to work as soon as you were able?

A. Yes.

(Exhibit 33 marked for identification.)

BY MS. GEHRKE:

Q. All right. We'll mark the next Exhibit 33. For the record, this is Bates-labeled United 3855 through 3943. It has a revision date of November 29th, 2021.

Have you ever seen this document before, Ms. Tien?

A. I -- I don't believe I did. It -- it doesn't look familiar to me.

Q. Okay. All right. Were you aware that there

A. I believe I didn't. I don't recall seeing this on Flying Together.

Q. But you knew this information was available on Flying Together generally? If you had any questions, you could go to Flying Together to look it up?

A. I wasn't sure because I didn't have questions. So I didn't try to see if Flying Together had the information or not because I didn't have questions. If I had questions, I may -- I may find this information on Flying Together.

Q. Let's go to what we previously marked as Exhibit 18 in your deposition. These were the text messages between yourself and Sheila Schultz of the AFA union.

Do you remember that?

A. Yes.

Q. Okay. And we went over these earlier in day one. I just wanted to ask you a follow-up question.

In this text message chain between you and Union Rep Sheila Schultz, she's told you that you can be on medical leave of absence for up to three years. It's likely that Sedgwick would send you back to work before then. Look here too. And there's a link:

https://www.unitedafa.org/benefits/occupational

Do you see that?

A. Yes.

Q. Do you recall ever clicking that link to see what resources the union website had on occupational leave benefits?

A. I don't recall.

Q. Okay. We'll mark the next exhibit.

Madam Court Reporter, what number are we up to?

THE COURT REPORTER: Let me just double-check.

Your next exhibit will be 34.

(Exhibit 34 marked for identification.)

BY MS. GEHRKE:

Q. Thank you. So I'll mark this as Exhibit 34. This is titled, "Know your occupational benefits" from the AFA website.

Do you recognize this packet, Ms. Tien?

A. You said on the AFA website?

Q. Yes.

A. No. I don't recall, and I don't recall seeing this AFA website.

Q. Okay. So Ms. Schultz told you about this available resource on the AFA website, but you don't

you and Ms. Nancy Byun-Riedel, and I want to start by going over your email to her that started this email chain.

You sent this to Ms. Byun-Riedel on February 7th, 2022, at 9:12 p.m.

Do you see that?

A. I do.

Q. Okay. And you write here, second paragraph of page 2 of that exhibit, "Had I been asked to return to work by January 25th, 2022, I would have agreed. I can return to my original position with some accommodation for my hand injury or to another position where I am qualified."

Do you see that?

A. I do.

Q. Now, as of January 25th, 2022, you had not yet had the hand surgery, correct?

A. Correct.

Q. And you had not yet been cleared to return to work in any capacity as a flight attendant, correct?

A. Correct.

Q. Okay. Now, you say here that if you -- had you been asked to return to work, you would have agreed.

A. You mean, did I expect United to offer light duty while I was waiting for the hand surgery?

Q. Even though you were asking for a leave of absence and on an approved leave of absence at the time, yes.

A. Yes.

Q. Okay. All right. On to now switch over to Exhibit 34 from your -- I'm sorry -- we're up to Number 36, I believe. We'll mark this as Exhibit 36.

(Exhibit 36 marked for identification.)

BY MS. GEHRKE:

Q. This is Bates-labeled Tien 522 through 525. These are documents you produced to United in this litigation that reflect positions you applied to after your termination at United.

Do you see that?

A. I do.

Q. Okay. So let's -- let's take them one by one, starting at the top.

So is it accurate that sometime in and around January 2023 you applied to be a manager of the station operations control at SFO?

A. Yes.

Q. Okay. And this was after you had already

been separated, correct?

A. Correct.

Q. Okay. And they were notifying you here in this email on page 522 that they had selected another candidate who more closely matched the requirements of the position?

A. Yes.

Q. Okay. So after you had been separated, you were still trying to be rehired by United but in a different position of manager station operations control?

A. I did.

Q. Okay. And then if we look at page 2, it's page 523, it's dated March 23rd, 2022, and it's an email thanking you for your recent application to the supervisor hub occupational opening.

Did you apply sometime around March 2022 for the supervisor hub occupational role?

A. I did.

Q. Okay. And did somebody else receive that job other than you?

Well, let me rephrase.

Did you -- were you ever given an update on the status of your application?

A. I remember I did not get any interview or

further --

Q. Okay.

A. -- further contact regarding this hiring.

Q. Okay. And was this supervisor role in the inflight department?

A. I believe so.

Q. Okay. All right.

A. The hub. Maybe the hub, San Francisco. I'm not sure.

Q. And next page, 524, there's an email from March 23rd, 2022, about a recent application for supervisor inflight services.

Do you recall applying for that position after your separation?

A. I do.

Q. Okay. And were you interviewed for the job?

A. No interview given. No opportunity was given.

Q. Okay. And you had not -- so you never received this job?

A. No, I didn't receive this job.

Q. Okay. Now, at the time of -- I should have asked this before all of them -- March 23rd, 2022, had you had the hand surgery yet?

A. I think I did.

medically able to do the flight attendant role without restrictions?

MR. CAPILITAN: Objection. Lacks foundation. Speculative. Vague and ambiguous.

THE WITNESS: I believe I most likely, probably, was able to do it in March.

BY MS. GEHRKE:

Q. With restrictions? You just testified it wasn't until May of 2022 that you were cleared to return to work without restrictions?

A. I remember I was cleared in February.

Q. I don't know that that's accurate. Your medical records reflect March 15th, 2022, you have work restrictions still?

A. I remember it was February I was cleared by the primary workers' comp doctor, not in May.

Q. Okay. So you believe that if you had -- if what you're saying is true that you were medically cleared without restrictions, that you could have performed the supervisor inflight services role, even if it meant being able to serve as a flight attendant on occasion?

A. Correct.

Q. Okay. All right. And then the last one is May 20th, 2022, a supervisor hub occupational, SFO,

you applied for a role around that time?

A. I did.

Q. And you did not receive the position?

A. No.  No interview offered.

Q. Okay.  And do you know if this was inflight or a different department?

A. I -- I think it was maybe for the whole San Francisco base, because it didn't specify inflight like the other one.

Q. Are you certain of that, or you're not sure?

A. I'm not sure if this is only for inflight or for the whole San Francisco base.

Q. All right.  So for all four of these positions that you applied to at United, after your separation in January of 2022, you did not receive those roles, correct?

A. Correct.

Q. Okay.  And do you have any information as to who was selected instead?

A. I don't.

Q. All right.  Are you still currently employed at United -- American Airlines?

A. I'm not.

Q. And when did your employment at American Airlines end?

camera if you want.

THE VIDEOGRAPHER: Yep.

MR. CAPILITAN: Okay. But we are going off the record. Just give me one second.

THE VIDEOGRAPHER: Counsel, would you like to go completely off the record?

MS. GEHRKE: Yes, please.

THE VIDEOGRAPHER: Counselors, we are going off the record. The time is 2:14. One moment, please.

(Discussion held off the record.)

THE VIDEOGRAPHER: Counselors, Madam Court Reporter, Madam Witness, we are going back on the record. The time is 2:19. Please proceed.

BY MS. GEHRKE:

Q    Ms. Tien, prior to the break, I was asking you about what you believe United Airlines did to you that would warrant punitive damages. Is there anything, other than your termination, separation of employment, that you believe violated your rights and would warrant punitive damages?

A    Do you mean --

MR. CAPILITAN: Objection, calls for a legal conclusion, legal contention.

THE WITNESS: Do you mean any other things than termination?

BY MS. GEHRKE:

Q Correct. I'm trying to understand, in order to get punitive damages, you have to prove that an officer, director or managing agent of United either engaged in or ratified malicious acts towards you that disregarded your rights or acted fraudulently towards you.

And so I'm trying to understand, other than your termination, if there's anything else that you believe United did that would warrant punitive damages.

MR. CAPILITAN: Same objections.

THE WITNESS: Other than termination and, also, they refused to provide reasonable accommodation after they -- after I told them they misled me.

BY MS. GEHRKE:

Q So they provided you with over a three-year leave of absence as an accommodation, correct?

A No.

Q From October 2018 until your separation January 25th, 2019 -- 2022, sorry, you were on an approved leave and not working, correct?

A Correct. I was on an approved leave.

Q Okay. So what reasonable accommodation did they fail to provide to you that you requested and that was denied?

MR. CAPILITAN: Same objections.

scheduled for October 26, 2021, correct?

A   I don't remember the exact date.

Q   Okay.  But do you recall, generally, it being scheduled in the October 2021 time frame originally?

A   October 2021, yes.  I think, we already went through that part last time.

Q   Okay.  And then, do you know why it wasn't scheduled for earlier, given that your injury was back in October 2018?

A   I'm not sure if you saw all the notes.  I'm not sure if those were written in the notes.  Dr. Pertsch, the hand surgeon, his office, they were -- they told me it was because during COVID, and then Dr. Pertsch had a vacation. Yeah, I think, those were the two main reasons.

Then Kevin and I, we talk about this during the visit.  And I remember I asked Kevin or the -- their assistant in the front desk to check with Dr. Pertsch's office.  I might have written emails with Dr. Pertsch's office; I'm not sure.  But I asked them to find out why it took so long to get an appointment, etcetera.  And also, Sedgwick, too.  It took Sedgwick so long to arrange appointment.

Q   Okay.  Well, once the surgery was scheduled in the October 2021 time frame, you asked to postpone that because your family cat had passed away and you wanted to

A   I think that was --

Q   -- or five zero?  We just can't understand you.

A   One -- the paper, the notes, they say one five, the doctor's note.

Q   The job description requires you to lift up to 55 pounds.

A   That's the flight attendant job duties.

Q   Correct.  So let me ask you this question.  You said, okay.  You had these conversations with Dr. Pertsch after your surgery, but you were already separated from United by then.  Did Dr. Pertsch, at any time prior to your separation of employment, ever tell you that you could do the flight attendant job at United?

A   Yes.  I say that earlier before the surgery, yes.

Q   Okay.  Then why did you not --

A   Before the termination.

Q   Why did you not ask him to submit a note releasing you to return to the flight attendant position full duty if you were able to do that?

A   Because we still had time, given the approved medical leave, and we still had a surgery, I mean, arranged.

Q   I don't understand, though.  If you felt you could do the full duties of a flight attendant, then why did you remain out on medical leave?

A   I was still -- I was still recovering and, because of the time I believe I was given, I wanted to heal as much as possible.  Not like I will be on medical leave forever.

But, since we believe I still had time, then we are waiting for the hand surgery instead of, okay.  I'm off, say, this week, this month, I -- the cyst did not bother me because it -- it was not stable, so it doesn't sound reasonable.  I requested I can work for this month and, maybe, another month.

And then the cyst came up, started hurt again.  And then I requested to be put back on the medical leave.  It didn't make sense.

Q   So I just want to be clear, because you never requested intermittent leave.  You requested and were given a full leave of absence to not work.  So my question is, if Dr. Pertsch and you thought that you could do the full flight attendant duties prior to your separation on January 25th, 2022, why did you not make that request?

A   Because I was still --

(Overspeaking.)

MR. CAPILITAN:  Objection, asked and answered.

THE WITNESS:  Because I was still recovering and in the approved medical leave.

REPORTER'S CERTIFICATION

I, Arleen Jimenez, a Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

In witness whereof, I have subscribed my name this 14th day of July, 2025.

*Arleen Jimenez*

Arleen Jimenez, CSR No. 4240

# EXHIBIT 35

# (Erroneously marked as Ex. 35; Identified in the deposition as Ex. 36)

 Gmail

Angela Tien <angelatien.sf@gmail.com>

## United - Application Update

**United Human Resources** <do_not_reply_hr_taleo@united.com>　　　　　　　　Tue, Jan 24, 2023 at 3:48 PM
Reply-To: do_not_reply_hr_taleo@united.com
To: angelatien.sf@gmail.com



Yihsing,

We wanted to thank you for your interest in the position of Manager - Station Operations Control-SFO00004295. We have reviewed your credentials and experience and we have selected other candidates whose backgrounds more closely match the requirements of this position. Please know that you were part of an extremely competitive candidate pool and our decision was a difficult one.

We sincerely appreciate your interest in United Airlines, your time and participation in our hiring process. Your application will be included in our talent community and be available to our recruiting team for consideration in other rolls. We invite you to actively look at additional job postings and apply to other positions that interest you at www.united.jobs.

Best regards,

United Airlines Talent Acquisition

united.jobs

**Let's get social**




YIHSING TIEN
VOLUME II
**Exhibit 35**
07/08/2025

**TIEN0522**

 Gmail

## United - Application confirmation

**United Human Resources** <do_not_reply_hr_taleo@united.com>
To: Yihsing Tien <angelatien.sf@gmail.com>

Wed, Mar 23, 2022 at 10:04 PM



Yihsing,

Thank you for your recent application to our **Supervisor - Hub Occupational** opening.

Login here to view your candidate profile and view the status of your application.

**Important Information about COVID-19 Vaccination** – If you receive an offer, in addition to other policy affirmations, you will be required to provide documentation of a completed COVID-19 vaccination record on your first day, meaning you must be fully vaccinated by the start of your employment (two doses of a two dose vaccine, one of a single dose vaccine). If you are unable to be vaccinated due to a medical restriction or religious reason, you will be able to participate in the Company's reasonable accommodation process (RAP) prior to your start date. The RAP would need to be fully approved prior to starting, and if the RAP is denied you must be fully vaccinated by the start of your employment (two doses of a two dose vaccine, one of a single dose vaccine). If you are unable to prove full vaccination status on your first day of employment, and your RAP was not approved prior to starting, you will be subject to immediate termination.

Thanks for your interest in careers at United.

**Best regards,**
Recruiting

**united.jobs**

**Let's get social**

      

TIEN0523


## United - Application confirmation

**United Human Resources** <do_not_reply_hr_taleo@united.com>
To: Yihsing Tien <angelatien.sf@gmail.com>

Wed, Mar 23, 2022 at 10:38 PM



Yihsing,

Thank you for your recent application to our **Supervisor - Inflight Services** opening.

Login here to view your candidate profile and view the status of your application.

**Important Information about COVID-19 Vaccination** – If you receive an offer, in addition to other policy affirmations, you will be required to provide documentation of a completed COVID-19 vaccination record on your first day, meaning you must be fully vaccinated by the start of your employment (two doses of a two dose vaccine, one of a single dose vaccine). If you are unable to be vaccinated due to a medical restriction or religious reason, you will be able to participate in the Company's reasonable accommodation process (RAP) prior to your start date. The RAP would need to be fully approved prior to starting, and if the RAP is denied you must be fully vaccinated by the start of your employment (two doses of a two dose vaccine, one of a single dose vaccine). If you are unable to prove full vaccination status on your first day of employment, and your RAP was not approved prior to starting, you will be subject to immediate termination.

Thanks for your interest in careers at United.

**Best regards,**
Recruiting

**united.jobs**

**Let's get social**

     

TIEN0524

 
## United - Position update

**United Human Resources** <do_not_reply_hr_taleo@united.com>
Reply-To: jason.stern@united.com
To: angelatien.sf@gmail.com

Fri, May 20, 2022 at 9:57 AM



Yihsing,

We have reviewed your credentials and experience for the Supervisor - Hub Occupational - SFO00004099 position. At this time, the position has been filled. We have selected other candidates whose backgrounds more closely match the requirements of this position.

We invite you to look at additional job postings and apply to other positions that interest you at www.united.jobs.

Best regards,

Recruiting

united.jobs

**Let's get social**

      

TIEN0525

# Exhibit C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YIHSING TIEN aka ANGELA TIEN, )

 )

   Plaintiff, )

 )

  vs. )

 ) Case No.:

UNITED AIRLINES, INC., a California ) 23-CIV-01798

Corporation; TALIA ESPINOZA, )

an individual; and DOES 1-100, )

inclusive, )

 )

   Defendants. )

_____)

DEPOSITION OF

ELIZABETH JACOBSEN

THURSDAY, JANUARY 23, 2025

SAN FRANCISCO, CALIFORNIA

FILE NO.: 6943465

REPORTED BY: MAXIMILLIAN A. CONTRERAS, CSR 13876

Page 1

I N D E X

PAGE

WITNESS:  Elizabeth Jacobsen

EXAMINATION BY ATTY. CAPILITAN.....................5

E X H I B I T S

NO.  DESCRIPTION                                    PAGE
Exhibit 1    Notice of Deposition..........................10
Exhibit 2    Flight Attendant Agreement 2016-2021...........63
             [TIEN-58 -- 210]
Exhibit 3    1/25/19 letter Jacobsen=>Tien..................81
Exhibit 4    Employee's Guide to Workers' Compensation......88
             [TIEN-26 -- 41]
Exhibit 5    E-mail chain 3/2/22............................93
             [UNITED-3607 -- 3609]
Exhibit 6    E-mail 1/7/22 Espinoza=>Tien.................107
             [UNITED-3454]
Exhibit 7    Working Together Guidelines..................115
             [UNITED-545 -- 3454]

BY ATTY. CAPILITAN:

Q.   Do you recall ever sending this letter out?

A.   I don't recall.

Q.   Okay.  But do you recall sending similar letters of this type out to different Flight Attendants with UA?

A.   This is -- this letter was -- I did not generate this letter.  This letter would have been generated by our Administrative Support Team.  Not "Administrative" in the same category as Supervisor, but I would just say we had a group of "coordinators," they were called -- that would generate this type of letter based on information that they received from the FAST team or the Service Center.

Q.   So you did not -- so this letter itself, you did not type any portion of this letter out?

A.   No, I did not.

Q.   Okay.  So this letter was basically generated by either the FAST team or Service Center, provided to you.  Then once received, did you just attach your signature when it's sent out?  Or how did --

What was your role in this?

ATTY. GHERKE:   Misstates prior testimony.

Go ahead.

THE WITNESS:   Can you repeat.

Page 82

ATTY. CAPILITAN: Yeah, yeah.

THE WITNESS: Sorry guys.

BY ATTY. CAPILITAN:

Q. No, it's fine. Just for clarification: So you said that this document here was generated -- you didn't have a role in the body, at least, of this paragraph; but it was generated by --

A. I didn't sign it.

Q. Okay. So --

A. My name is there and it was my name was put on the letter. But I did not generate this letter.

Q. Okay. So you had no role in actually any sort of capacity in the creation of this letter?

A. No.

Q. Okay. So who -- so when this was sent out, did they use your e-mail with UA?

A. No, I don't believe so.

Q. Okay. So did they do this just because --
When this letter was generated, is it just because you were the Administrative Supervisor at the time?

A. You mean with my name on it?

Q. Yeah.

A. Yes, I believe so.

Q. Well, to clarify, it says here, "Supervisor

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

A.   Did I -- what's your question?

Did I receive letters?

Q.   Yeah.   So did you ever see any sort of generated letters where the dates were placed in such a way that went beyond three years?

ATTY. GHERKE:   Overbroad.

THE WITNESS:   I don't believe so.

But again, I didn't generally -- there were numerous letters that went out that I have may not have seen.

BY ATTY. CAPILITAN:

Q.   From your understanding about how these letters are generated, do you know if it's an automatic system that does it?   Or whether it's individuals of whatever department that are the ones that type up this letter and put in the dates manually?

ATTY. GHERKE:   Calls for speculation.

Lacks foundation.   Go ahead.

THE WITNESS:   I believe that the Leave of Absence dates, the exhaustion of the sick bank, and then when the Flight Attendant is placed on the leave, and then the duration of the leave, is all calculated at the Employee Service Center or by the FAST team.   And then that information is sent to the Coordinator team who generates the letters.

Page 87

I had no role calculating the date the sick bank exhausted, the time frame before you're placed on a leave, or the dates that are referenced.

BY ATTY. CAPILITAN:

Q.   Okay.  Then are you aware of any other situation where a Flight Attendant was given the incorrect date for when her -- or their administrative separation would occur?

ATTY. GHERKE:  Overbroad.

THE WITNESS:  Am I aware of that?

When I was the Supervisor?

ATTY. CAPILITAN:  (Nonverbal).

THE WITNESS:  I'm not aware of that.

ATTY. CAPILITAN:  This will be Exhibit 4.

(Exhibit 4 marked for identification.)

BY ATTY. CAPILITAN:

Q.   So this is the "Employee's Guide to Workers' Compensation."  And I just want to --

A.   I just want to clarify that my understanding of the packet, this isn't the total.  This -- I don't know, I thought it was a bigger packet.

ATTY. GHERKE:  Then I'm going to object to the extent it's not -- actually, I see what you're talking be about, Ms. Jacobsen.  It goes from page 2, 3, all the way to 16.  So there's only three pages plus the cover

And overbroad.

THE WITNESS:  I would be speculating to even answer that.

BY ATTY. CAPILITAN:

Q.  Well, that's why to your understanding, was there any sort of policy or no policy?

ATTY. GHERKE:  Same objections.

THE WITNESS:  Policy, regarding what?

BY ATTY. CAPILITAN:

Q.  So the policy I'm asking is whether or not the only requirement to inform a Flight Attendant is the single letter provided to them as to the end time -- beginning and end date of their LOA.

ATTY. GHERKE:  And are you referring only to 2018 till she left the role in 2019?

ATTY. CAPILITAN:  Yes.

ATTY. GHERKE:  Okay.  With that clarification I still think it's overbroad.  Vague.  And calls for speculation.  But you can answer if you know.

THE WITNESS:  I don't know.

What is your question again?

BY ATTY. CAPILITAN:

Q.  So from your understanding, from the time you were with UA, that period of time, when these letters were sent out in regards to the start time and end time

to a Flight Attendant's LOA, was there only an obligation to send the one letter out?

ATTY. GHERKE: Same objections.

THE WITNESS: I am unaware if there was any other. But my understanding was that was the official notification.

BY ATTY. CAPILITAN:

Q. Okay. To your knowledge, does UA or any other department ever provide updates as to the lead-up to the actual termination date?

ATTY. GHERKE: Same objections.

THE WITNESS: Excuse me?

ATTY. GHERKE: I just said, "Same objections." Go ahead.

THE WITNESS: I can't speak to other departments. I don't know what the process is for other departments. And my understanding was that we don't provide update notifications because there are plenty -- it's in the Working Together Guidelines and it's in the Collective Bargaining Agreement and it's been put in a letter.

BY ATTY. CAPILITAN:

Q. Are you aware of any sort of automatic system that usually informs a Flight Attendant that is on LOA about the upcoming deadlines that might be approaching?

Page 98

REPORTER'S CERTIFICATE

I, MAXIMILLIAN A. CONTRERAS, CSR #13876, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 6th day of February, 2025.

MAXIMILLIAN A. CONTRERAS

CSR #13876

Page 151

# Exhibit 3



1/25/2019

U308222 / SFOSW
Yihsing Tien
370 Imperial Way Apt 228
Daly City, CA 94015 USA

Dear Yihsing,

The purpose of this letter is to advise you that our records indicate you have been placed on a leave of absence effective **1/25/2019**. If you remain medically unable to return to work, in accordance with Section 15E. of the Joint Collective Bargaining Agreement, you will be administratively separated on **1/25/2023**.

When you begin your Leave of Absence I will be your supervisor in lieu of your base supervisor. As Company policy, and government mandates may change, the most current Leaves of Absence Packet is located on Flying Together. The Leave of Absence Packet contains a summary of benefits affected by this status and should be read carefully.

Important information while on an inactive Leave of Absence:

- You are expected to remain under a physician's care, as well as provide OPCMD with regular medical updates following each visit or as directed by UAL Medical. To verify receipt of your medical documentation you may contact the Employee Service Center (ESC) at 1-877 UAL-ESC9 (1-877-825-3729).
- Your UA-issued (white) TSA crewmember badge may be retained. Should it expire during your leave of absence, it cannot be renewed until your return to active status.
- You will keep your LINK and accessories for the duration of your leave. If your leave of absence extends past 90 days, your LINK service will be suspended until your return to active service.
- Reasonable Accommodation Process (RAP), outside employment guidelines and information regarding seniority accrual is in the Leaves of Absence packet.

You are very important to United's success. I wish you a speedy recovery and look forward to having you back to work soon. Please contact me if you have any questions.

Respectfully,

Elizabeth Jacobsen
Supervisor Inflight Service
650-874-6514
elizabeth.jacobsen@united.com

cc: Personnel File



EXHIBIT
3

SB Exhaustion / Max Leave

Rev 12-5-17

# Exhibit D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YIHSING TIEN aka ANGELA TIEN,       )

 )

          Plaintiff,       )

 )

    vs.             )

                    ) Case No.:

UNITED AIRLINES, INC., a California ) 23-CIV-01798

Corporation; TALIA ESPINOZA,    )

an individual; and DOES 1-100,    )

inclusive,                 )

 )

         Defendants.    )

                    )

DEPOSITION OF

TALIA ESPINOZA

FRIDAY, JANUARY 24, 2025

SAN FRANCISCO, CALIFORNIA

FILE NO.: AB 7001211

REPORTED BY: MAXIMILLIAN A. CONTRERAS, CSR 13876

Page 1

A P P E A R A N C E S

FOR PLAINTIFF:

    KENZO CAPILITAN, ESQ.

    REISNER & KING LLP

    15303 Ventura Boulevard

    Sherman Oaks, California 91403

    (818) 981-0901

    kenzo@reisnerlaw.com

FOR DEFENDANTS:

    MICHELE HAYDEL GEHRKE, ESQ.

    REED SMITH LLP

    101 Second Street, Suite 1800

    San Francisco, California 94105

    (415) 659-4798

    mgehrke@reedsmith.com

ALSO PRESENT:

    YIHSING TIEN

A.    Yes.

Q.    Okay.  And throughout this deposition I might refer to United Airlines as "United" or "UA."
Also, San Francisco International Airport as "SFO."
And city of San Francisco as well, "SF."  So that for clarity.

And when I discuss -- unless I specify otherwise, when I discuss things in regards to United's operation, I specifically mean the operations of United at SFO.

ATTY. GHERKE:  And the Inflight Division.

ATTY. CAPILITAN:  Well, not necessarily, but we'll see.

ATTY. GHERKE:  Okay.  Well, if you don't limit it appropriately, then I'll just object.  But go ahead.

BY ATTY. CAPILITAN:

Q.    How long have you been working for United?

A.    For 25 years.

Q.    25 years?  So did you start in 2000?

A.    In '99.

Q.    1999?  Okay.  And when you first started working with United, what was your position?

A.    At that time, it was called an Alpha Clerk.

Q.    And then how long were you in that position for?

Page 12

A. I don't recall the exact time. My estimate is I believe two years, a year and a half.

Q. So would you -- would 2001 be accurate?

A. Around 2000. It wasn't very long.

Q. Okay. 2000-2001?

A. (Nonverbal)

Q. Okay. Then after Alpha Clerk, what position did you transfer to?

A. So it's a Coordinator, but there's -- you break it down. It's a Operational Coordinator, a Purser Coordinator, it's an Inflight Coordinator.

Q. Okay. And were you promoted to this position?

A. No, I applied for it.

Q. And then after -- well, how long did you remain in the Inflight Coordinator position?

A. Till 2018.

Q. Okay. And then what position were you -- I guess were you promoted or did you request a transfer?

A. I applied to be an Inflight Supervisor in 2018.

Q. Okay. And then -- so you're Inflight Supervisor now. How long did you remain in that position?

A. I'm still an Inflight Supervisor.

Q. Okay. Then I want to go over, I guess, your

Page 13

by that?

BY ATTY. CAPILITAN:

Q. So in regards to providing support to Flight Attendants on med leave -- such as you mentioned like answering questions, contacting the Flight Attendant Service Center, guiding them per the Contract -- when providing that information, how did you usually relay that information to Flight Attendants?

A. It depends how the Flight Attendant reached out to me; either by phone, in person, via e-mail.

Q. What about text?

A. No. I don't use texts.

Flight Attendants couldn't text us to our regular phone. It doesn't have that capacity and I've never used my personal phone to.

Q. Does United Airlines provide a work phone?

A. Yes, now they do.

Q. But at time, they didn't provide a personal work phone?

A. At the time when I was an Admin, I didn't have a phone. I don't know if they provided it, but I know I didn't have an extra phone for the company.

Q. Okay. Well, although you don't recall the exact year, you said approximately a year after you got into regular Supervisor, you became an Administrative

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

A. Yes. There was a signed letter that it was an agreement between United and the Union notifying Flight Attendants, everyone, that that applied to occupational.

Q. And where can this letter be found?

A. I don't know. I haven't tried to search it, so I don't know where it can be found. The Union, I know, is a great resource and I'm sure they provide that or they have the letter.

Q. Do you recall personally seeing the letter?

A. No, I don't.

Q. Okay. This letter that you mentioned, was it provided to all Flight Attendants through an e-mail?

ATTY. GHERKE: Calls for speculation. Lacks foundation.

THE WITNESS: I don't know how it was provided, but I know there's wide communication. Every time there's a change or something is updated with United, everyone gets notification of it.

BY ATTY. CAPILITAN:

Q. Do you recall when you were first notified that occupational injuries also applied to this section?

A. When I was doing the administrative leave, I knew. It was in the Workers' Comp Guide. It was in the Leave of Absence. They have that information.

back to work -- extensive leave. I'm not talking about they had a permittable three years and they took half a year.

But those that take almost the entirety of the time in order for them to recover, does United change or alter what they previously -- their duties were previously as a Flight Attendant in terms of hours or flight scheduling?

ATTY. GHERKE: Vague. Overbroad.

Incomplete hypothetical. Argumentative.

Assumes facts not in evidence.

Calls for improper opinion. Speculation.

THE WITNESS: No, they don't.

BY ATTY. CAPILITAN:

Q. If a Flight Attendant is taking an extensive Leave of Absence or Medical Leave of Absence and it appears that their injury or disability is causing them to take longer to heal than was expected, does United try to reach out to those employees to ensure whether or not they can return?

ATTY. GHERKE: Overbroad. Vague.

Incomplete hypothetical.

Assumes facts not in evidence.

Calls for speculation.

THE WITNESS: My understanding is United does

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

not reach out to the employee. The employee's in constant communication with United because documents need to be submitted. But my understanding is they don't besides the first initial letter when they go out of max LOA notifying them that they're on max LOA and there's certain steps they have they to take.

Other than that, not to let them know. They don't tell the Flight Attendant, "You need to come back by this date."

BY ATTY. CAPILITAN:

Q. Is that still currently the policy of United, to your understanding?

A. Yes. Contractually, they get one notification.

Q. Okay. Do you feel that one notification is -- throughout a three-year period of time when an individual is on a Medical Leave is a fair requirement?

ATTY. GHERKE: Vague. Overbroad.

Incomplete hypothetical.

Calls for improper opinion. And speculation.

THE WITNESS: I feel it's the Flight Attendant's responsibility to make sure, once again, to know your Contract and to know what are the expectations of the Company when you go out on a leave.

///

Page 88

BY ATTY. CAPILITAN:

Q. That's not my question. My question was whether you believe it's fair that one notification within a three-year period of time starting in the beginning of the first year, that that's enough notification.

ATTY. GHERKE: Same objections.

Also asked and answered.

THE WITNESS: I believe as an employee, I need to be -- it's important. It's my job, so I need to make sure that I am on top of the Contract. And knowing that I'm on a leave, you have that one contractual communication and then you have the Leave of Absence packet, Flying Together, other notifications that will let you know. You have the Union resource that will let you know about it.

BY ATTY. CAPILITAN:

Q. Well, let me ask you this then. And I just want a yes-or-no for this one.

Wouldn't you think it would be reasonable for United to provide at least a yearly update in regards to an individual's LOA date?

ATTY. GHERKE: Calls for improper opinion. Speculation. Incomplete hypothetical. Asked and answered.

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300     www.veritext.com

THE WITNESS: I can't answer yes-or-no.

The Company is -- the Flight Attendant's in touch with the Company because they have to submit documents. So the Flight Attendant has access to the FAST team, to the Union, to Flying Together; so it's important.

BY ATTY. CAPILITAN:

Q. United is a very large major international airline. Do you believe that to provide a yearly update would be of any great difficulty to United for its employees regarding the dates of their LOA?

ATTY. GHERKE: Argumentative.

Asked and answered.

Harassing. Badgering the witness.

Calls for improper opinion. Speculation.

THE WITNESS: I think United does a good job of communicating and letting us know what our resources are. I believe it is the Flight Attendant and the employee's responsibility to know my expectation, "This is what I'm expected to do while on a Leave of Absence."

BY ATTY. CAPILITAN:

Q. Okay. But you don't think that it'd be helpful for United to provide at least a yearly update?

ATTY. GHERKE: Asked and answered several

Page 90

Flight Attendant's Agreement states that it's in relation to non-occupational injuries.

And again, you have stated that although you may have understood yourself that it also applied to occupational injuries, that was clarified in the letter -- that I don't believe has been produced yet --

ATTY. GHERKE: That's not true. The side letter has been produced. It's the August 2017 letter from Sam Risoli to Ken Diaz.

ATTY. CAPILITAN: Would it be possible to pull it up then?

ATTY. GHERKE: I can look during a break.

ATTY. CAPILITAN: Yeah, during a break.

ATTY. GHERKE: We went over it with Ms. Tien during her deposition.

ATTY. CAPILITAN: Yes. I don't have all the exhibits from that depo.

ATTY. GHERKE: And I'll just note for the record you had a long speaking portion there.

I don't even know if you've gotten to a question yet. But I'll object to the premise of all of that. We're not adopting it. But go ahead.

BY ATTY. CAPILITAN:

Q. Again, the letter you referenced -- I guess I'm just trying to get clarification. The letter you

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

referenced, where could a Flight Attendant find this letter?

ATTY. GHERKE: Asked and answered.

You're referring to the August 2017 letter I just talked about?

ATTY. CAPILITAN: I would need to see it.

ATTY. GHERKE: Okay. But what we're calling the "side letter"?

ATTY. CAPILITAN: Yes.

THE WITNESS: I will say that in Flying Together, there's all the documents in there. I'm sure it was provided -- and I'm speculating to Flight Attendants, because that's a huge thing. It's a change in the Contract. I mean, we all -- the Contract is our life at United and that's what we go by; so the Union has it.

BY ATTY. CAPILITAN:

Q. When you say "Flying Together," it's a website. And was that website also available during this time period, 2018-2022?

A. Yes.

Q. Okay. So I know you had mentioned this other department, FAST. Was it FAST's responsibility in determining these -- the dates of LOA?

ATTY. GHERKE: Calls for speculation.

Page 100

mean?

A.    The Coordinators in the Base.

The ones who create the letters.

Q.    Okay.  So are the Coordinators a part of the FAST team?

A.    No.  They're part of Inflight.

Q.    Okay.  So there are Coordinators who --

So the letter I'm talking about, the LOA letter -- and we could go back to it just for reference, because you said that it's somewhat of standardized letter received.

A.    (Nonverbal)

Q.    And again, no "mm-hmms."

You need to say yes-or-nos.

A.    Oh.  Yes.  Sorry.

Q.    Okay.  So you mentioned that there are -- what did you say again?  The ones who prepare at Inflight?

A.    Coordinators.

Q.    Coordinators, okay.  So do Coordinators -- so Coordinators are not part of the FAST team?

A.    No.

Q.    They're part of Inflight?

A.    Yes.

Q.    Okay.  So when -- but does a Coordinator

prepare this type of document?

A. The Coordinators do prepare letters.

They're formatted letters.

Q. That's why I'm asking. To your knowledge, are these the formatted letters that you're talking about?

ATTY. GHERKE: Vague. Overbroad.

THE WITNESS: Yes.

BY ATTY. CAPILITAN:

Q. Okay. Then if the Coordinators are Inflight, is it a specific department these Coordinators are in?

A. No. They're at the Base. They're Inflight in San Francisco. Our Coordinators.

Q. What else do these Coordinators do then?

What are their responsibilities aside from preparing these letters to be sent out?

A. They prepare letters.

They used to sit at the concierge desk.

And they supported the Supervisors.

Q. How many Coordinators in the time frame that you were Administrative Supervisor or Inflight Supervisor were there, to your knowledge?

ATTY. GHERKE: What kind of Supervisor?

ATTY. CAPILITAN: Administrative and Inflight Supervisor.

Page 118

would it be done on the same day if possible?

A. Yes.

Q. So then it's understood that Ms. Tien then gave you a call on that same day, January 27, 2022. Do you recall receiving a phone call from Ms. Tien?

A. Yes.

Q. Okay. And do you recall the subject matter of that call?

A. It was regarding her max LOA.

I had to call her and left her a message.

Q. So you recall initiating a call and then leaving a message. And in that first call, in the message you sent, what did you state to Ms. Tien?

A. I don't recall exactly what I said, but it was give her a heads up that the FedEx was coming her way due to the max LOA -- reaching the max LOA.

Q. And on that same day that you called and left a message, did Ms. Tien reach back to you?

A. Yes.

Q. Okay. And do you recall if it was in regards to getting clarification as to why she had been terminated?

A. Yes.

Q. Okay. And was that when she informed you that she had received a letter from United, that LOA letter

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

stating she had until January 25th, 2023, for her to return?

A. Yes.

Q. Were you aware of that letter at that time?

A. No.

Q. Okay. What did you state to her when she said that the date on the letter had stated to her that it was January 25th, 2023?

A. So I don't recall my exact conversation with Ms. Tien. I know that I told her that it was contractually per the Contract, and then I asked her to forward the letter to me.

Q. Well, do you recall getting that letter forwarded to you later that day?

A. Yes. I think it was the same day.

Q. Okay. And upon preview of the document, did you determine that yes, the date on the document was incorrect?

ATTY. GHERKE: Calls for opinion. Overbroad.

THE WITNESS: So I saw the date in there. I did not know whether that was correct or not.

BY ATTY. CAPILITAN:

Q. Well, you originally called and left a message to let her know that her termination -- she had been terminated because the LOA date had passed, which was

so I don't want you to speculate or to assume or to guess. I just want to make sure what she's referencing, this other situation -- but you don't have knowledge of that?

A. I do not.

ATTY. CAPILITAN: Okay. Let's go on a break, like ten minutes.

(Off the record at 4:37 PM.)

(On the record at 4:48 PM.)

BY ATTY. CAPILITAN:

Q. Okay. So aside from the calls that you made -- well, the call you made to Liz and the e-mails that you sent out regarding the issue with Ms. Tien's letter and her circumstances, was there any other --

Let me rephrase that. Is there anything else you could have done that could have helped rectify this issue?

ATTY. GHERKE: Calls for speculation. Asked and answered. Incomplete hypothetical. Vague. And overbroad.

THE WITNESS: I believe I was being helpful in the sense of asking her. So keep in mind that Ms. Tien was already administratively separated when my first conversation with her. My simple response as an Inflight Supervisor would have been like, "Call your

Page 225

Union for additional assistance."

I was being helpful in asking her for the letter. I did not have to get myself in that situation. I wanted to know what the letter said and I wanted to escalate, and that was being helpful for me -- trying to figure out what had happened, and if anything needed to happen moving forward. Whoever the higher-ups needed to make decisions, I just wanted to do it right there and then. So for me, I was being helpful at that time.

I will not be able to rectify it. I don't know what United would have done. Once again, it was contractually. When you become an employee with United, we all know about the Contract. We know what the expectations are. And I don't know what the Company would have done to rectify.

BY ATTY. CAPILITAN:

Q. Okay. Do you feel that the steps that you did take in this circumstance was you simply doing Ms. Tien a favor?

A. No.

ATTY. GHERKE: Was going to say misstates prior testimony. Go ahead.

THE WITNESS: No. I was trying to find out what happened. It wasn't about doing favors. I was trying to find out what had happened. I was not

Page 226

REPORTER'S CERTIFICATE

I, MAXIMILLIAN A. CONTRERAS, CSR #13876,
Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken
before me at the time and place therein set forth,
at which time the witness was put under oath by me;

That the testimony of the witness, the
questions propounded, and all objections and statements
made at the time of the examination were recorded
stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct
transcript of my shorthand notes so taken.

I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
interested in the action.

I declare under penalty of perjury under
the laws of California that the foregoing is true and
correct.

Dated this 12th day of February, 2025.

MAXIMILLIAN A. CONTRERAS
CSR #13876

Page 239

# Exhibit E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YIHSING TIEN aka ANGELA TIEN,    ) No.4:23-cv-02622 JSW
    )
    )
           Plaintiff,    )
    )
vs.    )
    )
UNITED AIRLINES, INC.,    )
a California Corporation; TALIA    )
ESPINOZA, an individual; and    )
DOES 1-100, inclusive,    )
    )
           Defendants.    )
_____)

VIDEOCONFERENCE DEPOSITION OF UNITED AIRLINES,

INC., BY AND THROUGH MARY MERRITT

JULY 9, 2025

REPORTED BY:  LAURA S. WILLIAMS, CSR No. 9921

FILE NUMBER:  7431698

Page 1

I N D E X

WITNESS:  Mary Merritt

EXAMINATION                                         PAGE

    By Attorney Capilitan                       8, 144

    By Attorney Gehrke                             138


EXHIBITS:

PLAINTIFF'S

NUMBER                   DESCRIPTION                  PAGE

Exhibit 1 Correspondence to Yihsing Tien from United,   56
          dated 1/25/19


Exhibit 2 2016-2021 Flight Attendant Agreement         78


Exhibit 3 E-mail string, the last of which is sent to   82
          ESC - Occupational, et al., from FAST Inflight
          Admin, dated 1-25-19


Exhibit 4 E-mail string, the last of which is sent to   87
          Talia Espinoza, et al., from FAST Inflight
          Admin, dated 1-27-22


Exhibit 5 United FAST Inflight Administration           95
          Processing Pay Option Letter (Confidential)

Exhibit 6 FAST Comments and Work Notes                 117


DEFENDANT'S

NUMBER                   DESCRIPTION                  PAGE

Exhibit 7 Correspondence to Ken Diaz from Sam Risoli,   141
          dated 8-14-17

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
    (NONE)

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300        www.veritext.com

A.   Of course.

Q.   And then on occasion opposing counsel -- or counsel representing you rather may object to certain questions I may have but just because she objects, it doesn't mean that you don't need to answer.  I still    11:22 expect an answer unless she specifies otherwise.  I mean in regards to attorney-client confidentiality.

But other than that, I think we can begin here.  Well, first off, are you currently employed with United Airlines?    11:22

A.   Yes, I am.

Q.   Okay.  And what is your current job title?

A.   I am the senior manager of the flight attendant support team.

Q.   And what are your current duties as a senior    11:22 manager of the flight attendant support team?

A.   It is leading and supporting my team which is comprised of a team in Chicago as well as a team in Manila and then a team in Cape Town.  We handle all flight attendants scheduling functions as well as    11:23 administrative functions.

Q.   Okay.  And then you said Manila and Cape Town.  Is that -- I'm assuming that's the Philippines and South Africa?

A.   That is correct.    11:23

Page 11

Q. And I -- I'm assuming the flight attendant support team, that's the shorthand for FAST; is that correct?

A. That is correct.

Q. Okay. So moving forward, I'll just refer to it as FAST.

How long have you held that current position?

A. As a senior manager, two months.

Q. Okay. So you've been senior manager with FAST for two months meaning you began around what is --

A. April.

Q. April?

A. Uh-huh, yes.

Q. And prior to becoming the senior manager of FAST, were you still involved in with the FAST team?

A. Yes, I was.

Q. And so prior to you becoming a senior manager, what was your position with FAST?

A. Manager flight attendant support team administration team.

Q. And what were the other two you said? You said the manager of FAST and then there was the other ones?

A. It's manager flight attendant support team

Q. And then now in your new role how about in regards to scheduling then? Well, sorry. Let me clarify.

So now that you're senior manager of the FAST, you mentioned that you do your roles in now both the administrative work as well schedule; is that correct?     11:27

A. That is correct, yes.

Q. Okay. So in your new role specifically for scheduling, what does that entail now?     11:27

A. That would be placing flight attendants in training, flight attendants off and off a sick call, flight attendant trades.

Q. Anything else?

A. I was going to say more trades but it's -- that is the majority of all of the work that is published on the team.     11:27

Q. Okay. Well, I know that you stated that you were on the FAST team for 14 years but is that the entirety of your life working with United?     11:28

A. No, it is not.

Q. So what is your entire length of your work with United?

A. Over 24 years.

Q. And what were you -- what were you -- I     11:28

Page 14

guess as you were employed with United prior to you being a part of the FAST team, what was your role before then?

A. I've always been on the FAST team for my entire career.

Q. So just before you became manager of FAST, what was your position with FAST prior to that?

A. I've held several positions. I started off as a pre-scheduler assistant, I worked up to a facilities associate and then a supervisor and then after that facilities supervisor to manager to senior manager.

Q. And from what I can tell, there were two acronyms that were being used. There was FAST and then there's also FASC. Is FASC and FAST the same department or entity?

A. Yes, it is.

Q. Okay. So when was -- and just to correct me, what's the acronym for FASC, what does that stand for?

A. Flight attendants service center.

Q. When did the change occur?

A. Around 2009.

Q. Okay. Well, so in regards to today's deposition, what steps have you taken to prepare?

Page 15

Q. But before you became senior manager, how many managers are within the FAST team itself?

A. Two.

Q. Have there always been two I guess managers below the senior manager since you've been with the FAST team? 11:44

ATTORNEY GEHRKE: Vague. Overbroad. It exceeds scope.

BY ATTORNEY CAPILITAN:

Q. You can answer if you know. 11:44

A. Yes.

Q. And so for the relevant period of time when Ms. Tien was still employed and then a little -- a little bit past after, so October 2018 to June of 2022, you were one of the managers with the FAST team. Who was the other manager? 11:44

A. Sue Cleverly.

Q. Would be that spelled S-u-e for Sue and then Cleverly is?

A. C-l-e-v-e-r-l-y. 11:45

Q. And who had been senior manager at the time?

A. Kevin Nowoc, N-o-w-o-c.

Q. So then at the time, that period of time so 2018 to 2022, the senior manager would have been Kevin Nowoc and then the two managers would have been 11:46

Page 23

yourself and then Sue Cleverly. No other managers within the FAST team?

A. No.

Q. Okay. And so at that time did you and Sue both report to Kevin?                    11:46

A. Yes.

Q. Okay. And I'm guessing yourself and Sue Cleverly, you both had the same responsibilities in the same departments at the same locations or were they separated?                    11:46

ATTORNEY GEHRKE: It misstates testimony. Overbroad and vague.

You can answer.

THE WITNESS: So she handled schedule. I handled admin. We had different responsibilities    11:47 for our team based off of the -- the work we did.

BY ATTORNEY CAPILITAN:

Q. But the -- but the work that you did even though it was -- what do you call it? Different areas of work that was being conducted, it was still amongst    11:47 the same employees currently at these different locations?

ATTORNEY GEHRKE: Vague. Overbroad.

THE WITNESS: Yes.

BY ATTORNEY CAPILITAN:                    11:47

Page 24

location or is it sort of whoever's available within the Chicago or Manila office they'll be the ones that respond to that -- that employee or that flight attendant?

A. FAST would not tell them about their leave of absence. That was another department if the flight attendant requested a leave of absence.

Q. So you said they did not tell them about their leave of absence?

A. No.

Q. So what role does FAST play in regards to a flight attendant's leave of absence?

A. A flight attendant if they're sick or if they get injured, that starts with the employee service center. The employee service center provides FAST with the status update of put this flight attendant out on a status if it's not an occupational and our team would process it in Help Hub and the necessary scheduling system and HR system and wait for the next update from the employee service center.

We would then, in turn, advise the base the flight attendant is on a status and then the base of the employee service center would do their parts with their process. Now, if it's an occupational, our team is just advised of this and we update our system and

notify -- notify the base and then the base and the employee service center would do their part.

Q. So FAST's role is essentially to provide an update in regards to what's going on with a flight attendant status and then notifies basically their main base that they're still on a leave of absence or what -- what their current status. They're not -- well, is that correct? Would that be correct?

A. Yes, that is correct.

Q. Okay. And you said there's a difference between whether or not the employee service center relates that they're either on an occupational or nonoccupational leave of absence.

Can you explain again what the difference is between those two, like -- yeah, because I just need clarification. I'm not too sure.

A. Of course. If the flight attendant is out for an illness or an injury based off of whatever it is. So it's either an occupational if it's an injury with the company or an illness which is a nonoccupational.

The flight attendant has to provide all their medical documentation to the employee service center because it's HIPAA and our team did cannot look up at any HIPAA information. So when it is

Page 31

correction based on what the employee service center told you?

ATTORNEY GEHRKE: Objection. It assumes facts not in evidence. It exceeds the scope of the PMK designation.

You can answer if you understand.

THE WITNESS: I do. As I had said before, if -- I cannot -- I do not know if they make a mistake. If they send us something and then they send us something again, it could be for a variety of reasons. We don't sit and ask them. We just process what they provide us.

BY ATTORNEY CAPILITAN:

Q. No, and that's what I mean. So -- so then I'm guessing if a mistake was made, it's not -- it sounds like it's not about them informing there's a mistake, please make a change. It's just new paperwork or information received and that information would be then inputted into the system with FAST?

ATTORNEY GEHRKE: Vague. Overbroad. It exceeds the scope of the PMK. It calls for speculation.

THE WITNESS: The answer would be yes, we would process any paperwork that comes to us.

BY ATTORNEY CAPILITAN:

Q. But does FAST -- well, in that time period

have you seen FAST go into older, I guess, case notes -- or not case notes. Notes for a flight attendant in order to know what their status updates are to make any corrections that are needed?

ATTORNEY GEHRKE: The same objections. 12:12

BY ATTORNEY CAPILITAN:

Q. You can answer if you understand.

A. Okay. I do. And I'm going to keep going back. Because we don't see the paperwork that they have, we don't know what they're receiving and we are 12:12 just processing what they send us over and I'm not going to speculate and say yes, they're making mistakes or no, they're not making mistakes. We just process the information we receive.

Q. It's not -- I'm not asking about whether or 12:12 not you personally know or the FAST personally knows what mistake was made. I understand there's this processing that's conducted but what I do mean is that if there is an alteration that -- like, let's say there was an update to some information and that information 12:12 has corrected information on there. If an old note that was put in the system of FAST was -- sorry. It's a bit wordy. Let me -- okay.

So FAST obviously inputs case updates for flight attendants whether they're on occupational leave 12:13

or nonoccupational leave, correct?

A. Yes, correct.

Q. And then that's basically used to give an update as to their current status to see whether they would be fit for active duty or not?

A. That's correct.

ATTORNEY GEHRKE: It misstates prior testimony.

BY ATTORNEY CAPILITAN:

Q. So and, of course, updates are made based on paperwork or information that's given from the employee service center to be further incorporated into those notes as timing goes on, correct?

A. Yes, that's correct.

Q. Okay. But then if a change is made -- okay. So if further information is provided from the employee service center regarding a flight attendant's case and that information is either further -- is further corrected, there wouldn't be a change to the prior notes within FAST. It would just be an update on -- it would just be an update on the current note?

ATTORNEY GEHRKE: It assumes facts not in evidence. Incomplete hypothetical. It calls for speculation. It exceeds scope.

THE WITNESS: Yes, we would not adjust the original notes. We would just add the new information

to our case.

BY ATTORNEY CAPILITAN:

Q. Okay. And I'm sorry. I was trying to get the that but I was kind using steps to get there but that's all I wanted to get. Okay, so that's good.

Well, then aside from providing information to you, you said the -- basically, the base that the flight attendant works out of, in this case Ms. Tien was working out of the San Francisco base or SFO I guess is how it would be referred to. Would that be correct, SFO, right? SFO that's the airport?

A. Yes, that's correct.

Q. Is there any sort of support that the FAST team provides aside from just informing that their base -- informing the base of their current status?

THE REPORTER: I'm sorry, Counsel. I couldn't hear you.

ATTORNEY GEHRKE: Vague. Overbroad.

THE WITNESS: When you refer to support, what exactly do you mean?

BY ATTORNEY CAPILITAN:

Q. Like, is there any sort of, like, direct contact that FAST has with flight attendants regarding, like, their status or their updates?

A. As I mentioned before, we go ahead and

Page 41

advise the base and the base is responsible for their flight attendants so they're the ones that would reach out to the flight attendants and/or the employee service center because they're dealing with them and their medical paperwork.

Q. Okay. But -- but then -- well, is that specifically for occupational injuries?

A. That's for all processes that we do on a leave of absence.

Q. Okay. Then -- so, again, I just want to know there is direct contact between FAST and a flight attendant?

ATTORNEY GEHRKE: Vague. Overbroad.

THE WITNESS: We don't reach out to them, no.

BY ATTORNEY CAPILITAN:

Q. Okay. Can a flight attendant directly reach out to FAST?

A. Yes.

Q. Okay. And generally what would be the purposes for a flight attendant to directly reach out to FAST?

ATTORNEY GEHRKE: Overbroad.

THE WITNESS: It could be for a variety of reasons. Flight attendants have schedules, pay, their status. Anything that they have a question on, they

Page 42

A.   It's through e-mail.

Q.   Okay.  When a max LOA is -- well, for the max LOA to be calculated, is calculations done within FAST?

A.   Yes.

Q.   Okay.  The way calculations are done is it -- at that time period -- so when -- for example, in Ms. Tien's case, her -- I believe her LOA began sort of running in around January 25th of 2019.  Was that date inputted -- would that date have been inputted manually?

A.   Can you clarify that for me?  I'm sorry.

Q.   Yes.  So when the calculation is made of when the max -- when the LOA is to begin, is the initial date inputted manually?

A.   Inputted where?

Q.   In the FAST system.  So I don't know how the system works within FAST.

So if FAST calculates the max LOA once LOA begins, is the initial date inputted manually?

A.   For max LOA when a flight attendant hits -- let's let me start here.

When a flight attendant is placed on a leave of absence, their -- their information is updated in our inflight records team -- I'm sorry -- inflight

records system, as well as managers toolbox. Inflight records is updated because that is what handles the schedule. We need to make sure we block that flight attendant from receiving a schedule and it's not active. We also update our scheduling system to make sure they don't receive a schedule as well. We have current months and future months so we need to make sure we cover the -- our operation. And when I refer to "our operation," we want to make sure that that flight attendant is not on that aircraft or is not assigned to that trip and then we have an issue with that flight attendant being on that trip.

So we need to update our scheduling system, our inflight records and managers toolbox and managers toolbox is just because of the benefits and other systems within United that utilize that for whatever reason for -- for that leave of absence. Once we place them on the status, we go ahead and calculate the max leave of absence at that point, if that's what you're asking.

Q. Yes. And that's why I'm asking. The reason I'm asking is it's kind of like you want to calculate what is the full three years, right, for a date. And the reason why I'm asking if it's put in manually is that date -- so let's say you have -- you have the date

for the beginning of the LOA. That's inputted. Does the system itself automatically calculate three years and then that three years is then put into the system or is the three years also something that a person within FAST must just manually do, would just say this is the beginning at three years and this is the end date?

A. It's a manual process.

ATTORNEY GEHRKE: Kenzo, just a question. There's something -- someone here in the virtual room, Google Pixel 8. Who is that?

ATTORNEY CAPILITAN: I'm not sure.

ATTORNEY GEHRKE: Maybe we should take our first break and we can get them out.

ATTORNEY CAPILITAN: That's true. Actually, it's been about over an hour so we can take a quick 10-minute break. So let's go off the record.

THE VIDEOGRAPHER: All right. 12:26. Off the record.

(Off the record.)

THE VIDEOGRAPHER: We are at 12:41 p.m. Back on the record. Thank you.

BY ATTORNEY CAPILITAN:

Q. So, well, aside -- obviously, within the FAST, there's the -- you're the -- there's the senior

Page 48

into the record.)

ATTORNEY GEHRKE:  Will you be e-mailing us the exhibits?

ATTORNEY CAPILITAN:  Yes, I will.

ATTORNEY GEHRKE:  Okay.                                    12:55

BY ATTORNEY CAPILITAN:

Q.  Okay.  Do you see this image on your screen?

A.  Thank you.

Q.  Have you ever seen this document before?

A.  Yes.                                                   12:56

Q.  Okay.  And, of course, this is the -- the letter that Ms. Tien received regarding her leave of absence and the dates listed on here are -- or the effective beginning date being January 25th, 2019, to January 25th, 2023.                                          12:56

Now the point of contention has been, of course, that the 2023 year date was listed on here as being incorrect but my question to you is:  When this letter was -- does FAST have any involvement in the generation of this letter or these types of letters?  12:56

A.  No.

Q.  Whose responsibility would it be to generate this type of letter, if you know, regarding the dates for the effective date and for the end date of the leave of absence?                                             12:57

Page 57

ATTORNEY GEHRKE: It exceeds the scope of PMK. Vague and overbroad.

THE WITNESS: Are you referring to the letter itself or the dates?

BY ATTORNEY CAPILITAN:　　12:57

Q. Well, first the letter and then I'll go on to the dates but the letter itself.

A. No, FAST would not have anything to do with the letter.

Q. Okay. Then -- well, then going to the　　12:57 dates, the dates specifically. So the letter here has two separate dates. Would the dates have been something communicated to you, the Hub, from the FAST team?

A. Yes, we would have provided the leave of　　12:57 absence date as well as the max LOA date.

Q. Okay. And how -- how is that information usually provided to the hub?

A. As I had mentioned before, we would go ahead and place the flight attendant on the leave of absence.　　12:58 We would then go ahead and calculate the max leave of absence which would be the length of active service, disability and/or three years for a flight attendant and then we would go ahead provide this information through e-mail to the base.　　12:58

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300　　www.veritext.com

Q. Okay. That initial communication that was made, would that information still be retained by FAST about the original dates that were provided to the hub?

A. Yes.

Q. Okay. And where -- where would that information then be found? Is it like -- is it within the same system that is basically provided for the employee where they have, like, their updates regarding their status or is that a separate -- like, separate area within the hub that the information gets incorporated to?

ATTORNEY GEHRKE: Vague. Overbroad. It exceeds scope. It calls for speculation.

THE WITNESS: If you're referring to the leave of -- max leave of absence -- max LOA -- pardon me -- that would be in our Help Hub system where we would update it and then we would go ahead and provide that to the base and the base would do their parts of the max LOA process.

BY ATTORNEY CAPILITAN:

Q. Okay. Then when -- when the information is updated and placed into the Help Hub, does the employee themselves have access to Help Hub to see that date that is provided by FAST?

A. As I mentioned before, there is an internal

12:58

12:59

12:59

12:59

01:00

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

part where we are the fulfillers and we're updating information and then there's the external requester. So the flight attendant does not have access to our part of it at all.

Q. I see. So the only way for -- so the only way to get the date for the max LOA through Help Hub would be through a request by the flight attendant themselves to FAST to provide them with the actual date; is that correct?

ATTORNEY GEHRKE: It misstates testimony. Vague. Overbroad. It exceeds scope.

THE WITNESS: Generally, we refer flight attendants to their base and the reason I say that is the base is responsible for all flight attendant information. Our team just makes updates and advises the base and generally they're the ones that would be the ones that would communicate with the flight attendant as well as the employee service center.

BY ATTORNEY CAPILITAN:

Q. Okay. Then in regards to the calculations on the LOA and max LOA dates, so the beginning of LOA date to the max LOA date, the initial LOA date to begin LOA, is that set up by -- what was it -- the employee service center or is it done by FAST?

ATTORNEY GEHRKE: Vague. Overbroad as to "set

2019, and the max LOA date based on the contract max, it would have been three years. The argument is that it would have -- it should have been January 25th, 2022, not 2023.

My question is: If -- have you reviewed documentation in regards to when the base was told about this information? And if so, do you know whether that date that was originally provided to the base was 2022 or 2023?

ATTORNEY GEHRKE: Compound. Vague. Overbroad.

THE WITNESS: Yes, I reviewed the information in Help Hub and it was on January 25th, 2019. The base was advised of the date of 1/25/2023.

BY ATTORNEY CAPILITAN:

Q. Okay. So FAST did state January 25th, 2023? Okay.

ATTORNEY GEHRKE: Vague as to time. Overbroad.

BY ATTORNEY CAPILITAN:

Q. Do you recall who gave that information at that time from FAST or do you know of rather?

A. Yes, I do.

Q. Okay. Who was the name of that individual?

A. Her name is Danelle Berry, D-a-n-e-l-l-e, Berry, B-e-r-r-y.

Q. Does she still work with FAST?

A. Yes, she does.

Q. Was -- did the -- sorry. Let me try to phrase this.

Would -- would this -- this would have been a mistake on FAST's part in terms of the calculations; would that be correct?

A. Yes.

ATTORNEY GEHRKE: Objection. Speculation. It exceeds scope.

BY ATTORNEY CAPILITAN:

Q. When -- when was -- when was it first found out that this mistake had occurred?

A. An hour --

ATTORNEY GEHRKE: Sorry. It exceeds scope.

Go ahead.

THE WITNESS: An hour and a half after the first e-mail was sent to the base.

BY ATTORNEY CAPILITAN:

Q. It's very -- it's very specific. You said after a mistake had been made and it was -- and I guess the base was originally told of time -- that the mistake time, an hour and a half later the base was further informed that a mistake had been made and the date; is that correct?

A. Yes, that's correct.

Q. Is this -- was this correction made through e-mail?

A. The same process was followed as the first time, yes.

Q. Do you know who -- who was informed of the mistake?

ATTORNEY GEHRKE: It exceeds scope.

THE WITNESS: The e-mail address is a shared mailbox address so it's not necessarily one person. It's a group of individuals that it goes to.

BY ATTORNEY CAPILITAN:

Q. Would it be a group of individuals within FAST alone or is it with the base or is it a mixture of both?

ATTORNEY GEHRKE: It exceeds scope.

THE WITNESS: It's a FAST e-mail which several members can send e-mails out of it and receive, as well as a base e-mail that can send e-mails and receive.

BY ATTORNEY CAPILITAN:

Q. I see. So it would be like one of those e-mails where once you e-mail, you attach several other individuals within that same I guess e-mail chain; would that be correct?

A. It's actually a shared mailbox where I can go in there and set it up on my work station that I can

Page 65

send an e-mail out of it. And when I send, other people can see what's in there and vice versa.

Q. I see. So it's just sort of like an automated system. Once you send an e-mail, it will just put it out for everybody? 01:09

A. Correct.

Q. Then when the first e-mail was sent regarding Ms. Tien's LOA and max LOA or once that e-mail was sent, the -- who -- who first discovered the mistake? Was it -- was it Danelle Barry or 01:10 someone else?

ATTORNEY GEHRKE: It calls for -- it calls for speculation. It lacks foundation. It exceeds scope.

THE WITNESS: I honestly could not say if it was Danelle who caught it or if the base that caught it. I 01:10 just can see in my Help Hub that there is an entry with that incorrect date and then an hour and a half later has the correct date so that's what I can see.

BY ATTORNEY CAPILITAN:

Q. Okay. So when the correction was made via 01:11 e-mail, this was something that would have just been shared to the -- the base in which Ms. Tien was operating out of but the base -- again, FAST made the correction but the base itself would have been the one that would have needed to inform the flight attendant 01:11

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

of the -- of the correction being made if they had already initially provided the wrong date?

ATTORNEY GEHRKE: It calls for speculation. It exceeds scope. It assumes facts not in evidence. Vague and overbroad.

THE WITNESS: I will tell you I don't know exactly what the base does so that would be a question for them. I just know that our team sends it to them and whatever they do on their end with it, I'm not going to speculate on their part or --

BY ATTORNEY CAPILITAN:

Q. Of course and that's fine. I'm just asking if you know. If you don't, I don't want you to guess.

A. Yeah.

Q. So although the correction had been made shortly after the mistake was made initially, was FAST further notified in or around the time that plaintiff had been terminated that she had not been personally informed of the -- of the correction?

ATTORNEY GEHRKE: It assumes facts not in evidence. Vague. Overbroad. It assumes -- it exceeds scope.

THE WITNESS: I can only go with what information is in our Help Hub and I do not -- when I was reviewing it, I did not see anything that would

Page 67

work, is that something that FAST will notify that because they never received an update regarding them -- an employee's return to work and that they noticed that in the system that they have now passed that date that FAST is the one that now notifies the base that, oh, 01:22 this individual now needs to be I guess removed due to failure to return?

A. Once the flight attendant is close to their max LOA, we send an e-mail to the base advising that the flight attendant is coming close to their max LOA 01:22 and then we wait for the base to advise us of a termination. Or if there is a return to work, they would work with the employee service center. I mentioned we don't make the determination. We just -- we get the information as you had mentioned. We're 01:23 kind of -- we do the paperwork to move them along.

Q. I see. Okay. So how -- when do you usually provide the base, like, what's -- in terms of, like, time frame? How soon do you provide a base -- the base that a flight attendant's next LOA is approaching 01:23 before the actual max LOA date deadline occurs?

A. It's generally 30 days out.

Q. And is it just the one time?

A. Yes.

Q. Okay. And then as an employee or flight 01:23

Page 74

we do work on. The only way to tell is if some comment was in there.

BY ATTORNEY CAPILITAN:

Q. And that's -- that's -- that's the reason why I'm asking because I can't tell if there -- did it occur only because there is no comment on this document so that's the reason why.

Did you see -- in the -- in the documents you reviewed, did you see an e-mail or communication in regards to the base being informed 30 days before Ms. Tien's termination that -- that she should be notified?

ATTORNEY GEHRKE: It assumes facts not in evidence. Overbroad. Vague. It exceeds scope.

THE WITNESS: It's -- it's in the max leave of absence case.

BY ATTORNEY CAPILITAN:

Q. No, but I'm asking if you in preparation of today did you see a document that basically shows that the FAST team did -- did communicate that Ms. Tien should be notified that in the next 30 days she will exceed her max LOA?

ATTORNEY GEHRKE: The same objections.

THE WITNESS: I did not personally see one.

BY ATTORNEY CAPILITAN:

REPORTER'S CERTIFICATE

I, LAURA S. WILLIAMS, CSR No. 9921, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 17th day of July, 2025.

LAURA S. WILLIAMS, CSR No. 9921

Page 148

# Exhibit 1



1/25/2019

U308222 / SFOSW
Yihsing Tien
370 Imperial Way Apt 228
Daly City, CA 94015 USA

Dear Yihsing,

The purpose of this letter is to advise you that our records indicate you have been placed on a leave of absence effective **1/25/2019**. If you remain medically unable to return to work, in accordance with Section 15E. of the Joint Collective Bargaining Agreement, you will be administratively separated on **1/25/2023**.

When you begin your Leave of Absence I will be your supervisor in lieu of your base supervisor. As Company policy, and government mandates may change, the most current Leaves of Absence Packet is located on Flying Together. The Leave of Absence Packet contains a summary of benefits affected by this status and should be read carefully.

Important information while on an inactive Leave of Absence:

- ☐ You are expected to remain under a physician's care, as well as provide OPCMD with regular medical updates following each visit or as directed by UAL Medical. To verify receipt of your medical documentation you may contact the Employee Service Center (ESC) at 1-877 UAL-ESC9 (1-877-825-3729).
- ☐ Your UA-issued (white) TSA crewmember badge may be retained. Should it expire during your leave of absence, it cannot be renewed until your return to active status.
- ☐ You will keep your LINK and accessories for the duration of your leave. If your leave of absence extends past 90 days, your LINK service will be suspended until your return to active service.
- ☐ Reasonable Accommodation Process (RAP), outside employment guidelines and information regarding seniority accrual is in the Leaves of Absence packet.

You are very important to United's success. I wish you a speedy recovery and look forward to having you back to work soon. Please contact me if you have any questions.

Respectfully,

Elizabeth Jacobsen
Supervisor Inflight Service
650-874-6514
elizabeth.jacobsen@united.com

cc: Personnel File

SB Exhaustion / Max Leave                    Rev 12-5-17



EXHIBIT
1

# Exhibit F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YIHSING TIEN aka ANGELA TIEN,     )

                                 )

         Plaintiff,        )

                                 )

    vs.                   )  No. 4:23-cv-02622 JSW

                                 )

UNITED AIRLINES, INC., a       )

California Corporation; et al.,   )

                                 )

         Defendants.       )

_____)

Remote Deposition of DANELLE NICOLE BERRY, taken on behalf of Plaintiff, at Wheeling, Illinois, commencing at 10:07 a.m., Pacific Time, on Monday, July 21, 2025, before Robin L. Bittel, CSR No. 6419, CP, RPR.

File No. 7485448

Page 1

A P P E A R A N C E S

For Plaintiff:
REISNER & KING LLP
BY ADAM REISNER
15303 Ventura Boulevard, Suite 1260
Sherman Oaks, California 91403
Telephone:  (818)  981-0901
Facsimile:  (818)  981-0902
Email:  Adam@reisnerlaw.com

For Defendants:

REED SMITH
BY GARRETT C. PARKS
101 Second Street, Suite 1800
San Francisco, California 94105
Telephone:  (415)  543-8700
Email:  gparks@reedsmith.com

Also Present:  Angela Tien

                Mary O'Neil

                Zachary Reisner

Page 2

It's a question-and-answer session. And if we try to speak at the same time, the court reporter would have a very difficult time taking down your testimony accurately. Okay?          10:09

A.   Okay.          10:09

Q.   All right.

I don't want you to guess as to any of your testimony today, but I am entitled to your best estimate. Okay?

A.   Okay.          10:10

Q.   So can we agree no guesswork today?

A.   No guesswork.

Q.   Good. Okay. Wonderful.

If you don't understand my question, just tell me you don't understand or ask me to rephrase. Okay?          10:10

A.   Okay.

Q.   If you answer my question, I'm going to assume that you understood my question. Okay?

A.   Okay.

Q.   All right. Good. All right.          10:10

Are you currently employed?

A.   Yes.

Q.   And where are you employed?

A.   United Airlines.

Q.   How long have you worked at United Airlines?          10:10

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

A. 29 years and 11 months.                    10:10

Q. What's your title?

A. Assistant manager of the Flight Attendant Support Team.

Q. And the Flight Attendant Support Team, is that    10:10 referred to as FAST?

A. It is.

Q. Okay.

And then do you know who my client is?

A. I know she was a flight attendant. I don't    10:11 know her personally.

Q. Okay.

Have you ever met Angela Tien?

MR. ADAM REISNER: Not to my knowledge.

Q. You've never spoken to her on the phone?    10:11

A. Not to my knowledge.

Q. What did you do to prepare for your deposition today, if anything?

A. I met with Garrett briefly on Friday.

Q. Okay.                                      10:11

I'm not entitled to know the conversations you had with counsel, but other than your meeting with Mr. Parks last week, did you do anything else to prepare for your deposition?

A. When I got notified of the deposition, I met    10:11

Page 8

Q.   No problem.   10:14

My understanding is that Ms. Tien started --
had gone out initially on medical leave in October of
2018, and then she exhausted or she used her sick bank
and some other leave time initially.   10:14

Is that your understanding?

A.   I believe so.

Q.   And then in January -- approximately
January 25th, 2019, a letter was sent out to Ms. Tien,
informing her that she could take a medical leave   10:14
through January 25th, 2023.

Are you aware of that?

A.   I'm not aware of any letters sent to her.

Q.   Okay.

At some point, did you make an assessment as to   10:15
how much leave Ms. Tien was entitled to?

A.   Yes --

Q.   And -- go ahead.

A.   -- from the option letter.

Q.   Okay.   10:15

And when you initially prepared that document,
what document was it called?

A.   The email, the pay option letter.

Q.   Yes.   Okay.

So you received a pay option letter from the   10:15

Page 11

client, from Ms. Tien; is that correct? 10:15

A. From Crew Pay.

Q. Okay.

What is Crew Pay?

A. The payroll department. 10:15

She must have filled out the form, submitted it through the payroll channels. Payroll notified to us to place her on a leave.

Q. Okay.

And whose responsibility was it to determine 10:15 the amount of time that Ms. Tien was eligible to take off in 2018?

A. For the max leave of absence, I calculated that.

Q. Okay. 10:16

And how did you calculate that?

A. Looked at her active time, saw that she had more than three years of active service and adjusted the years from when we were starting the leave and ended it three years later. 10:16

Q. All right.

And so you took into account the time that she had taken time off already for the sick bank, or did you start anew, once she had exhausted the sick bank time?

A. She didn't exhaust the sick bank time, to my 10:16

Page 12

knowledge. It was initiated by a pay option letter. 10:17

Q. So was Ms. Tien eligible to have additional time off before you began to accrue the extended leave?

MR. PARKS: Objection. Calls for speculation.

Go ahead. 10:17

MR. ADAM REISNER:

Q. You can answer.

MR. PARKS: You can go ahead and answer after my objection unless I instruct you not to answer.

THE WITNESS: Can you repeat the question? 10:17

MR. ADAM REISNER: Sure.

Q. The medical leave that you were calculating, what was that called?

A. Her max -- we refer to it as max leave of absence. 10:17

Q. And what does that mean?

A. The maximum duration of time contractually that a flight attendant has according to their contract, Section 15.

I don't know the subsection off the top of my 10:17 head. I'm sorry.

Q. It's like 15.E.1.

Do you know if that's the correct section?

A. I know it's in Section 15. I don't know the exact subsection. 10:18

Q.   Got it.                                            10:18

Are you supposed to begin the calculation of the max leave of absence after the employee has exhausted their sick bank time off?

A.   If they've exhausted their sick bank, we      10:18
would -- 17 days after they exhaust their sick bank, we would calculate.

But it could be done prior with the payroll --
pay option letter to payroll, indicating they wanted to,
you know, not use their sick bank.                     10:18

Q.   Okay.

Is there any other time that an employee is able to use in addition to the sick bank time off?

MR. PARKS:  Objection.  Calls for speculation.

Go ahead.                                         10:18

THE WITNESS:  Can you repeat the question?

MR. ADAM REISNER:  Sure.

Q.   Is there any other time that an employee is able to take, in addition to the sick bank time, before you began to calculate the max leave of absence?      10:19

MR. PARKS:  Same objection.

Go ahead.

THE WITNESS:  I'm going to have to ask you one more
time.  I'm not sure I'm understanding what you're
asking.                                                10:19

Page 14

A. Correct, to go on a leave of absence --   10:21

Q. Okay.

A. -- and not draw from sick bank hours.

Q. Got it.

Do you know whether -- under United's policies,   10:21
do you know whether the sick bank hours could be used
after an employee has exhausted their max leave of
absence time?

A. Not without returning to work first.

Once they return from their leave, those sick   10:22
bank hours would remain for another absence if they
return.

Q. How would Ms. Tien know how much sick bank time
she had accrued as of the time that you began to
initiate the next leave of absence for her?   10:22

A. I don't know how she would know that.

Q. Okay.

And that's not part of your calculation because
your calculation is solely -- once you learn that the
employee has opted for this, you then calculate the max   10:22
leave of absence that they're entitled to; correct?

A. Correct.

Q. And in your initial assessment, you determined
that three-year mark to end January 25th, 2023; is that
correct?   10:23

Page 17

A.   I believe so.  I believe that was the incorrect initial date.

Q.   And you sent an email initially saying the date that's the max leave of absence that Ms. Tien is entitled to would be January 25th, 2023; correct?

MR. PARKS:  Counsel, could you clarify?

You said "sent an email."

Do you know who it was sent to, or could you give a little more detail?

MR. ADAM REISNER:

Q.   I thought you testified -- I'm sorry, Ms. Berry.  I thought you testified you sent an email.

A.   No.

Q.   No.  Okay.

A.   I sent an email to the -- her base.

Q.   Right.

You sent an email to her base, meaning Ms. Tien's base was San Francisco; is that right --

A.   Correct.

Q.   And what's a base?

A.   The location where flight attendants have their domicile.

Q.   Okay.

And you told the base that Ms. Tien was initially eligible for a max leave of absence through

Page 18

January 25th, 2023; correct?                                         10:24

A.     Yes, I believe that was the initial incorrect date.

THE REPORTER:  Excuse me.  Is it possible to go off the record right now for something, please?                          10:24

MR. ADAM REISNER:  Absolutely.

(Discussion off the record.)

(Whereupon Ms. O'Neil entered the deposition proceedings.)

MR. ADAM REISNER:  All right.                                        10:25

So I'm going to share my screen, for the record, Exhibit Number 5.

Zachary, if you can, send over Exhibit Number 5, please.

(Deposition Exhibit 5 was introduced for identification by the Certified Shorthand Reporter and is attached hereto.)

MR. ADAM REISNER:  I'm going to share my screen.

Just let me know if you guys can see my screen (indicating).                                                        10:26

THE WITNESS:  Yes.

MR. ADAM REISNER:  All right.

Q.     So, Ms. Berry, this is an email dated January 25th, 2019.  Exhibit 5 is a multiple-page document.  It's Bates stamped UNITED 3448 through 3453.   10:26

Page 19

Q. Is this email chain that you looked at -- 10:26

A. Yes.

Q. -- in preparation for your deposition?

A. Yes.

Q. Okay. Wonderful. Thank you. 10:26

And so this first email here at the top,

January 25th, 2019, can you tell me what this email is?

A. That is my response from receiving the pay

option letter, sending the information to the Employee

Service Center to the base -- what they call a base "IF" 10:27

box, the Inflight mailbox, with the breakdown of the

flight attendant's maximum leave duration.

Q. Okay.

And then it's got here the date of

January 25th, 2019. 10:27

Was that the date that you utilized in your

process of determining the max leave?

A. Correct.

Q. And so is it your understanding that the policy

is that an employee is eligible to exhaust their sick 10:27

bank prior to initiating the calculation for the max

leave of absence?

A. Flight attendant may exhaust their sick bank if

they choose to do so, yes.

Q. In this case, you learned that Ms. Tien had 10:27

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

opted to, through this pay option letter, request that

the max leave begin immediately; correct?

A. Correct.

Q. Okay.

And then it says here, "FA opted to freeze sick bank and be placed on LOA."

Do you see that?

A. I do.

Q. Do you know if there was any benefit to Ms. Tien to opt to freeze the sick bank and be placed on leave of absence?

MR. PARKS: Objection. Calls for speculation.

Go ahead.

THE WITNESS: I have no idea if there's any benefit to her or not.

MR. ADAM REISNER: Okay.

Q. In the past -- strike that.

How is it that you calculated this incorrectly?

A. It's one of those things where I wish I could tell you exactly.

Q. Okay.

A. It could be a misplacement of my finger. It could be, being that it's January, my mind is still thinking of, you know, the change of years. I don't know why I miscalculated initially.

Page 21

Q.   Fair enough.                                   10:29

So who did you send this information to?

A.   To the ESC occupational team, the ESC admin

support and to the San Francisco "IF" mailbox.

Q.   All right.                                     10:29

And the information that you provide them, is

it your understanding that United would then take that

information and input it into the system?

MR. PARKS:  Objection.  Vague.

MR. ADAM REISNER:                                   10:29

Q.   You can answer.

A.   Who is -- I'm sorry.  Can you repeat that?

Q.   Sure.

When you sent this information to ESC, did you

anticipate that they were going to take the information    10:29

you provided them, and they were going to input this

information into the system?

MR. PARKS:  Objection.  Vague as to what "system"

means.

But go ahead if you know.                      10:29

THE WITNESS:  I don't know what their process is at

the Employee Service Center.

MR. ADAM REISNER:  Okay.

THE WITNESS:  It's acknowledging she's being placed

on a leave, and this is her calculation.            10:30

Page 22

MR. ADAM REISNER:                                      10:30

Q.    What was your understanding of what United would utilize this admin separation date for?

A.    Flight attendants that do not return prior to their separation date would be administratively     10:30 separated.

Q.    Okay.  All right.

And then if Ms. Tien would have come back even a day before the administrative separation date, could she have continued to exhaust her sick bank if she had    10:30 any left over?

A.    She would have to complete the return process from that leave, which is attend any training, regain qualifications, obtain all her duty items, fill the schedule, work a trip.  If there's a next absence after    10:30 that, absolutely she could use her sick bank.

Q.    So even if she came back a day before this administrative separation date, she could not automatically use her sick bank without going through additional training?                                       10:31

A.    She'd have to be qualified, yes.

Q.    All right.

Now, you realized rather quickly that this date you had inputted, January 25th, 2023 -- you realized that this date was inaccurate; correct?                  10:31

A. I did, yeah.

Q. Now, do you actually put this information into some system that United has, or when you send it off to ESC or the administrative support, are they the ones that would put this information into the system?

A. It's occupational. The Employee Service Center would input it, the effective date of the leave.

Q. Got it. Okay.

Do you recall how you realized that there had been a mistake?

A. I don't recall the exact day I looked at the timing of the stamps of sent item.

Q. Okay.

A. My guess is I was doing work prior to lunch. I went to lunch. And it, more than likely, because it was -- about an hour later or hour and a little bit after that, it was still on my screen. And I noticed it, and I corrected it.

Q. Okay.

And then it says here, "Body of email."

It's got, "Yihsing Tien is opting not to be paid per pay option letter received January 25th, 2018."

What does that mean?

A. That's from Crew Pay. I don't know what that means.

Page 24

Q.   Okay.                                                          10:32

And then it says, "First day of lost time is 1/30/2018."

What does that mean?

A.   I'm assuming relating to her occupational.  I   10:33 don't know.

Q.   Well, isn't January 30th, 2018, the date that you should have used to calculate the start of the max leave of absence time?

MR. PARKS:  Objection.                                    10:33

I think there's an error in that --

MR. ADAM REISNER:  Okay.

Mr. Parks, please, if you could, refrain from offering any suggestions to your client.

Q.   Isn't January 30th, 2018, the date that you       10:33 were notified that you should begin the calculation for the max leave of absence time to begin?

A.   No.  We begin the leave of absence once we're notified of the effective date.  The date -- first day of lost time usually refers to the date of the           10:33 occupational.  But that doesn't seem like that's the correct date.

Q.   Right.

A.   I can't speak to what Crew Pay -- why they have a date in there that doesn't quite fit.              10:34

Page 25

Q. First day of lost time was the day that you're supposed to be calculating from; correct? 10:34

A. No. We do it from the date of notification.

Q. Okay.

Then what does first day of lost time mean? 10:34

A. I can't speak to what Crew Pay is referring to, other than we use it as the first day that an occupational began. But it doesn't seem like that would be the accurate date.

Q. What does lost time mean? 10:34

A. It refers to the time of an absence from an occupational that we use it as.

Q. A time from an occupational meaning that's the time that you first use to trigger the calculation for the max leave time; isn't that true? 10:34

MR. PARKS: Objection.

THE WITNESS: No.

MR. PARKS: Misstates prior testimony.

Go ahead.

THE WITNESS: No. We do it from the date of notification. 10:34

MR. ADAM REISNER:

Q. The date of notification?

A. Of the crew -- of the pay option letter.

Q. Okay. 10:35

In the past, when you've seen an email like this where it says the "Occ Sick Bank Exhaust" and it says, "First day of lost time is 1/30/18," don't you typically use that first day of lost time to begin your calculation for the max leave of absence?

MR. PARKS: Objection. Misstates the prior testimony. It's been asked and answered.

MR. ADAM REISNER:

Q. You can answer.

MR. PARKS: Go ahead.

THE WITNESS: We use the date that the Crew Pay notified us of the pay option letter.

MR. ADAM REISNER: Okay.

Q. So just so we're clear, where it says "first day of lost time," it is not your practice to use that as the initial day to start your calculation for max leave of absence?

A. No.

Q. My statement's correct?

A. Correct.

Q. Below that, it says, "Hello, FAST, flight attendant has requested to freeze sick bank now that her OJI time is depleted."

What's OJI time?

A. Occupational injury time.

Page 28

Q. Okay. 10:37

So is that different from the sick bank hours?

A. I don't know what Crew Pay is referring to there.

Q. Okay. 10:37

Well, are there additional hours that Ms. Tien would have been entitled to utilize in addition to her sick bank hours?

MR. PARKS: Objection. Assumes facts not in evidence. 10:37

MR. ADAM REISNER:

Q. You can answer.

A. All flight attendants have two sick banks, an occupational and non-occupational sick banks. If she still had non-occupational sick bank remaining and just 10:38 depleted her occupational bank and she's choosing not to use it, the pay option letter would be appropriate in that case, if she wants to freeze it.

Q. Got it. All right.

So then the original email you sent was on 10:38 January 25th, 2019, at 12:34 p.m.

And then the second email that you sent is January 25th, 2019, at 1:59 p.m.; correct?

A. Correct.

Q. Okay. 10:38

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

You say, "My apologies. New max LOA & separation date shown below"; correct?

A. Correct.

Q. What did you mean by that?

A. I had initially put the wrong year in the leave of absence end date and the admin separation date. And I was correcting the date, highlighting that the changes were made.

Q. Okay.

And so when you sent this email to "ESC-Occupational" and "ESC-Administrative Support," what did you expect would have occurred?

MR. PARKS: Objection. Calls for speculation.

But go ahead.

THE WITNESS: It's not my role to know what they do with that information. Employee Service Center would still initiate the leave on the same date. San Fran is being notified of the updated information. Whatever each team does respectively is up to them.

MR. ADAM REISNER:

Q. Were you aware, when you sent this email, that this information was going to be utilized to generate a letter to Ms. Tien to inform her of her max leave of absence and required return-to-work date?

A. Yes. There is a letter that's sent by the base

10:38

10:38

10:39

10:39

10:39

10:40

Page 30

with that information.          10:40

Q.   Has this ever happened to you before, where you sent the wrong date or submitted the wrong date to ESC?

A.   Nothing that I could specifically refer to, no.

Q.   If we go to the next email from Gail Kuntschik,          10:40 K-U-N-T-S-C-H-I-K, do you know who that is?

A.   I don't.

Q.   Okay.

She does say, "Ms. Tien is opting not to be paid per pay option letter received 1/25/18" which --          10:41 that meant, in your mind, that was the date to begin the calculation; correct?

MR. PARKS:  Objection.  Misstates prior testimony.

She established that that date of '18 is not correct.          10:41

MR. ADAM REISNER:

Q.   You can answer.

A.   I used -- we used the date that we were notified, which was 2019.

Q.   Okay.          10:41

Where could I look to find out what the term "lost time" would refer to?

A.   I don't know.

Q.   So is this inaccurate where it says here, "Ms. Tien is opting not to be paid per option letter          10:41

received 1/25/18"?

MR. PARKS: Objection. Calls for speculation.

But go ahead.

MR. ADAM REISNER:

Q. You can answer.

A. It would appear to be inaccurate because it's being received January 25th, 2019.

Q. Got it.

Now, did you take any steps to try to contact Gayle from the Flight Attendant Crew Pay Support Team just to get clarification on these dates?

A. No. We would just use the date we received it.

Q. Okay.

And this is one of the documents you reviewed in preparation for your deposition this morning; correct?

A. Correct.

Q. These are all true and correct copies of the emails you exchanged in January of 2019?

A. To my knowledge, yes.

Q. Okay. Thank you.

Other than sending the email out on January 25th, 2019, at 1:59 p.m., indicating that you had put the wrong date down, did you take any other steps to contact anybody to confirm that the date that

Page 32

A.    No.                                                    10:47

Q.    Okay.

      But this letter would have been generated based
on your initial email that we looked at, which is
Exhibit 5 right here at the top; right (indicating)?       10:48

      MR. PARKS:  Objection.  Calls for speculation.

      But go ahead.

      THE WITNESS:  Possibly.

      I don't -- I don't know what they used exactly.

      MR. ADAM REISNER:  Got it.  All right.           10:48

Q.    Do you know why Ms. Jacobsen used the incorrect
date in her letter of --

      MR. PARKS:  Objection.  Calls for speculation.

      MR. ADAM REISNER:

Q.    You can answer.                                     10:48

A.    I don't know why.

Q.    Has anybody from United come to you, telling
you they were investigating Ms. Tien's allegations?

      MR. PARKS:  Objection.  Vague, ambiguous.

      But go ahead.                                        10:48

      THE WITNESS:  I got notified of my needing to be a
witness in the deposition and that this was being
investigated.

      MR. ADAM REISNER:  Okay.

Q.    Well, when you were told it was being             10:49

Admin mailbox.                                                    11:01

Q.   So FAST Inflight Admin -- or

"FAST-Inflight-Admin@united.com," that was you; correct?

A.   Correct.

Q.   And so you put down here, "Separation Letter     11:02

for the PE file"; correct?

A.   Correct.

Q.   And you wrote also, "Please send a copy to the

FA"?

A.   Correct.                                                    11:02

Q.   Okay.

And then you put your name and "FAST"; correct?

A.   Correct.

Q.   Now, are you the one that prepared the

separation letter for Ms. Tien?                                  11:02

A.   No.  The separation letter refers to the form

that fills out once the separation has been processed.

So there's no filling anything out other than it

generates a PDF and we send it.

Q.   Who generated the PDF?                                      11:02

A.   Well, I process the separation through

PeopleSoft.

Q.   Now, at the time you processed the separation,

did you realize that this was the case where you had

sent the letter -- I mean the document and the error for   11:03

the separation date --

A. No.

Q. -- meaning Exhibit 5, which we looked at?

When you were preparing Exhibit 9, you didn't realize that you had made an error originally in the calculation for the separation date?

A. No.

MR. PARKS: Objection. Misstates the prior testimony about the correction.

But go ahead.

THE WITNESS: It was three years later. It was my only contact, I guess, with the case. And I didn't recall, initially or when processing, that this was the same flight attendant.

MR. ADAM REISNER: Okay.

Q. Now, Ms. Espinoza contacted you when you were part of FAST on January 27, 2022, to inform you that Ms. Tien had received a max LOA letter dated January 25th, 2019, with a separation date of January 25th, 2023; is that correct?

A. According to this email, yes.

Q. Okay.

And so the separation email you prepared went out on January 27th, 2022; correct?

A. Correct.

Page 43

A.   Correct.                                          11:06

Q.   This is a true and correct copy of that email?

A.   It appears so.

Q.   Okay.

Then there's an HR staff rep, Zareena Subhan,    11:07
who wrote on January 27th, 2022, at 8:51 a.m., "Please
advise the status of separation for Angela Tien"; is
that correct?

A.   Correct.

Q.   Now, isn't the FAST team -- aren't they also    11:07
responsible for sending notice to employees when their
time is coming up -- their max leave of absence time is
coming up?

MR. PARKS:   Objection.  Lacks foundation, assumes
facts not in evidence, calls for speculation.          11:07

Go ahead.

MR. ADAM REISNER:

Q.   You can answer.

A.   FAST doesn't send notification prior to a max
LOA.                                                   11:07

Q.   Never?

A.   Other than the initial calculation.

Q.   Okay.

So FAST doesn't send an additional letter to
any of their flight attendants to let them know their   11:08

max leave of absence is about to exhaust; correct?    11:08

A. No, not "about to."

Q. There's not like a "30-day before" as some sort courtesy reminder that FAST sends out to the FAs?

A. No.    11:08

Q. Are you aware of any letters that would go out to the FAs to inform them that their leave's about to exhaust?

MR. PARKS: Objection. Calls for speculation, assumes facts not in evidence.    11:08

But go ahead.

THE WITNESS: I don't know of any letter that would be sent.

MR. ADAM REISNER:

Q. Now, did you work with anyone by the name of    11:08 Nancy Byun Riedel?

Do you know who that is?

A. The name sounds familiar. I don't know where I would know that name from.

Q. Okay.    11:09

Now, in the past, are you aware of any employees that had been separated due to some sort of error -- interactive error whether they were allowed to be returned back to their position?

MR. PARKS: Objection. Vague, ambiguous, overbroad    11:09

Page 47

STATE OF CALIFORNIA      )

COUNTY OF LOS ANGELES ) SS

I, ROBIN L. BITTEL, CSR No. 6419, CP, RPR, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceeding;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this 27th day of July, 2025.

ROBIN L. BITTEL, CSR No. 6419, CP, RPR

Page 56

# Exhibit 4



**UNITED**

1/25/2019

U308222 / SFOSW
Yihsing Tien
370 Imperial Way Apt 228
Daly City, CA 94015 USA

Dear Yihsing,

The purpose of this letter is to advise you that our records indicate you have been placed on a leave of absence effective **1/25/2019**. If you remain medically unable to return to work, in accordance with Section 15E. of the Joint Collective Bargaining Agreement, you will be administratively separated on **1/25/2023**.

When you begin your Leave of Absence I will be your supervisor in lieu of your base supervisor. As Company policy, and government mandates may change, the most current Leaves of Absence Packet is located on Flying Together. The Leave of Absence Packet contains a summary of benefits affected by this status and should be read carefully.

Important information while on an inactive Leave of Absence:

☐ You are expected to remain under a physician's care, as well as provide OPCMD with regular medical updates following each visit or as directed by UAL Medical. To verify receipt of your medical documentation you may contact the Employee Service Center (ESC) at 1-877 UAL-ESC9 (1-877-825-3729).
☐ Your UA-issued (white) TSA crewmember badge may be retained. Should it expire during your leave of absence, it cannot be renewed until your return to active status.
☐ You will keep your LINK and accessories for the duration of your leave. If your leave of absence extends past 90 days, your LINK service will be suspended until your return to active service.
☐ Reasonable Accommodation Process (RAP), outside employment guidelines and information regarding seniority accrual is in the Leaves of Absence packet.

You are very important to United's success. I wish you a speedy recovery and look forward to having you back to work soon. Please contact me if you have any questions.

Respectfully,

Elizabeth Jacobsen
Supervisor Inflight Service
650-874-6514
elizabeth.jacobsen@united.com

cc: Personnel File

# Exhibit 5

**CONFIDENTIAL**

| | |
|---|---|
| **From:** | FAST-Inflight-Admin |
| **Sent:** | Friday, January 25, 2019 1:59 PM |
| **To:** | ESC-Occupational; ESC-AdminSupport; SFO - IF |
| **Subject:** | RE: Letter- Maximum LOA -- SFO U308222 Yihsing Tien |

==**** My apologies... New Max LOA & Separation date shown below*****==

**From:** FAST-Inflight-Admin
**Sent:** Friday, January 25, 2019 11:34 AM
**To:** ESC-Occupational <esc-occupational@united.com>; 'ESC-AdminSupport' <ESC-AdminSupport@united.com>; SFO - IF <sfo-if@united.com>
**Subject:** Letter- Maximum LOA -- SFO U308222 Yihsing Tien

ESC - Pay option letter received. FA opted to freeze sick bank and be placed on LOA. Please refer to the dated below and make any necessary updates. Thanks!

**Danelle Berry**
Flight Attendant Support Team

| | |
|---|---|
| **Email:** | SFO-IF@united.com   ; esc-adminsupport@united.com |
| **Title:** | Letter- Maximum LOA -- SFO U308222 Yihsing Tien |

| Date | ACTION: | FirstName | LastName | Emp ID # | Dom | | | SB Exhaust Date | LOA Eff Date | LOA End Date | Admin Separation date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/25/2019 | Letter- Maximum LOA | Yihsing | Tien | U308222 | SFO | | | N/A- Per FA Request via Pay Option letter | 1/25/2019 | ==1/24/2022== | ==1/25/2022== |

1

UNITED003451

**From:** Kuntschik, Gayle
**Sent:** Friday, January 25, 2019 10:55 AM
**To:** FAST-Inflight-Admin <FAST-Inflight-Admin@united.com>
**Cc:** Dingledy, David <david.dingledy@united.com>; Gebon-Fletcher, Dona <dona.gebon-fletcher@united.com>; Williams, Tonya <tonya.williams@united.com>
**Subject:** U308222 YIHSING TIEN

**Subject: FA T Brice 158880 - Occ Sick Bank Exhaust**

Body of email:
U308222 YIHSING TIEN is opting not to be paid per pay option letter received 1/25/18. First day of lost time is 1/30/18.

Let me know if you have questions.

Thanks

Regards,

*Gayle Schulze Kuntschik* – Flight Attendant Crew Pay Support Team
United / 609 Main Street / office 1636D / HSCPZ / Houston, TX 77002
1-800-358-5463 – Option 5, 1 and 1.

**From:** Kuntschik, Gayle
**Sent:** Friday, January 25, 2019 10:20 AM
**To:** FAST-Inflight-Admin <FAST-Inflight-Admin@united.com>
**Cc:** Kuntschik, Gayle <gayle.kuntschik@united.com>; Dingledy, David <david.dingledy@united.com>; Gebon-Fletcher, Dona <dona.gebon-fletcher@united.com>; Williams, Tonya <tonya.williams@united.com>
**Subject:** U308222 YIHSING TIEN

U308222 YIHSING TIEN HRC0805855

Hello Fast,

Flight Attendant has requested to freeze sick bank now that her OJI time is depleted.

UNITED003452

CONFIDENTIAL

Regards,

*Gayle Schulze Kuntschik* – Flight Attendant Crew Pay Support Team
United / 609 Main Street / office 1636D / HSCPZ / Houston, TX 77002
1-800-358-5463 – Option 5, 1 and 1.

3     UNITED003453

**CONFIDENTIAL**

CONFIDENTIAL

| | |
|---|---|
| **From:** | FAST Inflight Admin <FAST-Inflight-Admin@united.com> |
| **Sent:** | Friday, January 25, 2019 12:34 PM |
| **To:** | ESC - Occupational; ESC - AdminSupport; SFO IF |
| **Subject:** | Letter- Maximum LOA -- SFO U308222 Yihsing Tien |
| **Attachments:** | U308222 YIHSING TIEN.pdf |

ESC - Pay option letter received. FA opted to freeze sick bank and be placed on LOA. Please refer to the dated below and make any necessary updates. Thanks!

**Danelle Berry**
Flight Attendant Support Team

| | |
|---|---|
| **Email:** | SFO-IF@united.com ; esc-adminsupport@united.com |
| **Title:** | Letter- Maximum LOA — SFO U308222 Yihsing Tien |

| Date | ACTION: | FirstName | LastName | Emp ID # | Dom | | | SB Exhaust Date | LOA Eff Date | LOA End Date | Admin Separation date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/25/2019 | Letter- Maximum LOA | Yihsing | Tien | U308222 | SFO | | | N/A- Per FA Request via Pay Option letter | 1/25/2019 | 1/24/2023 | 1/25/2023 |

**From:** Kuntschik, Gayle
**Sent:** Friday, January 25, 2019 10:55 AM
**To:** FAST-Inflight-Admin <FAST-Inflight-Admin@united.com>
**Cc:** Dingledy, David <david.dingledy@united.com>; Gebon-Fletcher, Dona <dona.gebon-fletcher@united.com>; Williams, Tonya <tonya.williams@united.com>
**Subject:** U308222 YIHSING TIEN

1

**Subject: FA T Brice 158880 - Occ Sick Bank Exhaust**

Body of email:
U308222    YIHSING TIEN is opting not to be paid per pay option letter received 1/25/18. First day of lost time is 1/30/18.

Let me know if you have questions.

Thanks

Regards,

*Gayle Schulze Kuntschik* – Flight Attendant Crew Pay Support Team
United / 609 Main Street / office 1636D / HSCPZ / Houston, TX 77002
1-800-358-5463 – Option 5, 1 and 1.

**From:** Kuntschik, Gayle
**Sent:** Friday, January 25, 2019 10:20 AM
**To:** FAST-Inflight-Admin <FAST-Inflight-Admin@united.com>
**Cc:** Kuntschik, Gayle <gayle.kuntschik@united.com>; Dingledy, David <david.dingledy@united.com>; Gebon-Fletcher, Dona <dona.gebon-fletcher@united.com>; Williams, Tonya <tonya.williams@united.com>
**Subject:** U308222 YIHSING TIEN

U308222    YIHSING TIEN   HRC0805855

Hello Fast,

Flight Attendant has requested to freeze sick bank now that her OJI time is depleted.

Regards,

*Gayle Schulze Kuntschik* – Flight Attendant Crew Pay Support Team
United / 609 Main Street / office 1636D / HSCPZ / Houston, TX 77002

UNITED003449

CONFIDENTIAL

1-800-358-5463 – Option 5, 1 and 1.

UNITED003450

**CONFIDENTIAL**

# Exhibit G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YIHSING TIEN aka ANGELA TIEN,    )
    )
    Plaintiff,    )
    )
    vs.    )  No. 4:23-cv-02622 JSW
    )
UNITED AIRLINES, INC., a    )
California Corporation; et al.,    )
    )
    Defendants.    )
_____)

Remote Deposition of NANCY SUE BYUN RIEDEL, taken on behalf of Plaintiff, at Burlingame, California, commencing at 1:34 p.m., on Monday, July 21, 2025, before Robin L. Bittel, CSR No. 6419, CP, RPR.

File No. 7485448

Page 1

I N D E X

WITNESS:  NANCY SUE BYUN RIEDEL

EXAMINATION BY:                                                    PAGE

   Mr. Adam Reisner                                             4


E X H I B I T S

| EXHIBIT | DESCRIPTION | IDENTIFIED | MARKED |
|---|---|---|---|
| Exhibit 8 | Emails and copy of letter dated 1/25/2019, Bates stamp UNITED003642, UNITED003596 and UNITED003597 | 10 | 44 |


INSTRUCTIONS NOT TO ANSWER:

| Page | Line |
|---|---|
| 21 | 24 |
| 24 | 19 |


INFORMATION REQUESTED:

(None)

was on the "to" line.                                    13:50

Q.    Okay.

And you had initially sent Talia an email
saying -- on February 2nd, 2022, at 2:37 p.m., "Hi,
Talia, the AFA called me about Angela Tien's           13:50
separation."

Do you see that?

A.    Yes.

Q.    Who is the AFA?

A.    Rick Gonzalez.                                    13:50

Q.    And what does AFA stand for?

A.    Association of Flight Attendants.

Q.    What was your position at the time?

A.    I was in the Inflight base director for SFO.

Q.    Okay.                                             13:51

And who did you report to at that time?

A.    Dean Whittaker.

Q.    And what was his title?

A.    I don't know.  He was the managing director of
the Inflight bases.                                     13:51

Q.    And the director of Inflight operations, how
many -- I guess at least at that base, how many
individuals were above you?

A.    Above me?

Q.    Yes.                                              13:51

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300        www.veritext.com

A. I was the base director. There was no one locally above me in the department.

Q. Did you create policy for that base?

MR. PARKS: Objection. Vague and ambiguous.

But go ahead.

THE WITNESS: Yeah.

Policy specific to base policy.

MR. ADAM REISNER:

Q. Yes.

A. Not company policy or contractual policy.

Q. But for the base; correct?

A. Yes.

Q. Okay.

So you write, "The AFA called me about Angela Tien's separation."

Do you have a recollection of Rick calling you with regards to Ms. Tien's separation?

A. I don't recall the exact conversation.

Q. But he did call you?

A. I wrote that he called me. So I believe Rick did reach out about this situation.

Q. Did Rick reach out to you about Ms. Tien's separation before or after she was separated?

A. After.

Q. And do you know why Rick reached out to you?

Page 16

MR. PARKS: Objection. Calls for speculation.

But go ahead.

MR. ADAM REISNER:

Q. If you know.

A. What I recall him saying is that he knows that administrative terminations do not get appeals, but her case was -- I don't want to speak for him, but something about being unusual, and he asked if I would look into it.

Q. Do you know why -- strike that.

Did Rick tell you why he felt that this was unusual?

A. He told me that the max -- the letter that was sent to her had a different date than her max LOA date.

Q. And when you said normally they wouldn't have any type of administrative appeal, what was your understanding of what he meant by that?

A. That when somebody was administratively terminated after a three-year leave, after their three-year leave is over -- that it's not a case that is appealed.

I had not been involved in any appeals like that previously.

Q. But he felt the circumstances here were a little bit different, and perhaps they should make an

Page 17

leave-of-absence time.

And it's the employee's responsibility to understand when their three years is up and to return to work as soon as they're medically able.

Q. Right.

But they gave you an actual case where that had happened in the past, where there was a max leave-of-absence letter that had an incorrect date?

A. I don't know if that was the exact circumstances. I don't recall.

Q. But it was something similar to what happened to Ms. Tien?

A. Correct.

MR. PARKS: Okay.

Adam, if it's helpful, we produced the arbitration decision on that case.

MR. ADAM REISNER: I understand, but let her testify to it. And that's in arbitration. That's not something that, I think, should even be admissible in this case.

Q. You also wrote here, "Did we double-check with LR/Legal that we were clear to terminate?"

Do you see that?

A. Yes.

Q. And did you get an answer to that, whether anybody checked with LR/Legal to determine whether they

Page 21

were clear to terminate Ms. Tien?                           13:58

MR. PARKS:  Objection.  Calls for attorney-client privilege.

And we'll instruct her not to answer that.

MR. ADAM REISNER:  It's here in the document,        13:58
Garrett.

MR. PARKS:  Right.

But the content of what the --

MR. ADAM REISNER:  No, not whether -- not whether
she asked about it.  I disagree about that.              13:58

MR. PARKS:  Can you repeat the question?

MR. ADAM REISNER:  Sure.

Q.   You asked the question, "Did we double-check
with LR/Legal that we were clear to terminate?"

Do you see that?                                        13:59

A.   Yes.

Q.   Did you find out whether anybody had
double-checked with LR/Legal to find out whether they
were clear to terminate?

A.   Talia's response shows that she had checked         13:59
with LR --

Q.   I'm sorry.  I didn't mean to step on you.

A.   That's fine.

Q.   Did you speak to anybody with LR/Legal to find
out whether they had cleared the decision to terminate   13:59

Page 22

Ms. Tien?

MR. PARKS: Hold on.

Is the question, "Did you talk to them?" or did you want to know the substance of the communication with them?

MR. ADAM REISNER: No, just whether she talked with them.

MR. PARKS: Nancy, go ahead and answer that.

THE WITNESS: I spoke to them, but your characterization -- your question was whether we were clear to terminate.

The termination had already occurred. I did speak to them about this case, if there were any concerns.

MR. ADAM REISNER:

Q. But did you confirm that somebody contacted LR/Legal to clear the decision to terminate before the decision to terminate was made?

MR. PARKS: Can you repeat?

THE WITNESS: Yeah.

MR. PARKS: I'm confused with how you're phrasing that.

MR. ADAM REISNER: Okay.

Robin, are you able to read back my question, please.

Page 23

(Record read.)                                    14:00

THE WITNESS:  I don't think that was my -- what I was asking from Talia there.

MR. ADAM REISNER:

Q.    So you never determined whether someone had    14:00 contacted LR/Legal to clear whether the decision to terminate was appropriate before --

MR. PARKS:  Objection.  Misstates the prior testimony.

But go ahead.                                 14:01

THE WITNESS:  I'm sorry.  Could you repeat the question?

MR. ADAM REISNER:  Sure.

Q.    I just want to know whether you determined whether LR/Legal was contacted to clear the decision to    14:01 terminate before the decision to terminate had been made.

A.    I did not determine that.

Q.    Is it the policy of the company for United to get some sort of clarification or decision from LR/Legal  14:01 before a decision to terminate is made?

MR. PARKS:  Objection.  Calls for information protected by attorney-client privilege.

I'll instruct her not to answer.

MR. ADAM REISNER:  Whether it's the policy?      14:01

Page 24

because it's not something that I would review.    14:04

Q.    What is the SLOA report?

What does it do?

A.    I don't know for sure.

Q.    Well, what's your understanding of it?    14:04

A.    Well, it's a sick leave-of-absence report.  So anything that I say is my understanding would be my supposition because I didn't review the report.

I don't even know if I have received the report, but I'm assuming it had flight attendant names    14:04 that were on sick leave-of-absence.

Q.    And so are the people that are on the sick leave-of-absence report -- are they individuals that received notice when their max LOA is about to come to an end?    14:04

A.    Again, I don't know.

MR. PARKS:  Objection.  Calls for speculation.

But go ahead.

MR. ADAM REISNER:

Q.    Did you investigate what the purpose of the    14:05 January SLOA report with regards to Ms. Tien -- what that involved?

MR. PARKS:  Objection.  Vague and ambiguous.

But go ahead.

THE WITNESS:  No.    14:05

Page 27

MR. ADAM REISNER:

Q.   Do you know why Talia thought the January SLOA report not having any max LOA separations -- why she thought that was important for you to know?

MR. PARKS:   Objection.   Calls for speculation.

Go ahead.

THE WITNESS:   I don't know.

MR. ADAM REISNER:   Okay.

Q.   Do you know whether people that are on the SLOA report receive any type of notice?

MR. PARKS:   Objection.

THE WITNESS:   I don't know.

MR. PARKS:   Vague and ambiguous, calls for speculation.

Go ahead.

THE WITNESS:   I don't know.

MR. ADAM REISNER:   All right.

And then -- but Talia informs you that she received notification from FAST requesting that a separation case be opened for Angela.

Do you see that?

A.   Yes.

Q.   Okay.

And "a separation case be opened" means it's a request, basically, to terminate Ms. Tien; correct?

14:05

14:05

14:05

14:06

14:06

Page 28

would have shown up on my SLOA report for January 2022." 14:08

Do you see that?

A.   Yes.

Q.   Okay.

So does that refresh your recollection as to 14:08 the importance of the SLOA report for January of 2022?

A.   No.

Q.   Did you confirm whether that was true, that because the max LOA letter came from Inflight, it was not on the SLOA report for January of 2022? 14:09

MR. PARKS:  Objection.  Calls for speculation.

But go ahead.

THE WITNESS:  No, I don't.  I didn't look at the SLOA report.

MR. ADAM REISNER:  Okay. 14:09

Q.   Do you know -- if it had been on the SLOA report, do you know if anything different would have occurred with regards to notice being given to Ms. Tien?

MR. PARKS:  Objection.  Calls for speculation.

Go ahead. 14:09

THE WITNESS:  So I don't know who generates the SLOA report.  I don't know if it's something like an internal record that Talia kept based off of the work that she had done, if it came from somewhere.

That's why I don't know anything about the 14:09

Page 31

report and what work would have been driven off of that 14:09
report and who it came from.

MR. ADAM REISNER:

Q. Talia then said, "I called Angela back and took full responsibility for the error and apologized." 14:10

Do you see that?

A. Yes.

Q. Did Talia tell you that she took full responsibility for this error?

A. In this email, she did. 14:10

Q. Okay.

And was it Talia's fault that the letter -- that the max LOA letter that was sent to Ms. Tien had the incorrect year?

MR. PARKS: Objection. Calls for speculation, 14:10 assumes facts not in evidence, vague and ambiguous.

Go ahead.

THE WITNESS: I believe, from what I saw on the letter, it was sent prior to Talia being the administrative supervisor. 14:10

MR. ADAM REISNER:

Q. Well, did you ask Talia why she accepted full responsibility for the error and apologized?

A. No.

Q. Did you ask Talia why she thought that it was 14:10

her responsibility for the error?

A. No.

Q. Now, to your knowledge, during the time that you worked at United, did they have any policies about administrative errors or administrative mistakes that were done by the company?

A. I don't recall any policies related to that.

Q. So if somebody made a mistake on a date or a reference to something in a document, did the company have any policy of making amends for that mistake?

MR. PARKS: Objection. Asked and answered, calls for speculation, assumes facts not in evidence.

Go ahead.

THE WITNESS: I don't recall any policies.

MR. ADAM REISNER:

Q. Were you aware of any practices that -- when United made an administrative error, that they would correct that administrative error?

A. I'll share my personal experience where I was overpaid at one point after I had taken a voluntary furlough. And I actually brought it to the attention of payroll because I did not want to have issues later on down the road.

They did not resolve it for a couple months, but they did end up resolving it, and I had to remit

payment back. 14:12

Q. So that was an administrative error that you brought to their attention, and they fixed it?

MR. PARKS: Objection. Misstates the prior testimony. 14:12

But go ahead.

THE WITNESS: I don't -- from what I recall, this was years ago. They did not fix it based off of me bringing it to their attention. They fixed it when they went through an internal audit. 14:12

But I knew they made a mistake, and I kept the funds separate in preparation to return the funds, even though I already told them I owed them the funds. But there was no process for me to send it back until they contacted me again. 14:12

MR. ADAM REISNER:

Q. And this was an administrative error; correct?

A. I can't speak to what was the cause of the error, but --

Q. Well, somebody keyed something in incorrectly; correct? 14:12

A. I don't know.

Q. Okay.

When the company came back and took the money back that they had overpaid you, did you feel that they 14:13

Page 34

A. Yes.　14:14

Q. Did you have the ability -- when you were reviewing this claim by Ms. Tien, did you have the ability to make a decision not to terminate or separate her employment?　14:14

A. She was already separated at that time.

Q. Did you have the ability to return her back to work?

A. No, not for this type of administrative termination. She had already been removed from the seniority list.　14:14

Q. Okay.

Did you reach out to anybody to find out whether you had the ability to return Ms. Tien back to work?　14:15

A. I didn't reach out with that specific question.

Q. How do you know that you didn't have the ability to return her back to her seniority?

A. So I reached out to our labor relations in legal to discuss --　14:15

MR. PARKS: Nancy, I'm going to instruct you not to answer anything or not to disclose any information about your conversations with legal regarding this issue as those would be privileged.

THE WITNESS: Okay.　14:15

Page 36

Our -- our labor relations manager had educated 14:15 me on what happens with the max LOA and that it's contractual, and it's not a decision that anyone can overturn because it's negotiated in the contract.

MR. ADAM REISNER: Okay. 14:16

Q. That's what you were told?

A. Yes.

Q. Okay.

But other than being told by someone that you couldn't do it, do you have any other reason to believe 14:16 that you could not have returned her back to her seniority?

MR. PARKS: Objection. Calls for speculation.

MR. ADAM REISNER:

Q. You can answer. 14:16

A. Well, I mean, what I was told made sense. And I think my response to Ms. Tien had also mentioned that had she -- the expectation was that employees return to work as soon as they're medically able.

And the date, regardless of what the date is, 14:16 if she had not been medically able to return by the end of her three years, there would have been no change in the outcome to her case.

Q. Were you aware that Ms. Tien had an actual sick bank of times that she had accrued and could have used? 14:16

Page 37

THE WITNESS: I was not aware.   14:17

MR. PARKS: Objection. Calls for speculation, misstates the prior testimony.

But go ahead.

MR. ADAM REISNER:   14:17

Q. Were you aware that Ms. Tien had 250 hours of available sick time available for her?

A. I was not aware, but I -- from what I recall, employees are the ones who elect how their occupational and sick bank is used.   14:17

Q. Right.

But at the time that Ms. Tien made the decision not to use the sick bank, she had been informed -- erroneously informed that she had until January of 2023 on the max LOA policy.   14:17

You're aware of that?

A. I am not aware of that.

Q. All right.

So if Ms. Tien would have known that United was actually going to terminate her a year earlier, in   14:17 January of 2022, she had enough time that she could have used her sick bank time instead of being terminated.

Are you aware of that?

MR. PARKS: Objection. Lacks foundation, assumes facts not in evidence, calls for speculation.   14:18

Page 38

But go ahead.                                            14:18

THE WITNESS:  I'm not aware.

MR. ADAM REISNER:

Q.    If Ms. Tien wanted to use her sick bank time, could she have used that in January of 2022 instead of    14:18 being terminated?

MR. PARKS:  Objection.  Lacks foundation, assumes facts not in evidence, calls for speculation.

But go ahead.

THE WITNESS:  I don't know enough about the process    14:18 to know if she could have come off of a leave to go use a different sick bank.  I'm not the expert on that.

MR. ADAM REISNER:

Q.    Did you ask anybody whether her sick bank time could have been used instead of terminating her    14:18 employment?

A.    No.

Q.    Why not?

A.    Because she had already exceeded her max three years and had been terminated.                           14:19

Q.    But were you looking into this to see whether some exception could be made because United had made a mistake in the letter that was sent to her?

MR. PARKS:  Objection.  Asked and answered.

Go ahead.                                               14:19

Page 39

MR. ADAM REISNER:

Q. You can answer.

A. Yeah, I don't -- I did not know about her sick time. So I would not have known to ask her that question.

Q. And here's the bottom email (indicating).

You saw the letter that was sent to Ms. Tien?

A. Yes.

Q. And so you were aware this date that was identified that she had to be returned by, this January 25th, 2023 -- this was in error?

A. Yes.

Q. Now, did you discipline anybody under your supervision for giving Ms. Tien's letter with the wrong date?

MR. PARKS: Objection. Lacks foundation, assumes facts not in evidence.

But go ahead.

THE WITNESS: No. The individual whose name is on that letter was not working there at the time.

MR. ADAM REISNER:

Q. Elizabeth Jacobsen was no longer with the company when you reviewed this letter?

A. Correct. I don't believe I ever met Liz Jacobsen. She was already gone by the time I started.

Page 40

STATE OF CALIFORNIA    )

COUNTY OF LOS ANGELES ) SS

   I, ROBIN L. BITTEL, CSR No. 6419, CP, RPR, in and for the State of California, do hereby certify:

   That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

   That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceeding;

   That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was not required.

   I further certify that I am not interested in the event of the action.

   Witness my hand this 27th day of July, 2025.

ROBIN L. BITTEL, CSR No. 6419, CP, RPR

Page 46

# Exhibit 8

From: "Espinoza, Talia" <Talia.Espinoza@united.com>
To: "ByunRiedel, Nancy" <Nancy.ByunRiedel@united.com>
Cc: "Perez, Clarissa" <clarissa.perez@united.com>
Subject: RE: [EXTERNAL] Fwd: Termination Appeal
Date: Wed, 02 Feb 2022 23:01:47 +0000
Importance: Normal
Attachments: PXL_20220127_181845078.jpg
Embedded: unnamed; unnamed(1); unnamed(2)
Inline-Images: image001.jpg

Hi Nancy,

I have not had a case similar to this in the past. Our January SLOA report did not reflect that we had any MAX LOA separations, but I received a notification from FAST requesting that a separation case be opened for Angela. I contacted Scott (who shared the case with Clarissa) on the performance team and he suggested that I contact Liz C and I did. Liz confirmed that, according to the contract, I was taking the right steps.

The 2019 MAX LOA letter came from us at Inflight, but I believe the alert we received had the wrong year and I came to that conclusion because if we had the correct year, the FA would have shown up on my SLOA report for January 2022. I called Angela back and took full responsibility for the error and apologized. Please see the attachments related to this separation. Let me know if you have any other questions.

Sincerely,
Talia

From: ByunRiedel, Nancy <Nancy.ByunRiedel@united.com>
Sent: Wednesday, February 2, 2022 2:37 PM
To: Espinoza, Talia <Talia.Espinoza@united.com>
Cc: Perez, Clarissa <clarissa.perez@united.com>
Subject: FW: [EXTERNAL] Fwd: Termination Appeal

Hi Talia,
The AFA called me about Angela Tien's separation. Have you had situations in the past where the MAX LOA letter had an incorrect date? Did we double-check with LR/Legal that we were clear to terminate?

Sincerely,

**Nancy ByunRiedel** *(She/Her/Hers)*
Director, Inflight Base Operations - SFOSW

United | San Francisco International Airport - SFOSW | San Francisco, CA 94128
Tel 650-874-6510 | Cel 773-658-0897 | nancy.byunriedel@united.com
united.com

From: Rick Gonzalez <rgonzalez@unitedafa.org>
Sent: Wednesday, February 2, 2022 2:15 PM
To: ByunRiedel, Nancy <Nancy.ByunRiedel@united.com>
Subject: [EXTERNAL] Fwd: Termination Appeal

This message was sent from outside of United Airlines. Please do not click links or open attachments unless you recognize the sender and know that the content is safe.

FYI

Begin forwarded message:

From: Angela Tien <angelatien.af@gmail.com>
Subject: Re: Termination Appeal
Date: January 31, 2022 at 7:03:03 PM PST
To: Rick Gonzalez <rgonzalez@unitedafa.org>

Hi Rick,

1/25/2022.
U308222.

Please see the attached termination notification from Talia also the Max LOA letter from Elizabeth.

Talia, my former supervisor, called me on 1/27/2022 to inform I was terminated because I reached maximum LOA. She emphasized the company sent me a Max LOA letter so I should know the date. I was very shocked because I remember 1/25/2023 is the official max LOA date. I showed Talia the letter from Elizabeth Jacobsen, who was the OJI supervisor at the time. Talia didn't say anything about it but sent me the termination letter.

Sheila in the Union called Talia right away to see if United would honor the mistake, so Talia brought the issue up to the higher management. The next day, Talia said the higher-up said it's my responsibility to find the mistake on the Max LOA letter. Talia it's black and white on the contract says three years. I replied to Talia it's also black and white on this company official letter which Personnel department was cc'd. I didn't try to steal another year on LOA, I simply believed this date bolded in font on the official letter was true. Talia told me the high-up said the letter listed the starting date correctly and that was sufficient. I replied her the subject of the official letter is for "maximum LOA". The starting date was not important, it's the end date that should be accurate. Then she emphasized again it's my responsibility to find the final date.

Talia said the contract only required the company to inform the FA once, that was why the company didn't send me any reminders. That's fine. It would be even better if they didn't send it at all because otherwise I would ask around to ensure I followed the instructions properly. In about three weeks ago, I emailed Talia and asked her why didn't I see CBT in my FT CQ curriculum, and I didn't want to miss anything that would cause issues. She simply replied I didn't have to do CBT while I was on medical leave.

UNITED003642

CONFIDENTIAL



EXHIBIT
8

From: "ByunRiedel, Nancy" <Nancy.ByunRiedel@united.com>
To: "Rick Gonzalez" <rgonzalez@unitedafa.org>
Subject: RE: [EXTERNAL] Fwd: Termination Appeal
Date: Tue, 08 Feb 2022 20:45:54 +0000
Importance: Normal
Inline-Images: image001.jpg

Hi Rick,

I looked into this further. There is nothing I can do here. Angela emailed me directly and I told her the same thing. If she could have come back before the deadline, she should have come back as soon as she was medically able.

Sincerely,

**Nancy ByunRiedel** *(She/Her/Hers)*
Director, Inflight Base Operations - SFOSW

United | San Francisco International Airport - SFOSW | San Francisco, CA 94128
Tel 650-874-6510 | Cel 773-658-0897 | nancy.byunriedel@united.com
united.com

From: Rick Gonzalez <rgonzalez@unitedafa.org>
Sent: Wednesday, February 2, 2022 2:15 PM
To: ByunRiedel, Nancy <Nancy.ByunRiedel@united.com>
Subject: [EXTERNAL] Fwd: Termination Appeal

This message was sent from outside of United Airlines. Please do not click links or open attachments unless you recognize the sender and know that the content is safe.

FYI

Begin forwarded message:

From: Angela Tien <angelatien.sf@gmail.com>
Subject: Re: Termination Appeal
Date: January 31, 2022 at 7:03:03 PM PST
To: Rick Gonzalez <rgonzalez@unitedafa.org>

Hi Rick,

1/25/2022
U308222

Please see the attached termination notification from Talia also the Max LOA letter from Elizabeth.

Talia, my former supervisor, called me on 1/27/2022 to inform me I was terminated because I reached maximum LOA. She emphasized the company sent me a Max LOA letter so I should know the date. I was very shocked because I remember 1/25/2023 is the official max LOA date. I showed Talia the letter from Elizabeth Jacobsen, who was the OJI supervisor at the time. Talia didn't say anything about it but sent me the termination letter.

Sheila in the Union called Talia right away to see if United would honor the mistake, so Talia brought the issue up to the higher management. The next day, Talia said the higher-up said it's my responsibility to find the mistake on the Max LOA letter. Talia it's black and white on the contract says three years. I replied to Talia it's also black and white on this company official letter which Personnel department was cc'd. I didn't try to steal another year on LOA, I simply believed this date bolded in font on the official letter was true. Talia told me the high-up said the letter listed the starting date correctly and that was sufficient. I replied her the subject of the official letter is for "maximum LOA". The starting date was not important, it's the end date that should be accurate. Then she emphasized again it's my responsibility to find the final date.

Talia said the contract only required the company to inform the FA once, that was why the company didn't send me any reminders. That's fine. It would be even better if they didn't send it at all because otherwise I would ask around to ensure I followed the instructions properly. In about three weeks ago, I emailed Talia and asked her why didn't I see CBT in my FT CQ curriculum, and I didn't want to miss anything that would cause issues. She simply replied I didn't have to do CBT while I was on medical leave.

Where is it in section 15E states that the company only had to send one notification? When the company sent a deadly wrong information, the action did not fulfill the purpose of a notification that required by the contract. It's a violation. The contract didn't say the company can send a wrong date to mislead a flight attendant.

How I feel after the conversations is that the company was trying to get rid of me because my disability as they refused to own a mistake initialed by the company, and blamed everything on me. They blamed on me did not verify the years, did not do the math, did not read the Work History in CCS where it had stated three years.

I don't know if the Union will try to help me to make the company to own their mistake. I told Sheila I don't need the company to give me another year. I can return to work now. I just need Sedgwick not to delay the process any longer. I can use FMLA when Sedgwick finally approves the hand surgery extension and the timeframe needs to be long enough to book an appointment with the hand surgeon who was hard to book because he was often away. All the workers comp agree I can return to work after the surgery. The company must have all my workers comp medical records, but apparently they want to let me go. Now I start to wonder if that was really a typo or not. It's easier to type 2022 than 2023.

Best regards,

Angela

 Tien, Yihsing u308222.pdf

On Mon, Jan 31, 2022, 5:41 PM Rick Gonzalez <rgonzalez@unitedafa.org> wrote:

UNITED003596

CONFIDENTIAL

Hi Angela,

I need a little more information. When was the termination, and what is your employee number? If you have a copy of the Termination Letter can you forward to me?

Thank you.

Rick

Sent from my iPhone

> On Jan 31, 2022, at 3:25 PM, Angela Tien <angelatien.sf@gmail.com> wrote:
>
>
> Hi Rick,
>
> How do I appeal a termination?
>
> Best regards,
>
> Angela



**UNITED**

1/25/2019

U308222 / SFOSW
Yihsing Tien
370 Imperial Way Apt 228
Daly City, CA 94015 USA

Dear Yihsing,

The purpose of this letter is to advise you that our records indicate you have been placed on a leave of absence effective **1/25/2019**. If you remain medically unable to return to work, in accordance with Section 15E. of the Joint Collective Bargaining Agreement, you will be administratively separated on **1/25/2023**.

When you begin your Leave of Absence I will be your supervisor in lieu of your base supervisor. As Company policy, and government mandates may change, the most current Leaves of Absence Packet is located on Flying Together. The Leave of Absence Packet contains a summary of benefits affected by this status and should be read carefully.

Important information while on an inactive Leave of Absence:

- You are expected to remain under a physician's care, as well as provide OPCMD with regular medical updates following each visit or as directed by UAL Medical. To verify receipt of your medical documentation you may contact the Employee Service Center (ESC) at 1-877 UAL-ESC9 (1-877-825-3729).
- Your UA-issued (white) TSA crewmember badge may be retained. Should it expire during your leave of absence, it cannot be renewed until your return to active status.
- You will keep your LINK and accessories for the duration of your leave. If your leave of absence extends past 90 days, your LINK service will be suspended until your return to active service.
- Reasonable Accommodation Process (RAP), outside employment guidelines and information regarding seniority accrual is in the Leaves of Absence packet.

You are very important to United's success. I wish you a speedy recovery and look forward to having you back to work soon. Please contact me if you have any questions.

Respectfully,

Elizabeth Jacobsen
Supervisor Inflight Service
650-874-6514
elizabeth.jacobsen@united.com

cc: Personnel File

SB Exhaustion / Max Leave                                        Rev 12-5-17

UNITED003597

CONFIDENTIAL

# EXHIBIT H - INTENTIONALLY LEFT BLANK

# Exhibit I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


YIHSING TIEN AKA

ANGELA TIEN,


     PLAINTIFF,

v.                   Case No. 4:23-CV-02622 JSW

UNITED AIRLINES, INC., A

CALIFORNIA CORPORATION;

TALIA ESPINOZA, AN

INDIVIDUAL; AND DOES 1-100,

INCLUSIVE,

     DEFENDANTS.

_____)



REMOTE VIDEOTAPED DEPOSITION OF

ROBERT KRABBE

JULY 16, 2025


REPORTED BY: KIMBERLY K. WALSTAD, CSR NO. 13828

FILE NO.: 7485432

E X H I B I T S

NO.                 DESCRIPTION                              PAGE

Exhibit 1           United 2016-2021 Flight Attendant          19

Agreement, Bates numbers UNITED000110

through 543, 434 pages

Exhibit 2           Working Together Guidelines,               47

November 2021, Bates numbers

UNITED 000545 trhough 748, 204 pages

Exhibit 3           August 14, 2017, letter from United,       49

Sam Risoli, to Ken Diaz, Bates number

UNITED000544, 1 page

Exhibit 4           1/25/2019 Letter from United,              55

Elizabeth Jacobsen, to Yihsing Tien,

1 page

Exhibit 5           United Description of Flight               83

Attendant Job Duties, Bates numbers

TIEN0024 through 25, 2 pages

Page 5

EXHIBITS

(continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Agreement between The Continental Airlines, Inc. and The Association of Flight Attendants, July 13, 2012, through December 31, 2014, Bates numbers UNITED003991 through 4340, 350 pages | 88 |
| Exhibit 7 | May 24, 2019, Letter from United to Yihsing Tien, beginning with Bates number UNITED00114, 23 pages | 92 |
| Exhibit 8 | Know Your Occupational Benefits, Bates numbers UNITED003772 through 3788, 17 pages | 101 |
| Exhibit 9 | United, Inflight Services, Flight Attendant Leaves of Absence (LOA) Packet, Revised February 2018, Bates numbers UNITED003789 through 3854, 66 pages | 102 |

Page 6

E X H I B I T S

(continued)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| Exhibit 10 | United Flight Attendant Leaves of Absence Packet, Revised November 2021, Bates numbers UNITED003855 through 3943, 89 pages | 106 |
| Exhibit 11 | October 26, 1990, Arbitration Award between United Airlines, Inc., and Association of Flight Attendants, AFA Case No. 64-06-1-168-90, Bates numbers UNITED003947 through 3958, 12 pages | 109 |
| Exhibit 12 | Letter of Decision, ORD 148-08 dated October 14, 2008, Bates numbers UNITED003987 through 3990, 4 pages | 112 |
| Exhibit 13 | In the Matter of Arbitration Between Association of Flight Attendants-CWA, AFL-CIO and United Airlines, Inc., Date of Hearing, July 29, 2021, Bates numbers UNITED003965 through 3986, 2 pages | 114 |

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

A    That's correct.

Q    Okay.  And there hasn't -- has there been no form of accommodation in regards to providing a grace period in which this has occurred and, I guess, although the flight attendant has been separated, that they will be permitted to return but like as a new hiree?

MS. GEHRKE:  Vague.  Overbroad.  Compound. He can answer if he understands.

THE WITNESS:  So as I understand the question, you're asking me about whether they could return as a new employee?

BY MR. CAPILITAN:

Q    Yes.

A    This -- this language does not address that.

So this language addresses what happens once the individual reaches the maximum period of their leave of absence.  They -- they're eventually terminated and they're removed from the system seniority list.

They are not prohibited from reapplying and being hired again as a new hire.  This isn't -- this isn't a -- they're not being terminated for cause like someone who's violated the rules.

Page 26

A    We had received questions about whether occupational leaves of absence were covered under 15(E) and consistently answered that they -- they were.

The leave of absence packet, which is something that is supplied to flight attendants and is available on the Flying Together website, reflected the parties' understanding that this applied to both occupational and non-occupational.

It was simply a matter of we received some questions, and we felt we needed to formalize the understanding through a letter of agreement, and that's -- that's what -- that's how this letter resulted.

Q    Okay.  And this letter of agreement, when it was finalized and signed, how was it provided to each flight attendant?

A    I don't know how this -- I don't know how the letter would have been provided.  I believe AFA may have published it.

What -- what we had done is we had published information to the flight attendants.  As we were implementing sections of the contract, we provided flight attendants with information about how the contract applied.

Page 54

THE WITNESS: That's my understanding of what Ms. Tien is seeking, is an exception to the language of the three-year maximum duration and an exception to administratively separated and removed from the system seniority list under 15(E)(2).

BY MS. GEHRKE:

Q Based on your understanding of the JCBA, how do the maximum leave of absence provisions in Section 15(E) relate to leaves that a flight attendant may take under the federal Family and Medical Leave Act or the California Family Rights Act?

A So to the extent that they qualify for leave under either of those acts, it would run concurrently with the leave itself. The three years in this case far exceeds what those entitlements would be, but it would run concurrently. The JCBA offers more than would be required under those, essentially, by -- by agreement with the union.

Q All right. Counsel asked you about the Working Together Guidelines, so I want to ask you some follow-up questions on that. I believe we previously marked that as Exhibit 2.

So you identified some language -- well, let me just show you the document again. This is

Page 80

REPORTER CERTIFICATE

I hereby certify that the witness in the foregoing deposition, ROBERT KRABBE, was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of July, 2025.

*Kimberly K. Walstad*

KIMBERLY K. WALSTAD, CSR NO. 13828

STATE OF CALIFORNIA

Page 124

# Exhibit J

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

– – –

YIHSING TIEN aka ANGELA TIEN,          )
                                       )   Case No.:
            Plaintiff,                 )   4:23-cv-02622 JSW
                                       )
      vs.                              )
                                       )
UNITED AIRLINES, INC., a               )
California Corporation; TALIA          )
ESPINOZA, an individual; and           )
DOES 1-100, inclusive,                 )
                                       )
            Defendants.                )
------------------------------------)


REMOTE VIDEOCONFERENCE DEPOSITION OF

CARLOS RIVERA TORRES

CHICAGO, ILLINOIS

JULY 25, 2025


REPORTED BY:  LINDA L. HUDDLESTON, CSR NO. 11160

FILE NO: 7485451

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

```
                    I N D E X
WITNESS:  CARLOS RIVERA TORRES
EXAMINATION                                    PAGE
     By:  MR. CAPILITAN                      6, 118
          MS. GEHRKE                            90


EXHIBITS:
                    PLAINTIFF'S
NUMBER                DESCRIPTION                PAGE
Exhibit 1 - 2016 2021 Flight Attendant Agreement   72
Exhibit 2 - Working Together Guidelines            85
Exhibit 3 - Letter dated 8/14/17, to Ken Diaz,     73
             President, United Airlines MEC,
             from Sam Risoli, Senior Vice President
             Inflight Services, Bates-stamped
             UNITED000544
Exhibit 4 - Leave of Absence letter, sent to       65
             Yihsing Tien, dated 1/25/2019

Exhibit 5 - Email chain Bates-stamped              67
             UNITED-3448 through 3453
             (Confidential)

Exhibit 23 - Notification of Extended Illness       60
             Status, dated 2/19/19
Exhibit 24 - Letter dated 4/19/21, Subject:  Next   51
             Medical Udate Due - ESF

Exhibit 25 - Employee Work Status Form              59

Exhibit 26 - Job Descriptions/Functions for         32
             positions with Transitional Duty
Exhibit 30 - FAST ServiceNow HR Workforce           88
             Administration Case printout,
             Bates-stamped UNITED003965 through
             UNITED003981
             (Confidential)
```

Page 4

EXHIBITS:

DEFENDANTS'

NUMBER                    DESCRIPTION                         PAGE

Exhibit 31 - 2018 Leave of Absence Packet              92

Exhibit 32 - 2021 Leave of Absence Packet              95

Exhibit 33 - Flight Attendant Pay Option letter        97

Exhibit 34 - Reasonable Accommodation Program          100
             Invitation letter, dated 6/24/21


Exhibit 35 - Help Hub case for the Reasonable           105
             Accommodation Program, Bates-stamped
             UNITED-4355 through -4357
             (Confidential)

Exhibit 36 - Extended Illness Case, Bates-stamped       111
             UNITED-4341 through -4354



QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:


                    (NONE)



INFORMATION TO BE SUPPLIED:


                    (NONE)

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300        www.veritext.com

affect your best testimony today?

A. No.

Q. Okay.

And, of course, on occasion, Counsel representing you may object to some of my questions, but unless you specify otherwise, you're still obligated to provide an answer.

You understand?

A. Yes, I understand.

Q. Okay. So we'll get started here.

Well, first off, can you please state what position you are -- well, first off, are you -- you're currently employed with United, obviously; correct?

A. Yes, I'm employed with United.

Q. Okay. What's your current job title?

A. My current job title is Senior HR Manager over the Employee Service Center Absence Management Team.

Q. Okay. And make sure I got it right. So Senior HR Manager for Employment Service Center Absence Management Team?

A. It's "Employee" Service Center.

Q. Oh. Employee. Okay.

How long have you been in that position for?

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300      www.veritext.com

A. I believe I've been senior manager for two, two-and-a-half years.

Q. And before -- well, first off, how long have you been with United?

A. Been with United since 10/16 of 2000.

Q. Perfect. So essentially, you've been with United for like 25 years?

A. Yes.

Q. Or close to 25 years?

A. Yeah. Going to be, yeah.

Q. Well, what was the position that you held back in -- well, 2018?

A. In 2018, I was a manager within the Employee Services Center Team, again, still with human resources.

Q. Okay.

So is that the same position you held from 2018 up until you became Senior HR Manager?

A. Yes.

Q. Okay. So then, just manager with the HR team, how long have you been in that -- how long were you in that position before being promoted to Senior HR Manager?

A. I believe I was manager since 2008, March of 2008.

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

Q. So would, it be fair to say you're from basically, 2008 to 2000- -- would it be -22 or -23?

A. Let's see. Math. I'm sorry. What was the question again? Sorry.

Q. Just what was your time period being senior manager -- sorry, HR Manager. You said that was from 2008 to --

A. Yeah. It was March of 2008 till like around December of, I think it was '23, yeah.

Q. Okay.

Okay. So specifically, then, in your role as HR Manager of the Employee Service Center Absence Management Team, what were your duties in that role?

A. The one previous to the senior manager?

Q. Yes.

A. Yeah. There were several ESC staff reps that reported to me, so I just made sure that our team processed leaves of absence related requests accordingly.

Q. Okay. And then, what did you -- you mentioned something, but I -- I didn't quite get it. You mentioned, I guess, someone or teams report to you. Can you the say the initial part again?

A. Yeah. I had several direct reports that

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300          www.veritext.com

reported to me and they were ESC staff representatives.

Q. The -- what was it, BLC?

A. Sorry. ESC, which stands for the Employee Service Center.

Q. Oh, okay.

A. Yeah.

Q. And -- and specifically, was that for -- when individuals were requesting leaves of absence and that was processed, is it specifically for flight attendants or for anyone working within United?

A. That would be for anyone. We -- we process leave of absence requests for all employees.

Q. And you mentioned -- well, before we got on the record, you mentioned you're based out of Chicago; right?

A. Yes.

Q. Okay.

The office that you operate out of, is that -- is the Chicago base the main area, or are there also different bases of operation?

MS. GEHRKE: Vague -- vague, overbroad.

THE WITNESS: Can you restate the question?

Q. BY MR. CAPILITAN: Well, let me get some

Page 12

approved.

Would that be accurate?

A. Yes. My department, once we review the information, then we determine if it's enough to support the absence.

Q. Are you familiar with the Flight Attendant Service Team or FAST?

A. Yes, I'm familiar with their team.

Q. Okay.

What type of communications does your department have at that time in relation with FAST?

MS. GEHRKE: Overbroad.

MR. CAPILITAN: Oh, as it pertains to leave of absences.

MS. GEHRKE: Overbroad.

THE WITNESS: So there are -- there are certain notices that, when we place an employee out on leave, the FAST team is notified so that they can update some of their systems and also their case management system; in addition to FAST, at times, will let us know that somebody needs to be placed on a leave of absence and then we go ahead and, you know, take appropriate action.

Q. BY MR. CAPILITAN: So is it sort of like a, it could go either way in regards to requests to

leave of absences? So -- and I guess what you mean by that is, an employee could request a leave of absence directly from the HR Department and then the FAST team is notified or the FAST team can make a potential determination that an employee should be placed on a leave of absence.

Would that be accurate?

MS. GEHRKE: Misstates prior testimony, overbroad, vague, calls for speculation.

THE WITNESS: When FAST lets us know that somebody needs to be placed on leave, it's because the flight attendant has been calling out sick and they've reached a period of time where they are -- either they've reached their 17th day of sick unpaid status, right, or they've chosen to go immediately on leave.

And when that occurs, whether or not there has been medical information provided and we place them on leave of status (sic), we send them a letter and then we ask for medical documentation.

The other way around would be if the flight attendant submits medical documentation to us first, right, and then we update their calendar. And based on what we see, then we place them either on paid leave or eventually unpaid leave, depending if they

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300     www.veritext.com

have sick bank or not.

Q. BY MR. CAPILITAN: Okay. So that provides better clarification.

Then, my question is: In your review of any sort of documentation in relation to this matter, how was your understanding of the process in which Ms. Tien was placed on a leave of absence, if you know?

A. So if Ms. Tien was placed on a leave of absence, that would have been -- when you say "leave of absence," are you talking about inactive leave of absence?

Q. Well, yeah. So medical leave of absence.

A. Okay. So the reason I ask it that way is because someone can be placed out on a leave, if you will, right? But if they're using their sick bank, they'll be on a leave of absence, but they're still on active status while they're burning their sick time. A flight attendant can choose to go immediately on a leave of absence without using their sick bank.

So in that respect, that information is relayed to FAST, and FAST lets us know that the flight attendant elected to move directly to leave, so please place them on a leave of absence. And then

we update our systems accordingly and send them the notification that they've been placed on leave and with a date as to when the next documents -- medical documents are due to continue to support their leave.

Q. Okay.

Then, so understanding that difference in terms of whether or not they're an active leave of absence versus nonactive leave of absence, specifically, they're using their sick bank or not, in regards to, I guess, communication with flight -- specifically with flight attendants that are either going on an inactive leave of absence or are requesting it, what type of communication does your department at that time have with the flight attendant in relation to those requests being made and approvals being done?

MS. GEHRKE: Overbroad.

THE WITNESS: We sent -- we sent -- as far as being -- once we place them on an inactive leave of absence, we send what's called the extending illness, either nonoccupational leave of absence letter or extended illness occupational illness status letter. Obviously, one is for nonoccupational injuries. The other, if you've suffered an injury at work, then that's an occupational injury.

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300     www.veritext.com

That letter lets the flight attendant know, right, the effective date they've been placed on that leave and also the date that their next documents are due.

Q. BY MR. CAPILITAN: Okay.

And the specific instance of the next date in which their next documents are due, is that specifically for the medical aspect of it?

A. Yeah. Usually the date next documents are due would be if we -- if the information provided says there's a next appointment date. If for some reason there's no next appointment date, then based on the medical facts, we'll pick a date as to when the flight attendant needs to provide medical documentation by.

Q. Okay.

Aside from the communication you mentioned previously with FAST, does your department have any other sort of connection with FAST?

MS. GEHRKE: Vague, overbroad.

THE WITNESS: As far as while the flight attendant is out on leave?

MR. CAPILITAN: Um-hmm.

THE WITNESS: While the flight attendant is on leave, it's the -- and I'm going to instead of say

Veritext Legal Solutions
calendar-abi@veritext.com 818-551-7300 www.veritext.com

Would the only way to go back on sick bank is to be officially off of leave of absence, but you'd have to be required that you're able to return to work, then you may potentially be able to go back on sick bank?

MS. GEHRKE: Misstates prior testimony, asked and answered.

THE WITNESS: I believe the way it works is, once you go -- once you elect like, in this case, to go on unpaid status and you're on leave, if you return from leave, I believe as a flight attendant you have to, like, work at least one trip or have something in your -- in your schedule, right, as a quote-unquote workday.

And then after that, if -- if you return to work, then if you're sick again, then you're entitled to use your sick bank again. But if you never really returned, then you just be placed on that inactive leave status once again.

Q. BY MR. CAPILITAN: Okay.

And then going back to, I believe it was listed as Exhibit 35. And I have it now here. So let me pull that up.

Okay. You see the document on your screen?

A. Can you make it a little bigger, please?

REPORTER'S CERTIFICATE

I, LINDA L. HUDDLESTON, CSR NO. 11160, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Read and sign was requested.

Dated this 30th day of July, 2025.

*Linda L. Huddleston*

LINDA L. HUDDLESTON, CSR NO. 11160

Page 133

# EXHIBIT 33



**Flight Attendant Pay Option Acknowledgement**
**(Occupational) Letter**

I, __Yihsing Tien__ , __U308222__ , have submitted a claim for an occupational injury incurred
     **(Name)**         **(Employee ID #)**

on __Oct 30,2018__ , this has resulted in my absence from work.
  **(Date of injury)**

My claim has not yet been accepted or declined by Sedgwick/AIG, United's third-party administrator for
Workers' Compensation claims.

United has informed me that while my claim is pending acceptance by Sedgwick/AIG and provided that I
have submitted documentation to substantiate my inability to work, I can opt to receive any supplemental
sick leave pay calculations paid/given by United via my occupational and/or my non-occupational sick
banks. Through this acknowledgement I agree that if I receive full sick leave pay for time off while my claim
is being investigated and later also receive pay directly from Sedgwick/AIG for the same time period,
I will reimburse United and United will credit my occupational and/or non-occupational sick leave bank for
the amount paid over and above my line value and or pay option.

If my claim is accepted by Sedgwick/AIG, I will receive workers' compensation pay directly from
Sedgwick/AIG. This pay may or may not be equal to pay that I would receive if I were to be working or
collecting sick leave pay full time as a flight attendant for United. United has explained to me that I have
the following pay options which I can utilize while receiving workers' compensation payment from
Sedgwick/AIG. By checking below, I am informing United of my desired pay option and authorizing United
to, if I choose option 1-3, to calculate my supplemental sick pay credit as shown on my pay file:

1._____ Supplement my workers' compensation pay with hours from my occupational and/or non-
        occupational sick leave bank up to the value of my monthly awarded line of flying. (**Default**)

2._____ Supplement my workers' compensation pay with hours from my occupational and/or non-
        occupational sick leave bank up to 71 hours

3._____ Supplement my workers' compensation pay with hours from my occupational and/or non-
        occupational sick leave bank up to the 100 hours.

4.__X__ **Be placed on Occupational Leave of Absence and receive only workers' compensation with
no additional paid sick hours from my occupational and/or non-occupational sick leave bank. \*\***

The option selected will remain in effect for the duration of your occupational absence or (if options 1-3 are
chosen), until the hours in your non-occupational sick bank have been exhausted. Upon exhaustion you will
only receive workers' compensation payments directly from Sedgwick/AIG, and will be placed on an
occupational leave of absence.

**\*\* If you elect to be placed on leave you will receive only workers' compensation pay from Sedgwick/AIG. Once
placed on a LOA, the leave will not be rescinded. You will need to make arrangements to satisfy any regular
payroll deductions (medical, dental, etc.).**

_(signature)_                        __Jan 23, 2019__
Signature                                    Date

**THIS FORM MUST BE SUBMITTED VIA HelpHUB**>Employee Services>Payroll>Earnings and
Hours

Any questions pertaining to this form please contact a Flight Crew Support Team Member at 1-800-358-5463 Option 5,
Option 1, Option 1, or submit a service request via HelpHUB> Employee Services > Payroll > Earnings and Hours> Pay
Register/Payable Hours Inquiry.

Last Revised September 2018

**EXHIBIT**

33

# EXHIBIT K

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

ADAM REISNER, ESQ. (State Bar No. 204351)
adam@reisnerlaw.com
TESSA KING, ESQ. (State Bar No. 251408)
tessa@reisnerlaw.com
KENZO CAPILITAN, ESQ. (SBN 333009)
kenzo@reisnerlaw.com
REISNER & KING LLP
15303 Ventura Blvd, Suite 1260
Sherman Oaks, California 91403
Phone:   (818) 981-0901
Fax:     (818) 981-0902

Attorneys for Plaintiff **YIHSING TIEN aka ANGELA TIEN**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA OAKLAND DIVISION

| | |
|---|---|
| YIHSING TIEN aka ANGELA TIEN <br><br> Plaintiff, <br><br> vs. <br><br> UNITED AIRLINES, INC., a California Corporation; TALIA ESPINOZA an individual; and DOES 1 THROUGH 100, inclusive, <br><br> Defendants | Case No. 3:23-CV-02622 <br><br> [Assigned to Hon. Judge Jeffrey S. White, Dept. 5] <br><br> **DECLARATION OF ANGELA TIEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br><br> Date:      Sept. 12, 2025 <br> Time:     9:00 a.m. <br> Dept.:     5, 2nd Floor <br> Judge:        Hon. Jeffrey S. White |

I, Yihsing aka Angela Tien, declare and state as follows:

1. I am the Plaintiff in this action. I have personal knowledge of the following facts and if called as a witness I would and could testify competently thereto.

1

DECLARATION OF ANGELA TIEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

2. This declaration is only for the limited purpose of opposing Defendant's Motion for Summary Judgment, or in the alternative partial Summary Judgment. This is not an exhaustive account of all my claims against Defendant or the facts pertaining to it.

3. The following information I was not specifically questioned on in my deposition and/or I was not given the opportunity to respond fully.

4. As testified to, while working for United, I suffered disabilities after sustaining a work related injury. Although United knew of my disabilities, from before I went out on medical leave, and while I was on my medical leave, including from 2019 to 2022, United did not reach out to me to meet with me to engage in a good faith interactive process or to discuss my disabilities or whether they could be accommodated. This includes no one reaching out to me to discuss my restrictions, how they believed they affected my job or other jobs. The only time anyone ever spoke to me was in around June 2021 and I was asked if I wanted to work for another department. This person did not tell me that my medical leave until Jan. 25, 2023 was not approved, that my medical leave was only until Jan. 25, 2022, nor did this person discuss my medical work restrictions or other options.

5. As testified to, shortly after being notified of my termination which occurred on or about January 27, 2022, I reached out to Dr. Brian Mitchell regarding my separation with United and told him I needed to be released to work immediately. Shortly thereafter, on February 7, 2022, Dr. Mitchell provided me with a doctor's note stating that I had been released to work without medical work restrictions and it stated, "... Return to full duty Trial full duty." A true and correct copy of my February 7, 2022, doctor's note is attached as Exhibit 1. This demonstrates that had I been informed before my termination that I needed to return back to work on or before Jan. 25, 2022, I could have obtained the necessary release to return me to work. Yet as I testified to, I relied on Defendant's written representations that my medical leave was approved until Jan. 25, 2023, so I had remained out on medical leave while seeking ongoing medical treatment.

2

DECLARATION OF ANGELA TIEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

6. On February 7, 2022, I was cleared to return to work without restrictions by Dr. Brian Mitchell's office. On or about Feb. 7, 2022, Dr. Mitchell's office sent the clearance note to United and to Sedgwick, United's workers' compensation administrator.

7. Despite getting a release to work in February 2022, United failed to reinstate me, despite my requests that they do so, and also failed to rehire me.

8. Before I was told I was being fired, no one from United or on their behalf ever sent me a letter or told me that my medical leave was coming to an end or that I only had until Jan. 25, 2022, to return to work. This includes no one engaging in the good faith process with me or trying to contact me in 2022 to let me know my medical leave was going to expire and to see if there were other accommodations that I needed.

9. Had it been made clear that my protected medical leave expired on January 25, 2022, I would not have informed Dr. Mitchell that I had until January 25, 2023 to complete my wrist surgery and would have requested an earlier date for my surgery or asked whether it was possible to have restrictions taken off in order to return to work before I did this in Feb. 2022 after I was aware of United terminating my employment.

10. In addition to my other efforts, on Feb. 7, 2022, I sent an email to Ms. Bynun-Ridel and complained about being terminated when I had been told I had until Jan. 25, 2023 of medical leave and that I relied on this to my detriment. I also asked to be returned to work. A true and correct copy of this email is attached as Exhibit 2.

11. Additionally, at the time of my termination, I had accrued 214.38 hours of sick bank time which I decided to freeze when I went on my protected medical leave. Had I been informed that my protected medical leave was set to expire on January 25, 2022, I would have requested to return to work and utilize my sick bank hours instead. Doing so would have allowed me sufficient time to undergo my wrist surgery, recover, and return to work, thereby avoiding any issue related to the expiration of my protected medical leave on January 25, 2022. A true and correct copy of my sick bank records is attached hereto as Exhibit 3.

3

DECLARATION OF ANGELA TIEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

I declare under penalty of perjury under the laws of the United States of America and under the laws of the State of California that the foregoing is true and correct.

DATED: August 25, 2025

DocuSigned by:

Yihsing aka Angela Tien

DECLARATION OF ANGELA TIEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

# EXHIBIT 1



# NMCI Medical Clinic, Inc.

☐ NMCI San Jose
1720 Ringwood Ave.,
San Jose, CA 95131
Tel: (408) 988-8581; Fax: (408) 988-8734

☐ NMCI San Mateo
101 S. San Mateo Dr., Suite 112
San Mateo, CA 94401
Tel: (650) 755-6400; Fax: (650) 422-6403

☐ NMCI San Leandro
14000 E. 14th
San Leandro, CA 94578
Tel: (510) 351-4400; Fax: (510) 351-4401

☐ NMCI Sacramento
2901 K. Street, Suite 120-C
Sacramento, CA 95816
Tel: (916) 448-1770; Fax: (916) 448-3015

☐ NMCI Stockton
3031 W. March Ln, Suite 123-S
Stockton, CA 95219
Tel: (209) 476-8405; Fax: (209) 476-8406

☐ NMCI Salinas
680 E. Romie Ln., Suite C
Salinas, CA 93901
Tel: (831) 975-5902; Fax: (831)975-5906

**Patient Name:** Yihshing (Angela) Tien **Date of Injury:** 10-30-2018 **Date:** 02-07-2022
**Company:** United Airlines **Attention: Phone: ;Fax:**
**Work Status:** The patient has been instructed to: Return to full duty Trial full duty. Will reassess with PTP 3/2022.
**Modified Duties:**

| | | |
|---|---|---|
| ☐ No lifting greater than LBS | ☐ No levantar mas de LBS | |
| ☐ No repetitive bending or stooping | ☐ No agacharse o doblarse repetidamente | |
| ☐ No repetitive squatting | ☐ No ponerse en cuclillas repetidamente | |
| ☐ No prolonged or repetitive kneeling | ☐ No debe arrodillarse repetidamente o por mucho tiempo | |
| ☐ No walking on uneven ground | ☐ No caminar en terreno disparejo | |
| ☐ No heavy or repetitive pulling or pushing | ☐ No debe jalar o empujar cosas pesadas o repetidamente | |
| ☐ No climbing duties | ☐ No subir o encaramarse/escalar | |
| ☐ No repetitive work at or above shoulder | ☐ No debe usar el hombro repetidamente | |
| ☐ No repetitive grasping hand | ☐ No agarrar con la mano repetidamente | |
| ☐ Limited use of right hand | ☐ Uso limitado de mano derecha | |
| ☐ Limited use of left hand | ☐ Uso limitado de mano izquierda | |
| ☐ No prolonged sitting | ☐ No estar sentado por mucho tiempo | |
| ☐ No prolonged standing or walking | ☐ No estar parado o caminar por mucho tiempo | |
| ☐ Keep clean and dry | ☐ Debe de mantener limpio y seco | |
| ☐ Limit to hours on keyboard | ☐ Limitado a horas usando tablero | |
| ☐ Allow stretching breaks minutes every hour | ☐ Permita descanso pare estirarse minutos cada hora | |

☐ May work up to hours per day hours per week
☐ Other/Otro:

If the employer is unable to accommodate the above-stated modified activity/work restrictions, the patient will automatically be on temporary total disability.

*Kevin Saksa PA*

Kevin Saksa PA
*This has been electronically signed by Kevin Saksa PA on 02-07-2022.*

TIEN1400

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

# EXHIBIT 2

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

| | |
|---|---|
| **From:** | Angela Tien <angelatien.sf@gmail.com> |
| **Sent:** | Monday, February 7, 2022 9:12 PM |
| **To:** | ByunRiedel, Nancy |
| **Subject:** | [EXTERNAL] Max LOA Letter |
| **Attachments:** | Max LOA.pdf |

This message was sent from outside of United Airlines. Please do not click links or open attachments unless you recognize the sender and know that the content is safe.

Dear Nancy,

As you know, I have been on an approved medical leave since January 25, 2019 and I was told that If I remained medically unable to return to work I would be separated from the company on 1/25/2023.

Therefore, I was very surprised when, on 1/27/2022, an inflight supervisor in SFO, Talia, called to inform me I had reached the maximum LOA on 1/25/2022 so I was administratively separated by United.

I told her there must be a mistake. But Talia reiterated that the company has sent me a Max LOA letter before. I asked her why there was no reminder or any other notifications, she replied the contract requires the company only has to inform the employee once, which I was already informed about the maximum LOA date by a company letter. I clearly remember the timeframe on the Max LOA letter stated 2023, Talia asked me to send her a copy of that letter, which I did. See attached 1/25/19 letter.

The next day, Talia called to tell me that the higher-up said it was solely an employee's responsibility to find the accurate date regardless there was a mistake on the company letter. The higher-up said the starting date was listed correctly. I have not had a doubt on any company issued letters. As the subject of that letter was Max LOA, the most important information should be the end date.

I do not know why United mistakenly told me I had until 1/25/23 to return to work, but I believed that, and I think it was fair to at least provide a chance to fix the situation together. Since United made a mistake about this, the company should have warned me about it and given me an opportunity to return by 1/25/22. I was simply terminated by surprise on 1/25/22, and I wasn't told about it until two days later. No one even asked me if I was medically able to return to work or gave me any opening to come back. This made it impossible for me to come back from my medical leave.

Had I been asked to return to work by 1/25/22, I would have agreed. I can return to my original position with some accommodation for my hand injury, or to another position where I am qualified. Sedgwick changed my adjuster in September 2021. It might be the reason that caused the delay to the doctor's requests for the hand surgery. Doctors believed I could return to work as a flight attendant without any restrictions after the cyst removal surgery, but I can work with restrictions that won't interfere with my job or maybe another position now.

We now know United's letter made a big mistake and was the cause of this matter. Please kindly reconsider the situation, allowing me to return to work now based on my doctor's current recommendations, at least giving me a chance to apply for a job with accomodation at this point.

Thank you for your time.

Sincerely,

1

UNITED000060

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

Angela Tien
U308222

UNITED000061

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

# EXHIBIT 3

Docusign Envelope ID: D6899E7C-7078-4AF9-AC5A-FB0B3F798E6D

CCS - Pay Register

## Pay Register

🖨 Print

ⓘ All flight information is real-time and preliminary. Your Pay Register is updated automatically as pairings are completed. Your current bid month's activity is paid in the following month. Within 5 business days after the bid period ends, your Pay Register is pending final pay audit. Once the final pay audit is complete, your Pay Register will be final. Please refer to the final version of the Pay Register 5 business days after the bid period closes.

🖨 Print

| Pay Period: October 2018 ⌄ | Time | Amount | |
|---|---|---|---|
| Sick Hours Used | 0:00 | $0.00 | |
| General Sick Hours Remaining | 244:00 | | |
| Pay Seniority Occupational Hours Used | 0:00 | $0.00 | 06/06/13 |
| Seniority Occupational Hours Remaining | 248:00 | | 19009 |
| Base Pay Rate $ | | | 41.62 |
| Description | Time | | 6 |
| Pay Longevity | | | |
| Awards Quarterly Paid Activity: | 253:15 | | LS |
| Awarded Sick Threshold: F | | | LH |
| Language Specialty Current Month's Accrual: Sick | 4:00 | | |
| Current Month's Accrual: Occupational Injury | 4:00 | | |

Summary     Details

| Flight Advance | Time | Amount |
|---|---|---|
| Paid on the 1st of the month | 49:42 | $2,068.51 |

| Total Month's Pay | Amount |
|---|---|
| (Includes Flight Advance) | $7,225.39 |
| Guarantee | $6,711.18 |
| Add Pay (Base Pay Rates) | $0.00 |

https://ccs.ual.com/CCS-Pay/PayRegister?SKEY=032e167af0aa44a451f96e60b1e76ec1948198425&CMS=...    9/14/2019

CCS - Pay Register

| Org Chart | Domestic: 847-700-5800 () |
|---|---|
| (https://dmshr.ual.com/hr/orgchart/web/orgchar t.asp) | Toll Free: 800-255-5801 () |
| | International: 001-847-700-5800 () |

### Sick Pay     ✕

🖨 Print

| Description | Time | Amount |
|---|---|---|
| Sick Hours Used | 0:00 | $0.00 |
| Sick Hours Remaining | 244:00 | |
| Occupational Hours Used | 0:00 | $0.00 |
| Occupational Hours Remaining | 248:00 | |

| Description | Time |
|---|---|
| Quarterly Paid Activity: | 253:15 |
| Sick Threshold: F | |
| Current Month's Accrual: Sick | 4:00 |
| Current Month's Accrual: Occupational Injury | 4:00 |

https://ccs.ual.com/CCS-Pay/PayRegister?SKEY=032e167af0aa44a451f96e60b1e76ec1948198425&CMS=...    9/14/2019

---

CCS - Pay Register

## Pay Register

🖨 Print

ⓘ All flight information is real-time and preliminary. Your Pay Register is updated automatically as pairings are completed. Your current bid month's activity is paid in the following month. Within 5 business days after the bid period ends, your Pay Register is pending final pay audit. Once the final pay audit is complete, your Pay Register will be final. Please refer to the final version of the Pay Register 5 business days after the bid period closes.

🖨 Print

| Pay Period: January 2019 ⌄ | Time | Amount | |
|---|---|---|---|
| Sick Hours Used | 0:00 | $0.00 | |
| General Sick Hours Remaining | 214:38 | | |
| Pay Seniority Occupational Hours Used | 0:00 | $0.00 | 06/06/13 |
| Seniority Occupational Hours Remaining | 2:00 | | 19449 |
| Base Pay Rate $ | | | 41.62 |
| Description | Time | | 6 |
| Pay Longevity | | | |
| Awarded Quarterly Paid Activity: | 87:27 | | FA |
| Awarded Sick Threshold: P | | | LH |
| Language Specialty Current Month's Accrual: Sick | 2:00 | | |
| Current Month's Accrual: Occupational Injury | 2:00 | | |

Summary     Details

| Flight Advance | Time | Amount |
|---|---|---|
| Paid on the 1st of the month | :00 | $0.00 |

| Total Month's Pay | Amount |
|---|---|
| (Includes Flight Advance) | $0.00 |
| Guarantee | $0.00 |
| Add Pay (Base Pay Rates) | $0.00 |

https://ccs.ual.com/CCS-Pay/PayRegister?SKEY=032e167af0aa44a451f96e60b1e76ec1948198425&CMS=...    9/14/2019

CCS - Pay Register

| Org Chart | Domestic: 847-700-5800 () |
|---|---|
| (https://dmshr.ual.com/hr/orgchart/web/orgchar t.asp) | Toll Free: 800-255-5801 () |
| | International: 001-847-700-5800 () |

### Sick Pay     ✕

🖨 Print

| Description | Time | Amount |
|---|---|---|
| Sick Hours Used | 0:00 | $0.00 |
| Sick Hours Remaining | 214:38 | |
| Occupational Hours Used | 0:00 | $0.00 |
| Occupational Hours Remaining | 2:00 | |

| Description | Time |
|---|---|
| Quarterly Paid Activity: | 87:27 |
| Sick Threshold: P | |
| Current Month's Accrual: Sick | 2:00 |
| Current Month's Accrual: Occupational Injury | 2:00 |

https://ccs.ual.com/CCS-Pay/PayRegister?SKEY=032e167af0aa44a451f96e60b1e76ec1948198425&CMS=...    9/14/2019

---

CCS - Pay Register

| Add Pay (Other Rates) | | $0.00 |
|---|---|---|
| Reserve Override | | $0.00 |

| Minimum | | Guarantee | | Credit | ✕ |
|---|---|---|---|---|---|
| Sick Pay | | | | | |
| Time | Amount | Time | Amount | Time | |
| :00 | $0.00 | :00 | $0.00 | | |

🖨 Print

| Description | Time | Amount |
|---|---|---|
| **Sick Pay** | | |
| Sick Pay is the greatest of minimum and guarantee | 0:00 | $0.00  View Details |
| Sick Hours Remaining | 214:38 | |
| **Per Diem Pay (Not included in total month pay)** | | |
| Occupational Hours Used | 0:00 | $0.00 |
| Occupational Hours Remaining | 2:00 | |
| **Taxable** | | |
| Domestic Tax Per Diem | Time | $0.00 |
| International Tax Per Diem | | $0.00 |
| **Non Taxable** Quarterly Paid Activity: | 87:27 | |
| Domestic Non Tax Per Diem | | $0.00 |
| International Non Tax Per Diem | | $0.00 |
| Current Month's Accrual: Sick | 2:00 | |
| Current Month's Accrual: Occupational Injury | 2:00 | |

▾ Overtime Pay

Submit a pay request for positions that were unscheduled or not bid awarded.

| All Other Exceptions | Purser or International Purser | Holding Pay |
|---|---|---|

### Quick Links

Flying Together
(https://flyingtogether.ual.com/web/index.jsp)

### Contact Us for Technical Issues

United Service Desk

https://ccs.ual.com/CCS-Pay/PayRegister?SKEY=032e167af0aa44a451f96e60b1e76ec1948198425&CMS=...    9/14/2019

**TIEN1705**